# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, INC, *et al.*, | * |
| | * |
| *Plaintiffs*, | * |
| | *    No. 1:19-CV-02228-ELH |
| v. | * |
| LINDA H. LAMONE, *et al.*, | * |
| | * |
| *Defendants*. | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT
Assistant Attorney General
Bar No. 25300
ANDREA W. TRENTO
Assistant Attorney General
Bar No. 28816
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6472
jbernhardt@oag.state.md.us
atrento@oag.state.md.us

Attorneys for Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

Maryland's Voting System ............................................................................. 3

The 2016 Primary Election ............................................................................. 6

The 2016 General Election and 2018 Primary and General Elections .................... 8

2019 Legislative Efforts to Require Universal Use of BMDs ............................. 10

The 2020 Election BMD Policy ..................................................................... 12

The Filing of the Complaint .......................................................................... 13

ARGUMENT ..................................................................................................... 15

I.    LEGAL STANDARD ................................................................................. 15

II.   PLAINTIFFS FAIL TO STATE CLAIMS FOR VIOLATION OF EITHER THE
      AMERICANS WITH DISABILITIES ACT OR THE REHABILITATION ACT .................... 15

      A.    Any Claims Arising from the 2016 Primary Election Are Barred by
            the Applicable Three-Year Statute of Limitations.. ..................................... 18

      B.    Plaintiffs Fail to Allege that they Were Denied Meaningful Access to
            the Right Vote Privately and Independently in the 2016 and 2018
            Elections.. ..................................................................................... 19

      C.    Plaintiffs' Proposed Accommodation is Unreasonable ............................... 23

      D.    Plaintiffs' Proposed Accommodation Would Effect a Fundamental
            Alteration of Maryland's Voting Program ................................................. 26

III.  PLAINTIFFS' CLAIMS ARE MOOT ........................................................... 28

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

Page

## Cases

*Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*,
   929 F. Supp. 2d 502 (D. Md. 2013)................................................................. 10

*Alexander v. Choate*,
   469 U.S. 287 (1985) ....................................................................................... 16

*Allen v. Morris*,
   No. 4:93-CV-00398-BSM-JWC, 2010 WL 1382112 (E.D. Ark. Jan. 6, 2010),
   *adopted by*, 2010 WL 1382116 (E.D. Ark. Apr. 2, 2010)............................. 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 15, 22

*A Soc'y Without A Name v. Virginia*,
   655 F.3d 342 (4th Cir. 2011) .................................................................... 15, 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 15

*Blankenship v. Manchin*,
   471 F.3d 523 (4th Cir. 2006) ......................................................................... 15

*Brown v. Ocwen Loan Servicing, LLC*,
   PJM–14–3454, 2015 WL 5008763 n.3 (D. Md. Aug. 20, 2015) ..................... 7

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ......................................................................... 16

*Disabled in Action v. Board of Elections of N.Y.*,
   752 F.3d 189 (2d Cir. 2014) ........................................................ 16, 17, 19, 21

*Doe v. University of Md. Med. Sys. Corp.*,
   50 F.3d 1261 (4th Cir. 1995) ......................................................................... 16

*Foley v. City of Lafayette, Ind.*,
   359 F.3d 925 (7th Cir. 2004) .................................................................... 21, 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ................................................................................ 28

*Halpern v. Wake Forest Univ. Health Scis.,*
    669 F.3d 454 (4th Cir. 2012) ...................................................... 18, 24, 27

*Harper v. Cnty. of Merced,*
    No. 118CV00562LJOSKO, 2018 WL 5880786 (E.D. Cal. Nov. 8, 2018) .................. 24

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003) ........................................................................ 24

*J.D. v. Georgetown Indep. Sch. Dist.,*
    No. A-10-CA-717 LY, 2011 WL 2971284 (W.D. Tex. July 21, 2011) ....................... 21

*Massey v. Ojaniit,*
    759 F.3d 343 (4th Cir. 2014) ...................................................................... 15

*McElwee v. Cnty. of Orange,*
    700 F.3d 635 (2d Cir. 2012) ...................................................................... 16

*Montalvo v. Radcliffe,*
    167 F.3d 873 (4th Cir. 1999) ...................................................................... 27

*Nat'l Fed'n of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ...................................................... 18, 24, 27

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) ...................................................................... 26

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001) ................................................................................ 27

*Porter v. Clarke,*
    852 F.3d 358 (4th Cir. 2017) ...................................................................... 28

*Radaszewski ex rel. Radaszewski v. Maram,*
    383 F.3d 599 (7th Cir. 2004) ...................................................................... 27

*Reyazuddin v. Montgomery Cnty., Md.,*
    789 F.3d 407 (4th Cir. 2015) ...................................................................... 25

*Semenova v. Maryland Transit Admin.*,
    845 F.3d 564 (4th Cir. 2017) ............................................................... 17, 18

*Seremeth v. Board of Cnty. Comm'rs Frederick Cnty.*,
    673 F.3d 333 (4th Cir. 2012) ...................................................................... 16

*Stewart v. City of Baltimore*,
    No. CIV.A. RDB-14-03567, 2015 WL 5604279 (D. Md. Sept. 23, 2015) .................. 22

*Strickland-Lucas v. Citibank, N.A.*,
    256 F. Supp. 3d 616 (D. Md. 2017) ............................................................... 7

*Tanner v. Wal-Mart Stores, Inc.*,
    No. 99-44-JD, 2000 WL 620425 (D.N.H. Feb. 8, 2000) ................................... 21

*Telco Commc'ns, Inc. v. Carbaugh*,
    885 F.2d 1225 (4th Cir. 1989) .................................................................... 28

*Thomas v. Westchester Cnty. Health Care Corp.*,
    232 F. Supp. 2d 273 (S.D.N.Y. 2002) ....................................................... 4, 7

*Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*,
    382 F.3d 1276 (11th Cir. 2004) .................................................................. 28

*Whye v. Concentra Health Servs., Inc.*,
    No. CIV.A. ELH-12-3432, 2013 WL 5375167 (D. Md. Sept. 24, 2013), *aff'd*,
    583 F. App'x 159 (4th Cir. 2014) ................................................................. 4

## Statutes and Other Legislative Materials

29 U.S.C. § 794 ............................................................................................... 2

29 U.S.C. § 794(a) ......................................................................................... 16

42 U.S.C. § 12131 ............................................................................................ 1

42 U.S.C. § 12132 ......................................................................................... 16

52 U.S.C. § 21081(a)(3) ............................................................................. 4, 22

Md. Code Ann., Cts. & Jud. Procs. § 5-101 ................................................... 17

Md. Code Ann., Elec. Law § 9-102(a)(1)–(3) .......................................................................... 3

Md. Code Ann., Elec. Law § 9-102(d)(1)(vii) ......................................................................... 3

Md. Code Ann., Elec. Law § 9-102(f) ..................................................................................... 4

Md. Code Ann., Elec. Law § 9-102(f)(1) ................................................................................ 5

Md. Code Ann., Elec. Law § 9-102(g)(1)–(2) ......................................................................... 4

Md. Code Ann., Elec. Law § 10-206(e)(1)–(2) ....................................................................... 5

Dep't of Legislative Servs., Md. Gen. Assembly, *Fiscal and Policy Note:*
   *H.B. 565* (Feb. 17, 2019),
   http://mgaleg.maryland.gov/2019RS/fnotes/bil_0005/hb0565.pdf ...................... 11, 25

H.B. 565, 2019 Sess. (Md.)*,*
   http://mgaleg.maryland.gov/2019RS/bills/hb/hb0565f.pdf ........................................ 10

Md. House of Delegates, Ways & Means Comm., *Hr'g on H.B. 565*
   (Feb. 19, 2019) (live testimony), http://mgahouse.maryland.gov/mga/play/1a0a5140-
   4f25-43c2-a4ff-e761d2eee0b7/?catalog/03e481c7-8a42-4438-a7da-
   93ff74bdaa4c&playfrom=2643000 ........................................................................... 11

Md. House of Delegates, Ways & Means Comm., *Hr'g on H.B. 565*
   (Feb. 19, 2019) (written testimony) .................................................................... 11, 12

Md. Senate, Educ., Health & Envtl. Aff. Comm., *Hr'g on S.B. 363*
   (Feb. 28, 2019) (live testimony), http://mgahouse.maryland.gov/mga/play/ebaa7830-
   8666-4eac-a220-9f5bab8ead97/?catalog/03e481c7-8a42-4438-a7da-
   93ff74bdaa4c&playfrom=5583000 ........................................................................... 11

S.B. 363, 2019 Sess. (Md.)*,*
   http://mgaleg.maryland.gov/2019RS/ bills/sb/sb0363f.pdf ........................................ 10

## Regulations and Other Administrative Materials

28 C.F.R. § 35.130(b)(7) ............................................................................................. 17, 26

28 C.F.R. § 35.133(a)–(b) ................................................................................................. 22

28 C.F.R. § 35.133(b) ............................................................................... 22

98 Md. Op. Att'y Gen. 152 (Dec. 18, 2013) ............................................ 3, 5, 6

Md. State Bd. of Elections, *SBE Policy 2017-1: Contingency Plans for the
    2018 Elections*, available at pp. 78-82 of
    https://elections.maryland.gov/about/meeting_materials/December_2017.pdf ..... 4, 22

Md. State Bd. of Elections, *Meeting Minutes – July 25, 2019*,
    https://elections.maryland.gov/pdf/minutes/2019_07.pdf .................................... 13, 29

Md. State Bd. of Elections, *Meeting Minutes – June 27, 2019*,
    https://elections.maryland.gov/pdf/minutes/ 2019_06.pdf ............................ 13, 25, 29

Md. State Bd. of Elections, *Meeting Minutes – March 4, 2016*,
    https://elections.maryland.gov/pdf/minutes/2016_03_04.pdf ..................................... 7

Md. State Bd. of Elections, *Meeting Minutes – May 16, 2019*,
    https://elections.maryland.gov/pdf/minutes/2019_05.pdf ..................................8-9, 12

Md. State Bd. of Elections, *Meeting Minutes – Oct. 26, 2017*,
    https://elections.maryland.gov/ pdf/minutes/2017_10.pdf .......................................... 9

Md. State Bd. of Elections, *Meeting Minutes – Sept. 8, 2016*,
    https://elections.maryland.gov/pdf/minutes/2016_09_08.pdf ..................................... 8

Md. State Bd. of Elections, *New Voting System – What You Need to Know*,
    https://elections.maryland.gov/voting_system/index.html ........................................... 6

Md. State Bd. of Elections, *Number of Precincts and Polling Places by County*,
    https://elections.maryland.gov/elections/ 2018/numberofprecinctsbycountygeneral
    .pdf .......................................................................................................................... 9

Md. State Bd. of Elections, *Voting—Introduction*,
    https://elections.maryland.gov/voting/index.html .................................................... 20

## Other Authorities

*Trone v. Maryland State Bd. of Elections*,
    No. C-02-CV-16-000741, Pet. for Judicial Review & TRO
    (Md. Cir. Ct., A.A. Cnty.,  Mar. 4, 2016).................................................................. 6-7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, INC, *et al.*, | \* |
| | \* |
| *Plaintiffs*, | \* |
| | No. 1:19-CV-02228-ELH |
| v. | \* |
| LINDA H. LAMONE, *et al.*, | \* |
| | \* |
| *Defendants*. | \* |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

Plaintiffs the National Federation of the Blind, Inc., the National Federation of the Blind of Maryland, and three individual blind voters ask this Court to order the members of the Maryland State Board of Elections and the State Administrator of Elections (collectively, the "State Board") to change the way that Marylanders vote. Specifically, they seek to require the State to "move to a fully integrated voting system" in which all voters are "defaulted" to use accessible "ballot marking devices" ("BMDs"), whereas currently most voters choose to mark their ballots by hand. *See* Compl. [Dkt No. 1] ¶ 5. The Court should deny this requested relief and dismiss plaintiffs' claims.

First, plaintiffs fail to state claims for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("Title II") or Section 504 of the Rehabilitation

Act, 29 U.S.C. § 794 ("Section 504"). Their claims arising from the 2016 primary election are barred by the statute of limitations applicable to claims arising under Title II or Section 504 in Maryland because the allegedly actionable conduct occurred more than three years ago. And plaintiffs otherwise fail to plead facts that, when taken as true in light of legislative and administrative records of which this Court may take judicial notice, give rise to a plausible claim that disabled voters were denied meaningful access to the right to vote privately and independently during the 2016 general election and 2018 primary and general elections. Moreover, even if plaintiffs were able to plead a prima facie claim that their rights under Title II or Section 504 were violated (though they are not), their proposed accommodation of requiring *every voter* to default to using the BMD is unreasonable on its face and, if ordered by the Court, would fundamentally alter Maryland's voting program, which neither Title II nor Section 504 require of defendants. Accordingly, plaintiffs fail to state claims under Title II or Section 504 upon which relief can be granted, and those claims should be dismissed.

Second, plaintiffs' claims should be dismissed on the separate and independent ground that they are moot. They are moot because the State Board has recently adopted a new BMD policy for the 2020 elections that remedies the circumstances under the prior policy that allegedly form the basis for plaintiffs' claims. The new policy increases the number of voters per precinct required to use the BMDs from two to five, requires poll workers to use neutral language in presenting the BMD as an equally valid option for voters to use to mark their ballots (as opposed to identifying the BMD as an "accessible" device that was available "if needed"), increases training of poll workers around the BMDs, and

authorizes local elections boards to deploy additional BMDs to polling places without obtaining State Board approval. Accordingly, the allegedly unlawful behavior identified in plaintiffs' Complaint is not reasonably likely to occur. Therefore, plaintiffs' claims should be dismissed as moot.

## BACKGROUND

### Maryland's Voting System

Prior to 2016, Maryland voters cast their votes at polling places principally via "direct recording electronic" ("DRE") unit, a voting machine that provided for the voting and tabulation of votes directly by a computerized touchscreen without the need for paper ballots. *See* Compl. ¶ 20; 98 Md. Op. Att'y Gen. 152, 154 (Dec. 18, 2013). The DRE units were equipped with accessibility features, and thus all voters cast their ballots on election day in the same manner. Compl. ¶ 20. The DRE units did not, however, produce "a 'paper trail' that would allow for independent verification of the accuracy of the vote tabulation." 98 Md. Op. Att'y Gen. at 155.

As a result, the Maryland General Assembly enacted legislation directing the State Board to procure a voting system that would produce a "voter-verifiable paper record," Md. Code Ann., Elec. Law ("Elec. Law") § 9-102(d)(1)(vii) (LexisNexis 2017); Compl. ¶ 21, defined to mean "a paper ballot" that is either "prepared by the voter for the purpose of being read by a precinct-based optical scanner," "mailed to the applicable local board," or "created through the use of a ballot marking device." Elec. Law § 9-102(a)(1)–(3). At the same time, the legislature required any voting system selected by the State Board to:

(1) provide access to voters with disabilities that is equivalent to access afforded voters without disabilities without creating a segregated ballot for voters;

(2) ensure the independent, private casting, inspection, verification, and correction of secret ballots by voters with disabilities in an accessible media by both visual and nonvisual means, including synchronized audio output and enhanced visual display; and

(3) comply with both the Americans with Disabilities Act, P.L. 101-336, and the Help America Vote Act ["HAVA"], P.L. 107-252, including accessibility standards adopted as part of the Voluntary Voting System Guidelines pursuant to the Help America Vote Act.

*Id.* § 9-102(f).  Consistent with the requirements of HAVA, the legislature required the State Board to ensure that "[a]t least one voting system in each polling place on election day shall provide access for voters with disabilities," and that "adequate backup equipment is available and contingency plans are established to ensure compliance" with that requirement.  *Id.* § 9-102(g)(1)–(2); *see* 52 U.S.C. § 21081(a)(3) (requiring "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place").[1]  In addition, the law required that all election judges be trained on use of the voting systems, including "(1) all features of the voting

---

[1] Maryland's "contingency plan" during the period covered by plaintiffs' allegations required that voting equipment such as the BMD must either be functioning or replaced within two hours of the equipment failing or becoming inoperable or unavailable.  *See* Md. State Bd. of Elections, *SBE Policy 2017-1: Contingency Plans for the 2018 Elections*, available at pp. 78-82 of: https://elections.maryland.gov/about/meeting_materials/December_2017.pdf (last visited Sept. 3, 2019).  These administrative records are subject to judicial notice and may be considered by the Court without converting this motion to dismiss to one for summary judgment.  *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002); *Whye v. Concentra Health Servs., Inc.*, No. CIV.A. ELH-12-3432, 2013 WL 5375167, at *5 (D. Md. Sept. 24, 2013), *aff'd*, 583 F. App'x 159 (4th Cir. 2014).

system that provide access to voters with disabilities; and (2) the rights of voters with disabilities." Elec. Law § 10-206(e)(1)–(2).

The legislature did not define what constitutes a "segregated ballot" for purposes of § 9-102(f)(1). As the State Board was evaluating voting systems, the State Administrator requested an opinion from Maryland's Attorney General regarding the meaning of the term. *See* 98 Md. Op. Att'y Gen. at 152. The Attorney General issued his opinion in December 2013, concluding that "the General Assembly, by prohibiting the use of a 'segregated ballot,' intended to prevent the certification of a voting system that, for voters with disabilities, creates ballots that are physically set apart or can be easily distinguished from the ballots cast by other voters." *Id.* at 166. As a result, the State Board had "three options for certifying voting systems that would not result in creation of a segregated ballot." *Id.* It could:

(1) "require all voters to use accessible machines";

(2) "certify an accessible voting system for the sole use of disabled voters so long as (a) that system produces ballots that are identical to the ballots produced by non-accessible machines, and (b) all ballots, from whatever machine, are cast, counted, and stored together"; or

(3) "certify any accessible system so long as it establishes polling-place procedures to ensure that enough non-disabled voters will use the accessible system that the ballots of disabled voters cannot be identified as such."

*Id.* According to the Attorney General, "[a]ny one of these approaches would" meet the requirements of the law, and "[w]hich approach to take, and how to implement that approach, [was] within [the State Board's] statutory discretion to determine." *Id.*

In 2014, the State Board selected and certified a new voting system for use beginning with the 2016 primary election. *See* Md. State Bd. of Elections, *New Voting System – What You Need to Know*, https://elections.maryland.gov/voting_system/index.html ("*New Voting System*") (last visited Sept. 3, 2019). The system features the use of hand-marked paper ballots as well as an accessible ballot marking device that electronically marks and then prints paper ballots. *See id.*; Compl. ¶¶ 3, 23. Both types of ballots are then tabulated by optical scanners. *See New Voting System*. Both types of ballots are also of different size, shape, and content. Compl. ¶ 3.[2]

**The 2016 Primary Election**

The certification of a new voting system involving the use of both hand-marked and BMD-printed ballots of different sizes meant that the State Board needed to "establish[] polling-place procedures to ensure that enough non-disabled voters will use the accessible system that the ballots of disabled voters cannot be identified as such." 98 Md. Op. Att'y Gen. at 166. The State Board's considerations included concerns that "voters may be confused about how to move between screens on the BMD and that candidates further down the ballot could be prejudiced by not appearing on the initial contest screen." Compl. ¶ 43. Indeed, the State Board was sued by at least one candidate for this very reason. *See Trone v. Maryland State Bd. of Elections*, No. C-02-CV-16-000741, Pet. for Judicial

---

[2] Whereas the pre-printed, hand-marked paper ballot lists all of the candidates in the contests at issue, the ballot printed by the BMD encodes the voter's selections on a barcode and only lists the candidates selected by the voter for verification purposes.

Review & TRO (Md. Cir. Ct. Mar. 4, 2016) (seeking TRO against printing of ballot due to appearance of candidate's name on "second screen" of the candidate line-up for multi-candidate contest on the BMD, allegedly in violation of statutory requirement that the ballot "present all candidates . . . in a fair and nondiscriminatory manner") (attached hereto as Ex. B).[3]

For the 2016 primary election, the State Board settled on a policy under which "a minimum of 2 voters a day at each early voting center" during early voting and "at each precinct" on election day "will use the ballot marking device to mark their ballots."  Md. State Bd. of Elections, *Meeting Minutes – March 4, 2016*, at 2, https://elections.maryland.gov/pdf/minutes/2016_03_04.pdf (last visited Sept. 3, 2019).[4] The State Board made clear that "[a]ny voter may ask to use the ballot marking device," but did not require poll workers to advise all voters of its availability.  *Id.*  Although plaintiffs did not include data in their Complaint regarding the number of precincts that failed to meet the two-voter minimum for BMD usage in the 2016 primary election, they

---

[3] "[I]n the context of a motion to dismiss, '[a] court may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment.'" *Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 623 (D. Md. 2017) (quoting *Brown v. Ocwen Loan Servicing, LLC*, PJM–14–3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015)).

[4] In addition to being administrative records that are subject to judicial notice, *see Thomas*, 232 F. Supp. 2d at 276, the State Board's meeting minutes articulating the BMD policy that is the subject of this lawsuit may be considered by this Court in ruling on this motion to dismiss for the independent reason that the plaintiffs expressly refer to that policy in their Complaint. *See Strickland-Lucas*, 256 F. Supp. 3d at 622 (holding that a court may consider documents "explicitly incorporated into the complaint by reference" in ruling on a motion to dismiss).

allege that 50% of blind Maryland voters who responded to an NFB survey in 2016—almost certainly relating to that year's primary election, and not the general election[5]—reported that "poll workers failed to inform them that they had the option of voting using a BMD," 28% reported that "poll workers failed to provide instructions on how to use the BMD," and "nearly 40% reported that poll workers had problems setting up or activating the BMD."  Compl. ¶ 45.

**The 2016 General Election and 2018 Primary and General Elections.**

Following the 2016 primary election, prompted by several advocates (including plaintiffs NFB and NFB-MD), the State Board altered its BMD policy to require poll workers to read the following statement to all voters who check-in to vote at polling places: "If needed, there is an accessible way to read or mark your ballot."  *9/8/16 State Board Meeting Minutes*, at 3.  The policy also required poll workers to offer to explain the accessibility features of the BMD to any voter who requested to use it, and provided that only one BMD would be deployed to each early voting center and polling place unless a local board of elections sought and obtained approval from the State Board for the deployment of additional units.  *See* Md. State Bd. of Elections, *Meeting Minutes – May 16, 2019*, at 11, https://elections.maryland.gov/pdf/minutes/2019_05.pdf ("*5/16/99 State*

---

[5] The survey data alleged in the Complaint corresponds to survey results regarding the 2016 primary election presented by NFB representatives at the State Board meeting on September 9, 2016.  *See* Md. State Bd. of Elections, *Meeting Minutes – Sept. 8, 2016*, at 2, https://elections.maryland.gov/pdf/minutes/2016_09_08.pdf (last visited Sept. 3, 2019) (the "*9/8/16 State Board Meeting Minutes*").  At that meeting, NFB reported that 60 voters responded to its survey, of which 63% (*i.e.*, 38 respondents) were blind.  *Id.*

*Board Meeting Minutes*") (last visited Sept. 3, 2019) (summarizing BMD policy in place between 2016 and 2018).   Plaintiffs allege that in the 2018 general election under these policies, there were 34 precincts statewide in which only one ballot printed from a BMD was cast, Compl. ¶ 28, or approximately 1.7% of the 1,991 precincts that are active statewide.  *See* Md. State Bd. of Elections, *Number of Precincts and Polling Places by County*,                              https://elections.maryland.gov/elections/ 2018/numberofprecinctsbycountygeneral.pdf (last visited Sept. 3, 2019).

The State Board retained the BMD policy in place for the 2016 general election for both the 2018 primary and 2018 general elections, as its concerns regarding candidate placement and navigation between screens were not expected to be remedied by the BMDs' manufacturer in time for the elections.  *See* Md. State Bd. of Elections, *Meeting Minutes – Oct. 26, 2017*, at 8, https://elections.maryland.gov/ pdf/minutes/2017_10.pdf (last visited Sept. 3, 2019).  Plaintiffs allege that in the 2018 primary election, there were 40 precincts statewide in which only one ballot printed from a BMD was cast, Compl. ¶ 30, approximately 2.0% of active statewide precincts.  And plaintiffs allege that in the 2018 general election, there were 22 precincts statewide in which only one ballot printed from a BMD was cast (1.1%), and 66 precincts in which no ballot printed from a BMD was cast (3.3%).

Plaintiffs also allege specific instances across these elections in which individual voters encountered difficulty marking their ballots via the BMD, or had their privacy compromised as a result of the State Board's policy.  *See generally* Compl. ¶¶ 37-42. Plaintiff Joel Zimba alleges that he was the only voter who used a BMD at his precinct in

the 2018 primary election, and thus his ballot was "readily identifiable to the poll workers" at his precinct.  Compl. ¶ 37.  Plaintiff Ruth Sager alleges that the single BMD deployed at her polling place during the 2018 general election "was broken," and thus she had to enlist the help of two poll workers in order to cast a hand-marked paper ballot and "spent approximately 50 minutes voting, even though there was no line." *Id.* ¶ 39.  Plaintiff Marie Cobb alleges that in both the 2016 and 2018 general elections poll workers at her precinct did not know how to use the BMD, and that on both occasions Ms. Cobb was required "to set up and figure out how to use the machine on her own" (or with the help of a relative), requiring her "to spend between a half an hour to an hour trying to vote." *Id.* ¶ 41.

### 2019 Legislative Efforts to Require Universal Use of BMDs

Following the 2018 general election, the General Assembly considered legislation which would have required "each voter" to "use a ballot marking device that is accessible to voters with disabilities," beginning with the 2022 elections, *see* Compl. ¶ 33; H.B. 565, 2019 Sess. (Md.), http://mgaleg.maryland.gov/2019RS/bills/hb/hb0565f.pdf (last visited Sept. 3, 2019).[6]  The fiscal impact of the legislation was estimated to be $12 million annually, split evenly between the State of Maryland and the counties, arising from the costs of "leas[ing] sufficient numbers of ballot marking devices (approximately 18,000 statewide) . . . , plus transportation costs for the [BMDs] to and from voting locations."

---

[6] An identical bill was cross-filed in the Maryland Senate as Senate Bill 363.  *See* S.B. 363, 2019 Sess. (Md.), http://mgaleg.maryland.gov/2019RS/ bills/sb/sb0363f.pdf (last visited Sept. 3, 2019).  The legislative history of H.B. 565 and S.B. 363 may be considered by this Court without converting this motion to one for summary judgment. *See Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 512 (D. Md. 2013).

Dep't of Legislative Servs., Md. Gen. Assembly, *Fiscal and Policy Note: H.B. 565* (Feb. 17, 2019), at 1, 2, http://mgaleg.maryland.gov/2019RS/fnotes/bil_0005/hb0565.pdf (last visited Sept. 3, 2019) ("*HB 565 Fiscal Note*").   In hearings before committees of the Maryland Senate and House of Delegates, lawmakers heard testimony favoring and opposing the legislation.[7]   In general, supporters argued that the State Board's BMD policy for the 2016 and 2018 elections deprived disabled voters of an equal and independent voting experience, and that only a universal system in which all in-person voters used the same voting technology — or, at minimum, in which all voters cast their votes using ballots that were identical in appearance — would ensure true equality in voting.   *See generally* Md. House of Delegates, Ways & Means Comm., *Hr'g on H.B. 565*, at 3-7, 9, 16-32, 37 (Feb. 19, 2019) (written testimony) (attached hereto as Ex. A).   Jonathan Lazer, Professor of Information Studies at the University of Maryland, testified regarding the policies in several other jurisdictions that use the same model BMD that is used by Maryland, and concluded that the ballot secrecy problems encountered by Maryland are not encountered by other jurisdictions, where broader BMD use by voters is accomplished because "voters

---

[7] *See generally* Md. House of Delegates, Ways & Means Comm., *Hr'g on H.B. 565* (Feb. 19, 2019) (live testimony), http://mgahouse.maryland.gov/mga/play/1a0a5140-4f25-43c2-a4ff-e761d2eee0b7/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=2643000 (last visited Sept. 3, 2019); Md. Senate, Educ., Health & Envtl. Aff. Comm., *Hr'g on S.B. 363* (Feb. 28, 2019) (live testimony), http://mgahouse.maryland.gov/mga/play/ebaa7830-8666-4eac-a220-9f5bab8ead97/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=5583000 (live testimony) (last visited Sept. 3, 2019).

are given the neutral option to vote using [the BMD], are encouraged to vote using [the BMD], or are only allowed to vote using [the BMD]." *Id.* at 26.

Opponents, on the other hand, argued that the $12 million in additional costs associated with the bill were prohibitive, *see* Ex. A at 2 (Maryland Association of Counties), or that the bill's requirement that all voters use the BMDs compromised election security by increasing reliance machine-based technology posing ballot-security risks that are not present with paper ballots, *see id.* at 10-15 (SAVEourVOTES: Secure, Accessible, Verifiable Elections for Maryland; Common Cause of Maryland). Opponents also noted the navigation concerns that prompted the adoption of the State Board's BMD policy, as well as the possibility of disenfranchisement caused by longer lines at the polls resulting from the universal use of BMDs. *Id.* at 12-13. Finally, the Maryland Association of Election Officials testified that greater reliance on BMDs would also pose numerous practical problems relating to the availability of sufficient space and power outlets at polling places to accommodate the substantial increase in deployed BMDs that would be necessary under the bill. *Id.* at 8. The legislation ultimately did not proceed out of committee in either chamber of the General Assembly.

### The 2020 Election BMD Policy

At its meeting in May 2019, the State Board committed to revisiting and revising its BMD policy for the next election cycle, despite uncertainty about whether the BMD's manufacturer would be able to resolve the navigation and display issues with the devices. *See 5/16/19 State Board Meeting Minutes*, at 11. At its June meeting, the State Board decided on a new policy. In the course of the discussion around that proposed policy, the

State Administrator's staff explained that the State had 3,500 BMDs in its inventory statewide, and that the availability of additional BMDs was constrained by the manufacturer's inventory (given pending awards to other states) and the 12-14 month lead time that was needed for the production of new BMDs.  *See* Md. State Bd. of Elections, *Meeting Minutes – June 27, 2019*, at 9, https://elections.maryland.gov/pdf/minutes/ 2019_06.pdf (last visited Sept. 3, 2019) ("*6/27/19 State Board Meeting Minutes*"). Ultimately, the State Board changed the policy to increase the minimum number of voters per polling place required to use the BMDs to mark their ballots from two to five.  *Id.*  It also authorized local boards to deploy a second BMD at election day polling places and up to four BMDs at early voting centers without obtaining State Board approval.  *Id.*  Finally, it directed State Board staff to increase training of election judges around how voters are notified about the availability of the BMDs, and directed staff to propose revisions to the statement by which voters are made aware of the option to mark ballots by BMD.  *Id.*  At its July 25, 2019 meeting, the State Board voted to change the statement given to voters so that the BMD is presented neutrally as an equal option to the paper ballot:  "You have two ways to mark your ballot - either by hand or with the electronic device. Which do you prefer?"  Md. State Bd. of Elections, *Meeting Minutes – July 25, 2019*, at 11, https://elections.maryland.gov/pdf/minutes/2019_07.pdf (last visited Sept. 3, 2019) ("*7/25/19 State Board Meeting Minutes*").

### The Filing of the Complaint

Less than one week after the State Board's July 25, 2019 meeting plaintiffs filed this action, alleging that the State Board's implementation of its BMD policy in the 2016

-13-

and 2018 election cycles gave rise to "two separate and unequal voting systems: one for voters with disabilities and for everyone else," in violation of Title II and Section 504. Compl. ¶¶ 1, 3.  Plaintiffs alleged that the State Board's failure to consistently enforce its two-voter-minimum BMD policy has meant that "when only one voter uses the BMD in her precinct her ballot comes easily identifiable, destroying the secrecy of her vote." *Id.* ¶ 3.  Plaintiffs further alleged that State Board's failure to ensure more robust use by voters of the BMDs has relegated them to using "a secondary, poorly used voting option" that poll workers are unable to operate (or that poll workers simply forget "to plug . . . in before a voter requests to use one"), thus depriving individuals with disabilities of "equally effective" and "equal opportunity to vote." *Id.* ¶¶ 4-5; *see also id.* ¶ 36.  According to plaintiffs, this alleged "failure . . . to provide blind voters with an equal opportunity vote in person by secret ballot," *id.* ¶ 1, as well as the State Board's alleged failure to provide a sufficient "auxiliary aid or service that would allow them to vote equally," constitutes "an ongoing and continuous violation of" both Title II and Section 504. *Id.* ¶¶ 55, 57, 71.

But the remedy sought by plaintiffs is not merely a change in the policy to require a higher minimum of BMD-voters per precinct, or modifications to training, staffing or BMD-deployment protocols to improve compliance at the precinct level with the BMD policy.  Instead, plaintiffs ask this Court to order a wholesale change in how Marylanders vote by way of a permanent injunction "requiring the [State] Board in all future elections to offer BMDs to every in-person voter as the *default method of voting*, with paper ballots offered only to those voters who affirmatively opt out of using the BMD or in cases where there are long lines of people waiting to vote."  Compl. Prayer ¶ a.  Plaintiffs also seek a

-14-

declaratory judgment that defendants have violated Title II and Section 504 and will continue to violate those statutes with the implementation of the State Board's new BMD policy for the 2020 election cycle.

## ARGUMENT

### I.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court must accept well-pled factual allegations in a complaint as true, it is not required to accept conclusory factual allegations or legal conclusions disguised as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).  Nor is the Court required to accept allegations that "contradict matters properly subject to judicial notice or by exhibit." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006).  Rather, the complaint must contain direct and plausible allegations respecting all material elements necessary to sustain recovery under a viable legal theory. *Twombly*, 550 U.S. at 570.  Plaintiffs' claims should be dismissed under this familiar standard.

### II.    PLAINTIFFS FAIL TO STATE CLAIMS FOR VIOLATION OF EITHER THE AMERICANS WITH DISABILITIES ACT OR THE REHABILITATION ACT.

Plaintiffs' claims should be dismissed because they fail to plead violations of either Title II or Section 504.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, § 504 of the Rehabilitation Act, provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  In other words, "[a] public entity discriminates against a qualified individual when it fails to provide 'meaningful access' to its benefits, programs, or services." *Disabled in Action v. Board of Elections of N.Y.*, 752 F.3d 189, 198–99 (2d Cir. 2014) (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012)); *see Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).[8]  A plaintiff states a cause of action under either statute by alleging that "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine*, 411 F.3d at 498 (4th Cir. 2005) (citing cases).  Accordingly, the plaintiff must allege a "systemic

---

[8] "Claims under [Title II] and [Section 504] can be combined for analytical purposes because the analysis is 'substantially the same.' " *Seremeth v. Board of Cnty. Comm'rs Frederick Cnty.,* 673 F.3d 333, 336 n. 1 (4th Cir. 2012) (quoting *Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 n. 9 (4th Cir. 1995)).

failure to provide meaningful access" to a government benefit or service on account of her disability. *Disabled in Action*, 752 F.3d at 198.

However, "[d]etermining that plaintiffs have been denied meaningful access" to such a service, program, or activity "does not end [the] analysis." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016). To prevail on their ADA claim, plaintiffs must also "propose a reasonable modification to the challenged public program that will allow them the meaningful access they seek." *Id.* (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)). Moreover, even a reasonable modification "need not be made if that modification would 'fundamentally alter' the program." *Id.* at 508 (quoting 28 C.F.R. § 35.130(b)(7)).[9] Finally, any claims under Title II or Section 504 must be brought within "Maryland's three-year statute of limitations governing general civil actions." *Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *see* Md. Code Ann., Cts. & Jud. Procs. § 5-101(LexisNexis 2013 & 2018 Supp.).[10]

Here, plaintiffs have failed to plead facts that plausibly give rise to the conclusion that they were denied meaningful access to the "service, program, or activity" of voting in-person by secret ballot, and any claims arising from the 2016 primary election—which took

---

[9] Defendants bear the burden of proving that the requested modification would be a fundamental alteration to the program. *See* 28 C.F.R. § 35.130(b)(7).

[10] Because neither Title II nor Section 504 contains a statute of limitations, federal courts "borrow the state statute of limitations that applies to the most analogous state-law claim." *A Soc'y Without A Name*, 655 F.3d at 347. In *Semenova*, the Fourth Circuit concluded that the closest "state-law analog" to a Title II "claim" was Maryland's general civil cause of action, which is governed by a three-year limitations period. *Semenova*, 845 F.3d at 567.

place on April 26, 2016, more than three years before the filing of this suit—are barred by limitations in any event.  Moreover, even if plaintiffs had pled a prima facie claim under Title II or Section 504, their proposed accommodation of directing *all voters* to use the BMD is, on its face, unreasonable and would impermissibly effect a "fundamental alteration" in the State's program for in-person voting on election day.  Accordingly, plaintiffs' claims should be dismissed.

> **A.**   **Any Claims Arising from the 2016 Primary Election Are Barred by the Applicable Three-Year Statute of Limitations.**

As an initial matter, plaintiffs' claims arising from alleged Title II or Section 504 violations occurring in the 2016 primary election are barred by limitations.

Plaintiffs allege that "[s]ince 2016, Maryland has maintained two separate and unequal voting systems: one for voters with disabilities and one for everyone else," Compl. ¶ 3.  They further assert in connection with the 2016 primary election that: "[f]ifty percent of blind Maryland voters who responded to an NFB survey . . . reported that poll workers failed to inform them that they had the option of voting using a BMD"; "28% of blind respondents . . . indicated that poll workers failed to provide instructions on how to use the BMD"; and "nearly 40% reported that poll workers had problems setting up or activating the BMD."  Compl. ¶ 45.  However, the Fourth Circuit has made clear that Maryland's general three-year limitations period for civil actions governs claims under Title II and Section 504.  *See Semenova*, 845 F.3d at 567.  Since the 2016 primary election took place on April 26, 2016, more than three years before the August 1, 2019 filing of this lawsuit,

plaintiffs' claims under Title II and Section 504 arising from that election are barred by limitations and should be dismissed by this Court.

**B.     Plaintiffs Fail to Allege that they Were Denied Meaningful Access to the Right Vote Privately and Independently in the 2016 and 2018 Elections.**

Plaintiffs also fail to state a plausible claim that they encountered a "systemic failure to provide meaningful access" to the right to vote privately and independently in the 2016 general election or either of the 2018 statewide elections. *Disabled in Action*, 752 F.3d at 198.

With regard to the right to vote privately, plaintiffs allege that there were only 34 precincts, 40 precincts, and 22 precincts, in which only one BMD-marked ballot was cast in the 2016 general, 2018 primary, and 2018 general elections, respectively. Compl. ¶¶ 28, 30, 32.[11] This meant that (i) if any of these ballots were cast by voters with disabilities (ii) who happened to be known to poll workers, and (iii) if those same poll workers subsequently had occasion to manually review the ballot in the context of a recount, the secrecy of that ballot would have been compromised. *See* Compl. ¶¶ 30 (noting that "the 2018 primary election generated several manual recounts, where votes cast using the BMDs would have been readily distinguishable from hand-marked ballots), 37 (alleging that Plaintiff Zimba was known to poll workers in his precinct and "was the only voter to

---

[11] Plaintiffs also allege that *no* BMD-marked ballot was cast in 66 precincts in the 2018 general election. *See* Compl. ¶ 32. But even if this amounted to a breach of the State Board's two-voter policy for these precincts, it did not give rise to an allegedly "segregated ballot" under which the ballots of voters with disabilities would be "readily identifiable."

use the BMD in his precinct" in the 2018 primary election, and thus his ballot "was readily identifiable to the poll workers").

But plaintiffs do not allege a single instance of this sequence of events actually occurring.  Plaintiffs allege that Mr. Zimba's ballot in the 2018 primary election was "readily identifiable" to poll workers, *id.* ¶ 37, but that is true of every voter who enlists the assistance of a poll worker to scan a paper or BMD-printed ballot using the optical scanner, and would be true even if plaintiffs' preferred remedy of universal BMD use by all voters were ordered by this Court.[12]  They did not allege that Mr. Zimba's precinct was subject to a recount in that election, or that his ballot was otherwise manually reviewed by any of the poll workers who knew him.

Next, they allege that the "2018 primary election generated several manual recounts," Compl. ¶ 30, but fail to identify a single precinct in which only one BMD-marked ballot was cast that was the subject of one of those recounts (much less that the single voter who used the BMD in any of those precincts was a disabled voter).  Indeed, in light of the 1,991 total precincts involved in each of the three statewide elections since the

---

[12] Even if every voter in a precinct used the BMD to mark their ballots, the ballots would be "readily identifiable" whenever the voter requests the voter requests a poll worker's assistance in scanning the ballot.  In general, voters are provided "privacy sleeve[s]" to shield their ballots from view when, after marking their ballots, they take them to the scanner.  Md. State Bd. of Elections, *Voting—Introduction,* https://elections.maryland.gov/voting/index.html (last visited Sept. 3, 2019).  They are then directed by a poll worker "to insert [the voter's] ballot into the scanning unit" for tabulation and storage in a "secure ballot box." *Id.*   But any voter requiring assistance in scanning may need to present their ballot to a poll worker for insertion into the scanning unit. *See id.*

2016 general election, this is not surprising: only 1.1% to 2.0% of precincts (depending on the election) had only one BMD-marked ballot cast.   By contrast, the overwhelming majority of precincts were in compliance with the State Board's two-voter policy (with many exceeding that threshold substantially).   To the extent that, contrary to their training and to State Board policy, poll workers in a handful of precincts failed to ensure compliance with the two-voter BMD policy, plaintiffs have "allege[d], at worst, individual, isolated instances of employee negligence and not a systemic problem" with the State Board's policies. *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 930 (7th Cir. 2004).[13]   Even then, there is no allegation that the single BMD-marked ballot in any of these 1.1 to 2.0% of precincts was (i) cast by a voter with disabilities (ii) who was known to poll workers, (iii) and became the subject of a recount (iv) in which the same poll workers reviewed the same voter's ballot—all of which would be required for the secrecy of the voter's ballot to be compromised.   Plaintiffs have failed to plead a plausible claim disabled voters were denied meaningful access to the secret ballot as a result of their disabilities.

The same is true of plaintiffs' allegations regarding access to the ability to vote independently.   Plaintiffs allege that "the low usage rate of the BMD and th[e] fact that it

---

[13] *See also J.D. v. Georgetown Indep. Sch. Dist.*, No. A-10-CA-717 LY, 2011 WL 2971284, at *7 (W.D. Tex. July 21, 2011) ("[A]cts of negligence do not come within the ambit of the ADA."); *cf. Tanner v. Wal-Mart Stores, Inc.*, No. 99-44-JD, 2000 WL 620425, at *6 (D.N.H. Feb. 8, 2000) ("Title III's purpose is to ensure that people with disabilities have access to public facilities, not to provide a remedy for specific acts of negligence."); *compare Disabled in Action*, 752 F. 3d at 199 (80% of poll sites contained at least one barrier that could have prevented a voter with disabilities from accessing his or her polling place")

is a disfavored alternative means that poll workers are less familiar with how to set up and operate the machines, making it more likely that blind voters will have difficulty using the BMD in a timely manner." Compl. ¶ 36. Specifically, a broken BMD allegedly required Ms. Sager to complete a paper ballot with assistance from two poll workers, and to "spen[d] approximately 50 minutes" doing so "even though there was no line." *Id.* ¶ 39. But standing alone, assisted voting due to a broken BMD does not give rise to violation of Title II or Section 504. HAVA requires only a single accessible voting device at each polling place, *see* 52 U.S.C. § 21081(a)(3), and the ADA's implementing regulations expressly permit "isolated or temporary interruptions in service" of accessible equipment "due to maintenance or repairs." 28 C.F.R. § 35.133(b).[14] On their face, plaintiffs' allegations as to Ms. Sager's voting experience allege the mere *possibility* of a violation, as opposed to the *plausibility* required by *Twombly* and *Iqbal. See Stewart v. City of Baltimore*, No. CIV.A. RDB-14-03567, 2015 WL 5604279, at *6 (D. Md. Sept. 23, 2015) ("*Iqbal* and *Twombly* require sufficient detail to make the complaint plausible, not merely possible." (citing *Iqbal*, 556 U.S. at 678)).

---

[14] The ADA's implementing regulations require a "public entity" to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act," but do "not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 28 C.F.R. §§ 35.133(a)–(b). As noted, the State Board's contingency policy requires defective voting equipment to be rehabilitated or replaced within two hours, *see SBE Policy 2017-1*, and there is no allegation that the State Board failed to follow this policy in this instance.

Plaintiffs also allege that poll workers' lack of familiarity with the BMD required Ms. Cobb to enlist the help of her granddaughter and an NFB employee over the phone to set up and "guide her through the proper operation of the BMD" in one election, and to figure out how to use the BMD all by herself in another. *See* Compl. ¶ 41. But these allegations make clear that Ms. Cobb was able to vote effectively and independently in precisely the same manner as she would have had poll workers been the ones to instruct her on the proper use of the BMD. At most, plaintiffs have alleged two individual instances of negligence on the part of poll workers that ultimately caused Ms. Cobb no harm.[15] This, too, fails to state a claim under Title II or Section 504. *See Foley*, 359 F.3d at 930.

In sum, plaintiffs claim that the State Board's BMD policy has systemically denied voters with disabilities meaningful access to the right to vote secretly and independently at polling sites in Maryland. But the facts they allege in support of these claims do not plausibly set forth a violation of Title II or Section 504. Plaintiffs' claims can be dismissed on this ground alone.

### C.     Plaintiffs' Proposed Accommodation is Unreasonable.

Even if plaintiffs had succeeded in pleading a prima facie violation of Title II or Section 504 (though they have not), their claims should still be dismissed because the

---

[15] Plaintiffs allege that Ms. Cobb was required to devote "between half an hour to an hour trying to vote, even though there [was] no line at her polling place," Compl. ¶ 41, but do not explain why this time period would have been shorter had a poll worker — as opposed to an NFB employee — been able to explain the operation of the BMD to her.

accommodation they have proposed is unreasonable. *See Nat'l Fed'n of the Blind*, 813 F.3d at 507.

A modification is reasonable if it is "reasonable on its face" or used "ordinarily or in the run of cases" and will not cause "undue hardship." *Id.* (quoting *Halpern*, 669 F.3d at 464). The burden of establishing the reasonableness of an accommodation is "'not a heavy one'"; "it is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003). Although determination of the reasonableness of a proposed modification is generally fact-specific, *Halpern*, 669 F.3d at 464, in appropriate cases the determination may be made "as a matter of law." *Harper v. Cnty. of Merced*, No. 118CV00562LJOSKO, 2018 WL 5880786, at *8 (E.D. Cal. Nov. 8, 2018).

This is one of those cases. Plaintiffs' proposed accommodation is unreasonable because it would impose "undue hardship" on the State Board (and, indeed, on Maryland voters), while at the same timing imposing costs that clearly exceed its benefits. Plaintiffs seek as an accommodation the requirement that "the [State] Board in all future elections . . . offer BMDs to every in-person voter as the default method of voting." Compl. Prayer ¶ a. But this requested accommodation runs headlong into problems of fulfillment that are made plain by the legislative and administrative materials of which this Court may take judicial notice.

First is the problem of availability. The legislative history of HB 565, which unsuccessfully sought by legislation what the plaintiffs seek now by court order, makes

clear that a *fivefold* increase in the statewide inventory of BMDs would be needed to support a policy under which every voter was directed to use the BMD to mark their ballot. *See HB 565 Fiscal Note* 2 (noting that 18,000 BMDs would be necessary to implement legislation); *6/27/19 State Board Meeting Minutes* 9 (noting that Maryland currently has 3,500 BMDs statewide).   Procuring that many BMDs from their manufacturer would require a lead time of 12-14 months, which would put the 2020 primary (~ 8 months away) and probably the 2020 general elections (~14 months away) out of reach for implementation of the relief sought by plaintiffs.   "A reasonable accommodation is one that is feasible or plausible."  *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414 (4th Cir. 2015).   Since plaintiffs' proposed accommodation would be impossible to implement in time for the 2020 elections, it is not reasonable.

Second is the problem of cost.   The *HB 565 Fiscal Note* indicated that the accommodation sought by plaintiff would require $12 million in additional state and local outlays per year. *See HB 565 Fiscal Note* 1.   This cost exceeds the benefits of the proposed accommodation, particularly since the accommodation goes well beyond what would be needed to remedy the violations alleged in plaintiffs' Complaint, even accepting all of their allegations as true.   For example, increasing the minimum number of voters per precinct who must use the BMD to mark their ballots would have the same effect of rendering any ballots cast by voters with disabilities private, without the increased cost associated with requiring *every* voter to use the BMD.   So, too, would altering the statement provided to voters by poll workers to present the BMD as a neutral alternative (as opposed to an "accessible" device that is available "if needed").   And increased emphasis on training

-25-

would address the isolated instances in which poll workers either fail to ensure that the minimum number of voters per precinct uses the BMD, or are unable to sufficiently instruct voters as to the operation of the BMDs.  "A public entity is required to make reasonable accommodations where necessary to give meaningful access to programs or benefits, but need not do so if the accommodation would be unduly burdensome."  *Allen v. Morris*, No. 4:93-CV-00398-BSM-JWC, 2010 WL 1382112, at *7 (E.D. Ark. Jan. 6, 2010), *adopted by*, 2010 WL 1382116 (E.D. Ark. Apr. 2, 2010).  Given the availability of less burdensome remedies, plaintiffs' proposed accommodation is unreasonable.

> **D.** **Plaintiffs' Proposed Accommodation Would Effect a Fundamental Alteration of Maryland's Voting Program.**

Even assuming the plaintiffs' proposed accommodation could be regarded as "reasonable on its face" (though it cannot), their proposal to require all voters to be directed to use the BMD would constitute a fundamental alteration of Maryland's voting program.

The ADA's implementing regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  The Fourth Circuit has held that "budgetary concerns" may be "relevant to the fundamental alteration calculus," but "financial constraints alone cannot sustain a fundamental alteration defense."  *Pashby v. Delia*, 709 F.3d 307, 324 (4th Cir. 2013).  Rather, a modification to an "essential aspect" of the program constitutes a fundamental alteration.  *Halpern*, 669 F.3d at 464 (quoting *PGA*

*Tour, Inc. v. Martin*, 532 U.S. 661, 682-83 (2001).  The question for the Court is whether the proposed accommodation is "so at odds" with the existing voting program so as to be "unreasonable."  *Cf. Nat'l Fed'n of the Blind*, 813 F.3d at 509.  Although the fundamental alteration analysis is typically not appropriate at the motion-to-dismiss stage, *see Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004), here the Complaint permits no other conclusion than that plaintiffs are seeking a fundamental alteration of Maryland's voting program.

Plaintiffs acknowledge that most voters choose to hand-mark their ballots.  Compl. ¶ 3.  Yet rather than seek relief within the confines of that framework, plaintiffs propose to turn it on its head, demanding that the State Board "move to a fully integrated voting system, in which *the BMD* is the default option for all voters."  *Id.* ¶ 4 (emphasis added). This wholesale change to the manner in which millions of Marylanders vote is precisely the sort of fundamental alteration that is foreclosed by the ADA.  In *Montalvo v. Radcliffe*, 167 F.3d 873 (4th Cir. 1999), the Fourth Circuit held that a proposed accommodation that would have required a martial arts studio to "soften the teaching style of its program," so as to minimize the risk of bloody injuries so that an HIV-positive student could participate, constituted a "fundamental alteration of the nature of [the] program."  *Id.* at 879.  Similarly, plaintiffs here seek a program-wide alteration that would change the way that most Maryland voters mark their ballots.  Just like the "fundamentally different program of instruction" that the Fourth Circuit rejected in *Montalvo*, *id.*, plaintiffs here would impose a fundamentally different program of voting.  Accordingly, plaintiffs fail to state a claim

for violation of Title II and Section 504, because their proposed accommodation would require a fundamental alteration of Maryland's voting program.

## III.   PLAINTIFFS' CLAIMS ARE MOOT.

Plaintiffs' claims should be dismissed for the separate and independent reason that they are moot. Plaintiffs have alleged violations of Title II and Section 504 on the basis of the implementation of a BMD policy that has now been superseded. Moreover, the new policy in place for the 2020 elections addresses the issues that plaintiffs allege give rise to their claims. Accordingly, plaintiffs' claims should be dismissed for this reason as well.

A case becomes moot "if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The Fourth Circuit has held that "a governmental entity's change of policy renders a challenge moot when the governmental entity 'has not asserted its right to enforce [the challenged policy] at any future time.'" *Porter v. Clarke*, 852 F.3d 358, 360, 364 (4th Cir. 2017) (alteration in original) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989)); *see also Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1285 (11th Cir. 2004) (holding that "a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated").

Here, the "allegedly wrongful behavior" that occurred during the 2016 and 2018 elections cannot "reasonably be expected to recur" in 2020, because the new BMD policy adopted by the State Board clearly remedies the circumstances under the prior policy that

-28-

formed the basis for plaintiffs' claims.  Plaintiffs' claims focus on two alleged deficiencies with the State Board's prior BMD policy: its failure to assure voters with disabilities a secret ballot (due to the number of polling places that "had only one voter use the [BMD]"), Compl. ¶ 3; and its relegation of the BMD to a "secondary, poorly used voting option" that "poll workers [we]re not as familiar with," *id.* ¶ 4.  Both alleged defects are addressed by the State Board's new policy.

First, the new policy:

(i)     increases the minimum number of voters per precinct who will be required to use the BMDs to mark their ballots from two to five;

(ii)    alters the statement made to each voter so that the BMD is presented as a neutral alternative (as opposed to an "accessible" device, "if needed");

(iii)   increases training of poll workers around how voters are notified about the availability of the BMDs; and

(iv)    authorizes local boards to deploy an additional BMD at polling places without needing to obtain prior State Board approval.

*See 6/27/19 State Board Meeting Minutes* at 9, *7/25/19 State Board Meeting Minutes* at 11. Together, these changes will lead to an increase in BMD usage that will more than compensate for the handful of precincts in which only one BMD-marked ballot was cast in recent elections.  Plaintiffs contend that because "the Board has consistently failed to require even two voters per precinct to use the BMD since 2016," it is unlikely to be able to adhere to its new policy of requiring five voters per precinct to mark their ballots via BMD.  Compl. ¶ 35.  But aside from their mischaracterization of the extent to which

-29-

precincts statewide failed to adhere to the two voter policy,[16] plaintiffs ignore the comprehensive nature of the policy changes: in addition to raising the minimum from two to five voters, the State Board also ordered increased poll worker training, authorized greater BMD deployment, and modified the statement provided to voters to present the BMD as a neutral alternative.  The new policy can therefore "reasonably be expected" to remedy plaintiffs' alleged violations regarding the secrecy of disabled voters' ballots.

Second, the increase in BMD-usage occasioned by these changes will also remedy the circumstances under which BMDs allegedly served as "a secondary, poorly used voting option."  Compl. ¶ 4.  In addition to the increased training they will receive, poll workers will become more familiar with the BMDs as more voters opt to use them, thereby resolving those instances where a poll worker's lack of familiarity with how the devices work was driven by a paucity of voters who used them.

Accordingly, since the alleged violations giving rise to plaintiffs' "cannot reasonably be expected to recur" under the State Board's new BMD policy, plaintiffs' claims are moot and should be dismissed.

## CONCLUSION

For all of the foregoing reasons, the defendants' motion to dismiss should be granted and the plaintiffs' Complaint should be dismissed.

---

[16] As noted above, between 1.1% and 2.0% of precincts had only one voter mark his or her ballot via the BMD in the last three statewide elections, while 3.3% of precincts in the most recent general election had no voter use the BMD.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Andrea W. Trento

_____
JULIA DOYLE BERNHARDT
Assistant Attorney General
Bar No. 25300
ANDREA W. TRENTO
Assistant Attorney General
Bar No. 28816
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6472
(410) 576-6955 (facsimile)
jbernhardt@oag.state.md.us
atrento@oag.state.md.us

Sept. 3, 2019                    Attorneys for Defendants