# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

|  |  |  |
|---|---|---|
| NATIONAL FEDERATION | * | |
| OF THE BLIND, INC., *et al.*, | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No. 19-2228-ELH |
| | * | |
| LINDA H. LAMONE, *et al.*, | | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jessica P. Weber (Federal Bar No. 17893)
James T. Fetter (Federal Bar No. 20727)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
jweber@browngold.com
jfetter@browngold.com

*Attorneys for Plaintiffs*

Dated:  September 17, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

    I.      Voting in Maryland ..................................................................................................... 3

    II.    The Impact of Board Policy on Blind Voters ........................................................ 5

    III.   The Board's Recent Policy Changes ....................................................................... 7

STANDARD OF REVIEW ....................................................................................................... 8

ARGUMENT .............................................................................................................................. 8

    I.      Plaintiffs Have Sufficiently Stated Claims Under the ADA and Section 504. ....... 8

          A.     The Board has deprived plaintiffs of an equal voting experience in violation of the ADA and Section 504. ...................................................... 9

                1.     The ADA and Section 504 require an equal opportunity, not merely some opportunity, for blind voters to vote ................... 9

                2.     The Board's policies, not the sporadic negligence of poll workers, have created systematic problems in the voting program that deprived plaintiffs of their federal rights ................ 14

                3.     Defendants' actions do not fall within the ambit of any safe harbor. ......................................................................................... 17

                4.     The Board cannot prevail on a motion to dismiss by drawing factual inferences in its favor. ........................................ 18

          B.     Plaintiffs' proposed relief is reasonable .................................................. 19

          C.     The statute of limitations does not bar plaintiffs' claims .......................... 23

    II.    Defendants Do Not Satisfy the Fundamental Alteration Defense. ....................... 24

    III.   Plaintiffs' Claims Are Not Moot .......................................................................... 26

CONCLUSION ......................................................................................................................... 29

## **TABLE OF AUTHORITIES**

### **Cases**

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342 (4th Cir. 2011)............................................ 23

*Alexander v. Choate*, 469 U.S. 287 (1985) ........................................................................... 10, 11

*Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51 (D.D.C. 2006) .................................... 12

*Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) ....................................... 13

*Anderson v. Mills*, 664 F.2d 600 (6th Cir. 1981) ..................................................................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 19

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................................................. 18

*Bell Atl.  Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 8

*Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir. 1994)........................................... 24

*Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975) ..................................................................... 13

California Council of the Blind v. County of Alameda, 985 F. Supp. 2d 1229
    (N.D. Cal. 2013) ......................................................................................................... 15, 17

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ............................................................. 26

*Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003) ............................................... 12

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) ................................................. 26

*Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984) ............................................................... 10

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir.
    2005) .............................................................................................................................. 8

*Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931 (N.D. Ind. 2009)........................................ 22

*Disabled in Action v. Bd. of Elections*, 752 F.3d 189 (2d Cir. 2014) .............................. 11, 13, 25

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)....................................................... 8

*Foley v. City of Lafayette*, 359 F.3d 925 (7th Cir. 2004)........................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167
    (2000)................................................................................................................. 26, 27, 28

*Hall v. DIRECTV, LLC*, 846 F.3d 757 (4th Cir. 2017) ............................................................ 8, 19

*Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012)) ......................... 20

*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ........................................................ 10

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ............................................... 20

*Innes v. Bd. of Regents of the Univ. Sys. of Md.*, No. CIV.A. DKC 13-2800, 2015
    WL 1210484 (D. Md. Mar. 16, 2015) ......................................................... 21, 22

*J.D. v. Georgetown Indep. Sch. Dist.*, No. A-10-CA-717 LY, 2011 WL 2971284
    (W.D. Tex. July 21, 2011) ....................................................................... 16

*Kerrigan v. Philadelphia Bd. of Election*, No. CIV. A. 07-687, 2008 WL 3562521
    (E.D. Pa. Aug. 14, 2008) ......................................................................... 11

*Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298 (2012) ................................. 26

*Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305 (10th Cir. 1999) .............................. 10

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .............................................. 13

*Montalvo v. Radcliffe*, 167 F.3d 873 (4th Cir. 1999) ...................................................... 25

*Moore v. State*, 388 Md. 623 (2005) ............................................................................. 22

*Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir. 2012) ............................... 12

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) ................................. 11, 24, 25

*Nat'l Fed'n of the Blind v. Lamone*, No. CIV.A. RDB-14-1631, 2014 WL
    4388342 (D. Md. Sept. 4, 2014) .............................................................. 17

*New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86 (2d Cir. 1998) ..................... 26

*Prakel v. Indiana*, 100 F. Supp. 3d 661 (S.D. Ind. 2015) ................................................ 20

*Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004)) ................................................... 24

*Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407 (4th Cir. 2015) ............................... 22

*Tanner v. Wal-Mart Stores, Inc.*, No. 99-44-JD, 2000 WL 620425 (D.N.H. Feb. 8,
    2000) ....................................................................................................... 16

*Tennessee v. Lane*, 541 U.S. 509 (2004) ....................................................................... 12

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) .................................................. 26

*Westchester Disabled on the Move, Inc. v. Cty. of Westchester*, 346 F. Supp. 2d
473  (S.D.N.Y. 2004) ........................................................................................ 12

*Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398 (D. Md. 2015) .................. 23

**<u>Statutes</u>**

29 U.S.C. § 794 ...................................................................................................... 1

42 U.S.C. §§ 12131–12134 ...................................................................................... 1

52 U.S.C. § 21081 ................................................................................................. 17

Md. Code Ann., Elec. Law § 9-102 ................................................................... passim

**<u>Regulations</u>**

28 C.F.R. § 35.130 ...................................................................................... 10, 20, 24

28 C.F.R. § 35.133 ............................................................................................... 17

28 C.F.R. § 35.160 ............................................................................................... 10

28 C.F.R. § 35.164 ............................................................................................... 21

28 C.F.R. § 41.51 ................................................................................................ 10

28 C.F.R. Pt. 35, App'x B ..................................................................................... 18

**<u>Other Authorities</u>**

*About SBE*, The State Board of Elections,
https://www.elections.maryland.gov/about/index.html .......................................... 25

*Polling Place List*, Official Election Site of Alameda County,
https://www.acgov.org/rov_app/pollinglist ............................................................ 15

Title II Technical Assistance Manual, Title II Technical Assistance Manual at §
II-5.1000, https://www.ada.gov/taman2.htm ........................................................ 22

## INTRODUCTION

For four consecutive elections, the Maryland State Board of Elections (the "Board") has relegated blind voters to a separate and unequal voting system that, because it is poorly used, fails to ensure the secrecy of blind voters' ballots and is often more time-consuming and difficult to access. The Board thus violates Title II of the Americans with Disabilities Act ("ADA" or "Title II"), 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, by denying blind voters an equal opportunity to exercise their fundamental right to vote and to communicate their votes in an equally effective manner. The pervasive nature of plaintiffs' negative voting experiences—over the course of several elections and at different polling sites—demonstrates that the Board's failure to provide an equal voting experience for blind voters stems from its policy of maintaining a separate, lesser used voting system for individuals with disabilities, not, as the Board[1] claims, from the random negligence of a few poll workers. Furthermore, despite the Board's contentions otherwise, there is no legal safe harbor for the Board's denial of equal opportunity, nor is there reason to draw factual inferences in the Board's favor at this stage.

For four consecutive elections, the National Federation of the Blind of Maryland ("NFB-MD") has brought concerns about these practices to the Board's attention and asked the Board to take action to protect blind voters' civil rights in the next election. Yet for four consecutive elections, the Board has refused to change its policies, has failed to respond to the NFB-MD's attempts to initiate dialogue, and has even opposed proposed legislation supported by the NFB-MD, and a wide array of other disability rights groups—legislation that would have ended the

---

[1] Because all defendants in this action are sued in their official capacities with respect to their roles as Board members or staff, plaintiffs use the terms the "Board" and "defendants" interchangeably in this memorandum.

use of separate and unequal voting systems in Maryland.  Only this past summer, in response to plaintiffs' May 2019 pre-litigation demand letter, did the Board make some minor changes to its election protocol.  In light of the Board's track record of failing to ensure an equal voting opportunity for blind voters on the ground, the Board's tinkering around the edges of its inherently flawed policy of separate voting systems is simply not good enough.

The Board complains that plaintiffs are asking for a "wholesale change."  Defs.' Mem. Supp. Mot. Dismiss 14, ECF No. 18 (hereinafter "Defs.' Mem.").  It is true that after four elections where, despite warnings, election officials have violated blind voters' federal civil rights, plaintiffs are not interested in untested cosmetic changes.  The persistent nature of the violations makes clear that only systemic relief will ensure an equal voting experience in future elections: making ballot marking devices, rather than pens, the default method for voting in Maryland.  This relief is eminently reasonable; indeed, even the Attorney General of Maryland, who represents the Board, has proposed this solution as a viable option for complying with the law.  And for more than a decade, until 2016, all Maryland voters used machines to vote.

For similar reasons, defendants' prematurely raised, fact-intensive, fundamental alteration affirmative defense is easily dispensed with at this stage.  Increasing use of a voting system already in place in Maryland does not fundamentally alter elections in the state, particularly where all voters used machines to vote for more than a decade until 2016. The Court should also reject defendants' attempt to insert an argument about undue financial burden into the inquiry into whether plaintiffs' requested relief is reasonable.  Undue burden, too, is a fact-specific affirmative defense that requires discovery to resolve.

Finally, the Board's recent, untested, minor changes to its election protocol do not moot plaintiffs' claims.  Given the Board's consistent inability to ensure that its instructions for poll workers are carried out on the ground, there is little reason to trust that these minor changes will

effectively stop the pattern of civil rights violations that has plagued the last four Maryland elections.  Defendants fall significantly short of satisfying the heavy burden required to render plaintiffs' claims moot.  Accordingly, defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

### I.   Voting in Maryland

From 2004 until 2016, Maryland required all voters to use electronic voting machines, which were equipped with accessibility features that gave blind voters non-visual access to the ballot.  Compl. ¶ 20.  These voting machines directly recorded and tabulated votes and did not produce a voter-verifiable paper record.  98 Md. Op. Att'y Gen. 152, 154–55 (Dec. 18, 2013).

In 2007, Maryland enacted legislation requiring the Board to certify, for elections after January 1, 2010, voting machines that would generate a paper trail.  Compl. ¶ 21; Md. Code Ann., Elec. Law § 9-102.  This legislation also required the Board to ensure that voters with disabilities could vote at their local precinct on an accessible ballot marking device ("BMD") that generated a paper trail, so that they could vote privately and independently.  Compl. ¶ 21; Md. Code Ann., Elec. Law § 9-102.  BMDs are machines that allow voters to mark their ballots electronically, instead of by hand.  Compl. ¶ 23.  They are equipped with both a touchscreen and a non-visual interface to allow blind voters to mark their ballots without assistance.  *Id.*  BMDs help prevent common voter mistakes by alerting voters if they have selected too many options for a particular contest (over-voting) or too few (under-voting).  *Id.*  Once voters confirm their selections, the BMD prints a paper ballot they can then feed into the scanner that tabulates votes. *Id.*  BMDs do not cast or directly record any votes.  *Id.*

The 2007 Maryland legislation also specified that the Board must "provide access to voters with disabilities that is equivalent to access afforded voters without disabilities without creating a segregated ballot for voters with disabilities."  Md. Code Ann., Elec. Law § 9-

102(f)(1); Compl. ¶ 21.  In 2013, the Maryland Attorney General issued an opinion elucidating the meaning of the term "segregated ballot" and interpreting § 9-102(f)(1).  Compl. ¶ 22; 98 Md. Op. Att'y Gen. at 152.  In this opinion, the Attorney General wrote that "the General Assembly, by using the term 'segregated ballot,' intended to ensure that the ballots cast by voters with disabilities could not be identified as such during the process of casting, counting, and, if necessary, re-counting the paper ballots cast in an election."  98 Md. Op. Att'y Gen. at 152, 153. The Attorney General presented the Board with three options for certifying a voting system that would not create a segregated ballot for voters with disabilities: "[1] require all voters to use a voting system that is accessible to voters with disabilities . . . [; 2] certify an accessible voting system that generates a ballot that is formally identical to those ballots cast by non-disabled voters . . . [; or 3] certify an accessible voting system that generates a non-identical ballot, so long as voting procedures are implemented to ensure that non-disabled voters use the accessible system as well and do so in sufficient numbers to prevent the resulting ballots from being identified as having been cast by voters with disabilities."  *Id* at 153.

The Board finally transitioned to a paper-based voting system in 2016, choosing to lease Election Systems and Software's ExpressVote BMD for use as an accessible alternative to hand marking paper ballots.  Compl. ¶ 23.  In adopting a new voting system, the Board followed none of the Attorney General's proposed options for complying with Maryland law.  *Id.*  The ExpressVote BMD generates ballots that differ significantly in size, shape, and content from hand-marked paper ballots.  Compl. ¶ 24.  While the paper ballots used for hand marking are 8.5 by 11 inches and contain all contest selections, with corresponding bubbles for voters to fill in with their selections, the ExpressVote paper ballots measure 4.5 by 14 inches and only list the options the voter selected.  *Id.*  Although the ExpressVote ballots are thus readily distinguishable

from the hand-marked paper ballots used in Maryland, the Board required neither that all voters nor sufficient numbers of voters without disabilities use the BMDs.  Compl. ¶¶ 24–26.

Instead, since 2016, the Board has presented paper ballots that require hand marking to all voters as the default voting option, steering almost all voters without disabilities to such ballots.  Compl. ¶ 25.  As a matter of policy since 2016, the Board has required that two voters per precinct use BMDs to mark their ballots; as a matter of practice, however, in every election since 2016, the Board has failed to meet even this low benchmark in multiple precincts throughout the state.  Compl. ¶¶ 26, 28, 30, 32.[2]  In the 2016 general election, there were 34 precincts in which only one voter used the BMD.[3]  Compl. ¶ 28.  In the 2018 primary election, despite the NFB-MD alerting the Board of this problem after the 2016 elections, the number of precincts in which only one voter used the BMD rose to 40.  Compl. ¶¶ 28–30.  In the 2018 general election, there were 22 precincts in which one ballot was marked using a BMD and 66 precincts in which the BMD was not used at all.[4]  Compl. ¶ 32.

## II.   The Impact of Board Policy on Blind Voters

Segregated voting in Maryland has harmed blind voters, including Plaintiffs Joel Zimba, Ruth Sager, and Marie Cobb.  Mr. Zimba was the only voter to use a BMD in his precinct in the 2018 primary election.  Compl. ¶ 37.  The poll workers at Mr. Zimba's precinct recognized him when he came to vote and knew him by name.  *Id.*  Thus, unlike Maryland voters without disabilities, Mr. Zimba had no reasonable expectation that his ballot was secret.  *Id.*  While all

---

[2] This policy would not have protected the secrecy of blind voters' ballots even had it been enforced.  In any precinct in which the two voters to use the BMD voted for the same candidates, the choices of the blind voter (and the other voter) would have been revealed.

[3] The Board incorrectly states that plaintiffs allege that 34 precincts had only one ballot marked using a BMD in the 2018 general election.  Defs.' Mem. 9.

[4] The 2018 general election is the only election for which the Board chose to collect and release data on the number of precincts in which BMDs were not used at all.  Compl. ¶ 32.

Marylanders without disabilities will go to vote in 2020 confident that their voting selections will remain anonymous, Mr. Zimba is concerned that he will again be deprived of a secret ballot. *Id* at ¶ 38.

In every election since 2016, Plaintiff Marie Cobb has experienced avoidable delays when voting, ranging from a half hour to an hour, caused by poll workers unfamiliar with how to set up and operate the BMD. Compl. ¶ 41. Poll workers at Ms. Cobb's precinct have told her that they never received training on how to set up or use the BMD. *Id.* In both the 2016 and 2018 general elections, when Ms. Cobb voted on election day, she had to set up the BMD herself, without the assistance of poll workers. *Id.* In the 2016 general election, she even had to enlist the help of her 13-year-old granddaughter, who discovered that, although Ms. Cobb's precinct had been open for hours, the only BMD was not plugged in and the cord was still wrapped and affixed to the back of the machine. *Id.* Ms. Cobb's granddaughter had to plug in the machine, at which point an NFB employee Ms. Cobb had contacted by phone gave her instructions on how to use it. *Id.*

The Board denied Plaintiff Ruth Sager the right to vote privately and independently altogether. When Ms. Sager voted during the November 2018 general election, the poll workers at her precinct informed her that the only BMD was broken and that she should have her husband, who was sighted, fill out her ballot for her. Compl. ¶ 39. Ms. Sager was not comfortable with this option, so the poll workers assisted her with voting instead. *Id.* The first poll worker who assisted Ms. Sager was unable to read her ballot properly or correctly record her choices, requiring Ms. Sager to request assistance from another poll worker. *Id.* Ms. Sager thus had to divulge her voting selections to two poll workers to exercise her right to vote in the November 2018 election. *Id.*

### III.  The Board's Recent Policy Changes

After years of writing letters, testifying at Board meetings, and pushing corrective legislation (opposed by the Board) in a vain attempt to get the Board to take the persistent issue of unequal and non-anonymous voting experiences for blind voters seriously, plaintiffs sent the Board a final demand letter in May 2019.  Compl. ¶¶ 27–34.  Faced with the prospect of a lawsuit, the Board, in June 2019, increased the number of voters per precinct required to use BMDs from two to five, gave permission to local boards of elections to place up to two BMDs at polling sites on elections day (but did not require it), and directed staff to "increase training of election judges around how voters are notified about the availability of the BMDs."  Defs.' Mem. 13.  In July 2019, the Board changed the statement that poll workers are supposed to deliver to all voters when they check in to vote to neutrally present hand-marking or the BMD as two options for voting.  *Id.*

Despite these paper changes, there is no evidence, and no reason to believe, that the Board will ensure that five voters at each precinct use a BMD on election day, when over the course of four consecutive elections, it has never succeeded in ensuring that at least two voters use the machine at all precincts.  Compl. ¶ 35.  Furthermore, the Board's changes—particularly capping the number of BMDs that can be offered at each polling site to two (and not even requiring that more than one machine be deployed)—ensure that voters seeking to use the BMDs will encounter delays, discouraging their use.  Because they will have had little experience with the BMDs, poll workers will be less familiar with their set-up and operation, causing further difficulty and delay and perpetuating their underutilization.  Compl. ¶ 36.  The Board can expect that the BMDs will continue to be underused or not used at all, as occurred in 66 precincts in the November 2018 election.  Compl. ¶ 32.  Plaintiffs therefore proceeded with filing the present

lawsuit to ensure that they or their members can vote in future elections without sacrificing their civil right to an equal voting experience, including a secret ballot.

## STANDARD OF REVIEW

A party moving to dismiss a complaint pursuant to Rule 12(b)(6) bears the burden of demonstrating that the plaintiff's claims are legally insufficient and that the plaintiff has stated no claim for relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At the motion to dismiss stage, a court must accept as true all well-pled allegations in the complaint and construe the facts and reasonable inferences that can be drawn therefrom in the light most favorable to the plaintiff. *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). Courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

## ARGUMENT

### I.   Plaintiffs Have Sufficiently Stated Claims Under the ADA and Section 504.

Plaintiffs have adequately alleged that the Board has violated Title II and Section 504. To state a claim under either statute,[5] plaintiffs must allege that: (1) they are individuals with disabilities; (2) they are "otherwise qualified to receive the benefits of" Maryland's voting program; and (3) they are "excluded from participation in or denied the benefits of" Maryland's voting program, "or otherwise discriminated against, on the basis of [their] disabilit[ies]." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). Defendants contend only that the third factor is not met here. Because the Board does not protect

---

[5] Because the standards established by Title II and Section 504 are substantially similar, the Fourth Circuit analyzes the two statutes together. *See Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012).

the secrecy of plaintiffs' ballots, as it does for all other voters, and has made it more time-consuming and difficult for plaintiffs to vote privately and independently, it has failed to ensure an equal voting experience for plaintiffs.  This is discrimination within the meaning of Title II and Section 504.  Plaintiffs' requested relief is reasonable; indeed, it aligns with how Marylanders voted for more than a decade until 2016.  Finally, because plaintiffs do not pursue any claims pertaining only to the 2016 primary election, but rather seek to correct a continuing violation that began during the 2016 primary and has continued in each election since, defendants' statute of limitations argument does not warrant dismissal of any claims.

### A. The Board has deprived plaintiffs of an equal voting experience in violation of the ADA and Section 504.

When Mr. Zimba, Ms. Sager, and Ms. Cobb, along with other NFB and NFB-MD members, go to vote on election day in Maryland, they cannot be confident that their readily distinguishable ballots will remain anonymous. Voters without disabilities have no reason to doubt the secrecy of their ballots.  Plaintiffs and NFB members encounter significant delays at the polls when the BMDs are not adequately set up and/or poll workers cannot give sufficient instruction on how to operate the machines.  Voters without disabilities experience no such frustrations.  And when the one BMD at a plaintiff's polling place is inoperative, she cannot vote privately and independently at all.  Maryland's move to a predominately hand-marked paper ballot system of voting has created a separate and unequal voting system to which plaintiffs and NFB members are relegated.  *See* Compl. ¶¶ 37–42.

### 1. The ADA and Section 504 require an equal opportunity, not merely some opportunity, for blind voters to vote.

When the Board denies plaintiffs a voting experience equal to that enjoyed by voters without disabilities, it violates Title II and Section 504.  Public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid,

benefit, or service" they provide "that is not equal to that afforded others"; nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. 28 C.F.R. § 35.130(b)(1)(ii)–(iii); *see* 28 C.F.R. § 41.51 (b)(1)(ii)–(iii) (substantially similar Section 504 regulation). Public entities must also provide "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).[6] When blind voters, but not sighted voters, must accept the risk that their ballot will not remain secret in order to vote; when blind voters, but not sighted voters, must call on outside assistance to vote; and when blind voters, but not sighted voters, must accept needless delays in order to vote, the state has not given them an equal opportunity to vote.

The Board's argument to the contrary is unmoored from the law's guarantee of equal opportunity.[7] The Board maintains that "standing alone," each of plaintiffs' voting experiences

---

[6] These regulations are entitled to deference. The Supreme Court has held that the Department of Health, Education and Welfare's contemporaneous regulations for Section 504, which mirror the language of 28 C.F.R. § 41.51, "particularly merit deference" because "the responsible congressional committees participated in their formulation, and both these committees and Congress itself endorsed the regulations in their final form." *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 & n.14 (1984). Because Congress mandated that the Department of Justice model the Title II regulations after these Section 504 regulations, the Title II regulations carry "the force of law." *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995); *see Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1306 n.1 (10th Cir. 1999). The Fourth Circuit has held that these "regulations are the agency's interpretation of the statute, and they are therefore given 'controlling weight' unless they conflict with other departmental regulations or the ADA itself." *Seremeth*, 673 F.3d at 338.

[7] Indeed, defendants do not cite 28 C.F.R. § 35.160 or 28 C.F.R. § 41.51 at all, and only cite 28 C.F.R. § 35.130 with respect to the fundamental alteration affirmative defense. *See* Defs.' Mem. 17 n.9, 26.

does not independently amount to a denial of "meaningful access." Defs.' Mem. 19–23.[8]  Yet

"meaningful access" is not a separate, less demanding standard.  Courts interpret it to incorporate

the requirement of equal opportunity set forth in the Title II and Section 504 regulations. *See,*

*e.g.*, *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) (hereinafter "*Lamone*

*I*"); *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 199 (2d Cir. 2014).  As the Second

Circuit explained, to find that defendants have provided meaningful access simply because they

have afforded plaintiffs "the opportunity to vote at some time and in some way—would render

meaningless the mandate that public entities may not afford persons with disabilities services

that are not equal to that afforded others."  *Disabled in Action*, 752 F.3d at 199 (internal

quotation marks, alterations, and citation omitted).  Plaintiffs have sufficiently alleged that the

manner in which Maryland forces them to vote denies them the equal opportunity to exercise the

franchise.

Simply allowing plaintiffs to vote "at some time and in some way" does not satisfy

defendants' obligations under Title II and Section 504, as the Board believes.  Defs.' Mem. 19–

23.  Blind voters have beaten back similar defenses to previous challenges to Maryland's voting

program.  In *Lamone I*, the Fourth Circuit held that, although blind voters could cast their ballots

either in person or, if absentee, with assistance, the Board deprived blind voters meaningful

access to its absentee voting program because sighted voters need not sacrifice their privacy and

independence to vote absentee.  813 F.3d at 507.  Other courts agree that voters with disabilities

---

[8] The term "meaningful access," which does not appear in the text of the ADA or Section 504 or their regulations, stems from *Alexander v. Choate*, 469 U.S. 287 (1985).  There, the Court interpreted Section 504, which does not set forth a fundamental alteration defense, as requiring recipients of federal funds to afford "meaningful access" to their programs and activities as a way of striking a balance between the civil rights of individuals with disabilities and federal grantees' interest in avoiding fundamental modifications to their programs and activities. *See Alexander*, 469 U.S. 299–301.

must have "an equal opportunity to access the program of voting," not merely some opportunity to vote. *Kerrigan v. Phila. Bd. of Election*, No. CIV. A. 07-687, 2008 WL 3562521, at *18 (E.D. Pa. Aug. 14, 2008) (concluding that although voters with mobility impairments could have their votes counted at some polling locations, the board of elections violated Title II by failing to ensure that these individuals had the same opportunity as others to vote at their local polling locations).

When voters with disabilities are forced to experience inconveniences or take risks not imposed on others, they do not have an equal opportunity to vote. *See Westchester Disabled on the Move, Inc. v. Cty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004) (holding that providing individuals with disabilities limited methods by which to vote "could not reasonably be construed as consistent with providing 'meaningful access' to the voting process, particularly where the alternatives relied upon by the [d]efendants impose additional costs, risks and inconveniences on disabled voters not faced by others"); *cf. Chaffin v. Kan. St. Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003), *overruled on other grounds by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012) (holding that merely providing individuals with disabilities access to the state fairgrounds did not provide the level of meaningful access required under Title II where these individuals were restricted to a particular section); *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 59 (D.D.C. 2006) ("[P]laintiffs do not need not to prove 'no access' to prevail" on a Section 504 claim.). This has long been the understanding of federal disability law. In *Tennessee v. Lane*, for example, although the plaintiff could access the courthouse by crawling up two flights of stairs or allowing court officers to carry him, the Supreme Court held that his right to equal access to the courthouse under the ADA had been violated. 541 U.S. 509, 514 (2004). The conditions plaintiffs must endure to exercise their right to vote matter.

Thus, the fact that all plaintiffs were eventually able to vote does not mean that they suffered "no harm." Defs.' Mem. 23. Blind voters' ability to vote privately and independently should not—and legally, cannot—be contingent on having sighted family members with them or outside organizations they can call for assistance. As the Second Circuit reasoned in *Disabled in Action*, "[t]he right to vote should not be contingent on the happenstance that others are available to help." 752 F.3d at 200. The need for third-party assistance, to which Ms. Cobb and Ms. Sager were both required to repair, Compl. ¶¶ 39, 41, deprives blind voters an equal opportunity to vote and is antithetical to the ADA and Section 504's "emphasis on independent living and self-sufficiency," which "ensure[] that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008).

Nor can blind voters be forced to shoulder the risk that their secret ballot will be compromised in order to vote. Mr. Zimba need not have pled that his ballot was actually identified during the tally, as defendants would have it. Defs.' Mem. 20. The right to vote by secret ballot is, as the Supreme Court has described, "the hard-won right to vote one's conscience without fear of retaliation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995); *see Buckley v. Valeo*, 519 F.2d 821, 867 n.117 (D.C. Cir. 1975) ("In this country a person's right to vote secretly is inviolate."), *rev'd on other grounds*, 424 U.S. 1 (1976). To enforce the right to vote without fear, courts strike down laws that "operate[] to discourage citizens from participation in the electoral process simply because they do not wish people to know how they will vote." *Anderson v. Mills*, 664 F.2d 600, 608–09 (6th Cir. 1981) (striking down law requiring those who sign a petition to place a candidate on the ballot to sign an unenforceable declaration that they will vote for that candidate). The Board's policies, which force blind voters to cast a ballot that can easily be traced to them, are just the sort that

discourage voting by promoting a fear of disclosure and retaliation.  They therefore violate blind voters' rights.

Defendants wander even further afield from the proper standard when they assert that because some voters who *choose* to ask for assistance may have their ballot secrecy compromised, blind voters have no grounds for complaint.  Defs.' Mem. 20.  Sighted voters are given a choice whether to compromise their privacy.  Blind individuals are not.  That is not equality.[9]

### 2. The Board's policies, not the sporadic negligence of poll workers, have created systematic problems in the voting program that deprived plaintiffs of their federal rights.

The Board cannot foist responsibility for the problems plaintiffs have experienced voting on to its poll workers.  Rather than isolated incidents of poll worker "negligence," as the Board contends, Defs.' Mem. 23, plaintiffs have pled a pattern of violations that are the natural consequence of maintaining a separate, lesser used voting system for individuals with disabilities.  When few people use the BMDs, poll workers do not maintain the knowledge (or learn in the first place) how to set up and operate the machines.  Compl. ¶ 36.  When poll workers do not know how to work the machines, and when there are only one or two machines at a precinct, fewer people use them.  The cycle continues.  The ultimate result is the relegation of blind voters to an unequal voting system.

The Board's failure to ensure the secrecy of blind voters' ballots is a prime example of a systemic problem, not a mere aberration.  In the past three elections, more than 20—and as many as 40—precincts had only one voter use the BMD.  Compl. ¶¶ 28, 30, 32.  Although the Board

---

[9] The Board's speculation that seeking assistance with the tabulating scanner requires a voter to reveal her ballot is also an allegation of fact that, if it were relevant, would have to be proven in discovery.  One could imagine, for example, that voters could preserve the secrecy of their choice by turning their ballot upside down.

attempts to minimize the scope of the problem, this is not an instance where only one or two precincts failed to adequately protect ballot secrecy. Nor is this a case where the same precincts continue to be repeat violators: the Board's data shows very little overlap in the list of offending precincts from election to election. *See* Ex. A to Defs.' Mem. 21–24, ECF No. 17-2. And the Board's data from the 2018 general election reveals that at 66 precincts, the BMDs went totally unused on election day. Compl. ¶ 32. Had a blind voter gone to vote at any of these precincts, they also would have had their ballot secrecy compromised.

The Board's focus on the overall percentage of problem precincts is unavailing. In *California Council of the Blind v. County of Alameda*, the court held that blind voters had sufficiently stated ADA and Section 504 claims that the County denied them an equal voting experience based on the plaintiffs' experiences at 4 out of 787 polling places on election day in November 2012, or roughly 0.5% of all precincts. 985 F. Supp. 2d 1229, 1233 (N.D. Cal. 2013); *see Polling Place List*, Official Election Site of Alameda County, https://www.acgov.org/rov_app/pollinglist (last visited Sept. 16, 2019) (select November 2012 election from drop-down menu). Regardless of the total percentage of problem precincts, a blind voter cannot go to vote on election day with the confidence that her ballot will be kept secret. Because voters without disabilities need not use a method of voting more likely to reveal their voting selections, Mr. Zimba and other blind voters have suffered and continue to suffer an unequal voting experience.

The Board's characterization of Ms. Cobb's experiences in November 2016 and November 2018, when she encountered poll workers unfamiliar with the BMD, as isolated instances of poll worker "negligence," Defs.' Mem. 23, is equally unavailing. It ignores Ms. Cobb's allegation that she has encountered difficulty and delay voting in all four elections since 2016. Compl. ¶ 41. Ms. Cobb is not an outlier. Ms. Sager has also had difficulty voting in every

election since 2016.  Compl. ¶ 39.  During the November 2018 election, the poll workers

informed her that the one BMD at her polling site was broken, forcing her to divulge her voting

selections to two poll workers in order to cast her vote.  *Id.*  She was thus unable to vote privately

and independently at all in the last election.  These experiences are attributable to the Board's

decision to make the BMD a lesser-used alternative to hand-marking paper ballots.  If most

Maryland voters used BMDs, poll workers would know how to operate them, more than one

would be required per polling site, and any malfunction would likely be remedied quickly.

Because Mr. Zimba, Ms. Sager, and Ms. Cobb's unequal experiences voting in the past

several elections stem from the Board's policy of maintaining the BMDs as a seldom-used,

alternative voting system, rather than from unrelated instances of poll workers simply not

performing their jobs well, the cases to which defendants cite are readily distinguishable.  *See*

Defs.' Mem. 21 & n.13.  In *Foley v. City of Lafayette*, 359 F.3d 925 (7th Cir. 2004), the plaintiff

could point to no city policy that had contributed to a one-time temporary elevator outage

affecting only him.  In *Tanner v. Wal-Mart Stores, Inc.*, No. 99-44-JD, 2000 WL 620425

(D.N.H. Feb. 8, 2000), the plaintiffs pursued a one-time failure to remove shopping carts and ice

from a handicapped parking space on a particular day, without any allegation that this failure was

systemic or caused by an identifiable policy or practice.  Here, plaintiffs have alleged multiple

experiences over three years of encountering hurdles and risks when voting.  They have also

identified specific Board policies that caused these harms.[10]  Together, these experiences amount

to a denial of an equal opportunity to vote, in violation of the ADA and Section 504.

---

[10] Defendants' reliance on *J.D. v. Georgetown Indep. Sch. Dist.*, No. A-10-CA-717 LY, 2011 WL 2971284
(W.D. Tex. July 21, 2011), for the proposition that "[a]cts of negligence do not come within the ambit of the ADA" is even more misplaced.  Defs.' Mem. 21 n.13.  In *J.D.*, the court held that a

### 3.   Defendants' actions do not fall within the ambit of any safe harbor.

The Help America Vote Act ("HAVA") and the ADA do not provide a safe harbor, as the Board contends, Defs.' Mem. 22, for the failure of its one BMD at Ms. Sager's polling place.  In requiring "at least" one accessible voting machine at each polling place, HAVA sets a floor, not a ceiling that limits the scope of the ADA and Section 504.  52 U.S.C. § 21081(a)(3)(B); *see Cal. Council of the Blind*, 985 F. Supp. 2d at 1244–45 (finding no conflict between the requirements of HAVA on the one hand and the ADA and Section 504 on the other).  If Maryland needs to provide more BMDs to ensure blind voters' equal opportunity to vote, it must do so.  *See Nat'l Fed'n of the Blind v. Lamone*, No. CIV.A. RDB-14-1631, 2014 WL 4388342, at *5 (D. Md. Sept. 4, 2014) (requiring the Board to offer accessible absentee voting system even though the voting machines it used for in-person voting were compliant with HAVA), *aff'd* 813 F.3d 494 (4th Cir. 2016).

The Board's reliance on 28 C.F.R. § 35.133(b) fares no better.  The Board claims that it gets a free pass when the one accessible voting machine at a poll breaks down on election day because § 35.133(b) states that the ADA "does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." *See* Defs.' Mem. 22.  The Board ignores that such temporary disruptions must be "due to maintenance or repairs," not simply an unexpected breakdown.  The Board does not (and at this stage, cannot) claim that the BMD at Ms. Sager's polling site was undergoing maintenance or a repair on election day; instead, it was simply broken on the one day when it was needed.  This is not the kind of service disruption excused by the regulation. *See, e.g.*, *Cal. Council of the Blind*, 985 F. Supp. 2d at 1240 (holding that 28

---

heightened pleading standard applied to Section 504 and ADA claims when they concern the denial of adequate educational services by schools—a standard requiring a showing that the school acted with "bad faith or gross misjudgment."  2011 WL 2971284, at *7.  Defendants do not argue that a similar standard applies here.

C.F.R. § 35.133(b) did not shield the county from liability under the ADA where accessible voting machines were inoperable on election day not because of "maintenance or repairs," but because of the county's broader policies).

The same regulation also provides: "[a] public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." § 35.133(a). As the Department of Justice has explained, "allowing obstructions or 'out of service' equipment to persist beyond a reasonable period of time would violate this part . . . . Failure of the public entity to . . . arrange prompt repair of . . . other equipment intended to provide access would also violate this part." 28 C.F.R. Pt. 35, App'x B.[11] There is no "reasonable period of time" for the single accessible voting machine at a poll to be broken on election day—voters may have little time to vote and cannot wait hours for the opportunity. The only reasonable course of action to protect plaintiffs' right to vote privately and independently, and under the same conditions as sighted voters, is to ensure that enough machines are available so that a breakdown of one does not render the whole enterprise inaccessible.

### 4. The Board cannot prevail on a motion to dismiss by drawing factual inferences in its favor.

The Court should reject the Board's invitation to make inferential leaps in support of its motion. With respect to Plaintiff Marie Cobb, the Board questions whether having a trained poll worker assist Ms. Cobb would have shortened the time it took her to vote. Defs.' Mem. 23 n.15. Common sense dictates that if a voter encounters an unplugged machine that no one knows how to use, has to make a phone call for remote assistance, and ultimately rely on an untrained minor

---

[11] This interpretation is entitled to *Auer* deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (In agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation.") (internal quotation marks and citations omitted).

to configure a voting machine for her—before she even starts reviewing her ballot or making selections—it will take significantly longer to vote than walking into one's polling place, receiving brief instructions from a trained poll worker, and immediately being able to use a voting machine that has already been set up. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). The Court is neither required nor permitted to accept the Board's postulate to the contrary at this stage of the proceedings. *See Hall*, 846 F.3d at 765 (requiring a court to draw all reasonable inferences in plaintiffs' favor at the motion to dismiss stage).

Once again filling in its preferred version of facts from the complaint's silence, the Board argues that Ms. Sager's experience should be discounted, because its policy is to fix or replace broken machines within two hours on election day and there are no allegations that this did not occur. Defs.' Mem. 22. According to the complaint, in the approximately 50 minutes Ms. Sager spent at her polling site, the machine never became operable, nor was she told that it would be working at some later point that day. Compl. ¶ 39. Plaintiffs allege that the poll worker instructed Ms. Sager to vote with assistance; the poll worker did not inform Ms. Sager she could return in two hours when the machine would be replaced or fixed, even if that were a reasonable solution under the circumstances (which plaintiffs do not concede). Compl. ¶ 39. The Court can reasonably infer that the poll worker had no plan to fix or replace the machine and that it was not fixed. Accordingly, plaintiffs have sufficiently alleged a denial of equal opportunity in violation of Title II and Section 504.

### B. Plaintiffs' proposed relief is reasonable.

In arguing that plaintiffs' proposed relief is unreasonable, defendants miss that under the effective communication regulation, 28 C.F.R. § 35.160, plaintiffs need not establish the

reasonableness of their proposed auxiliary aid or service (in this case, expanded use of the BMD to render it an equally effective aid).  A public entity must implement an auxiliary aid or service simply upon a showing that the aid or service is "appropriate" and "necessary," in that it will "afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160 (b)(1) (stating that a public entity "shall" provide the auxiliary aid or service); *Prakel v. Indiana*, 100 F. Supp. 3d 661, 683 (S.D. Ind. 2015) (distinguishing mandatory nature of auxiliary aid requirement in effective communications regulation, 28 C.F.R. § 35.160(b)(1), from requirement under 28 C.F.R. § 35.130(b)(7) that modifications be reasonable).

Nevertheless, plaintiffs' proposed relief is reasonable.  As the Board admits, "[t]he burden of establishing the reasonableness of an accommodation is 'not a heavy one'; 'it is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'"  Defs.' Mem. 24 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)).  The Board further acknowledges that the "determination of the reasonableness of a proposed modification is generally fact-specific." *Id.* (citing *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 464 (4th Cir. 2012)).

The Court has not had the benefit of any discovery concerning the actual costs of plaintiffs' proposed relief or the benefits it might bestow upon all Maryland voters.  Without such, it cannot determine that plaintiffs' proposed relief is unreasonable as a matter of law, as defendants argue.  Defs.' Mem. 23–26.  The Board faces an uphill battle on that front, particularly given that plaintiffs' supposedly "unreasonable" request was one of three options proposed by the Maryland Attorney General in his 2013 opinion on the issue of avoiding segregated ballots. *See* 98 Md. Op. Att'y Gen. at 153 (opining that the Board could "require all voters to use a voting system that is accessible to voters with disabilities").  It is perplexing that

the Board's counsel would now characterize their previous proposal as unreasonable as a matter of law.

Furthermore, it cannot be unreasonable to ask all voters to use machines to mark their ballots when this is exactly how Maryland conducted elections for more than a decade until 2016.  Compl. ¶ 20.  Nor can requiring or encouraging all voters to use BMDs be unreasonable when several other jurisdictions in the United States, including the state of West Virginia, already follow this practice.  Compl. ¶ 44.  The use of the BMDs would not compromise the legislature's purpose in changing its voting program, because they leave a paper trail, which is all the General Assembly required.  *See* Md. Code Ann., Elec. Law § 9-102.  In light of the Board's extensive experience with operating a machine-only voting system, it is reasonable to require the Board to return to having one unified system of voting in Maryland whereby voters with and without disabilities all use the same machines to vote unless they affirmatively request to hand mark their ballot.

The Board's claim of "undue hardship," Defs.' Mem. 24, is simply a thinly-veiled attempt to raise the affirmative defense of undue burden and to shift to plaintiffs the responsibility to establish that their proposed relief would not pose such a burden.  Under the ADA, undue burden is an affirmative defense, and it is the defendant's responsibility to prove it. *Innes v. Bd. of Regents of the Univ. Sys. of Md.*, No. CIV.A. DKC 13-2800, 2015 WL 1210484, at *7 (D. Md. Mar. 16, 2015); 28 C.F.R. § 35.164.  Plaintiffs need not anticipate and disprove undue burden at the pleadings stage.

Even taken at face value, defendants' "undue hardship" argument fails to render plaintiffs' requested relief unreasonable.  First, the Board has now retracted its argument that an adequate number of BMDs cannot be made available in time for the 2020 elections.  *Compare* Defs.' Mem. 24–25 *with* Supp. Mem. Supp. Defs.' Mot. Dismiss, ECF No. 19.  The Board's

supplemental filing makes clear that the Board could obtain enough BMDs and BMD activation-card printers to make BMDs the default voting method in Maryland months before the April 2020 primary election.[12]

Second, the Board argues that the cost of making BMDs the default voting option would be too high, based entirely on a legislative fiscal note of which it asks the Court to take judicial notice. Defs.' Mem. 10 n.6, 25. The Board cites no authority that supports accepting a cost estimate in a fiscal note as fact. While courts consider legislative history to help determine legislative intent, *see Moore v. State*, 388 Md. 623, 635 n.4 (2005), there is no reason that the statements made therein must be accepted as true, particularly at the pleadings stage before the evidence supporting and perhaps undermining such statements can be explored. Moreover, the fact that the legislature believed that the costs were too high does not establish that it was so for purposes of the ADA;[13] otherwise government would nearly always be able to make out an undue burden defense when it failed to open its programs to people with disabilities because of assumed costs.

Ultimately, the costs and benefits of plaintiffs' proposed relief are factual matters not suitable for decision on the pleadings. *See, e.g.*, *Innes*, 2015 WL 1210484, at *8–9 (Title II case evaluating cost of plaintiffs' proposed modification and financial resources available to

---

[12] Even if the Board could not implement plaintiffs' relief in time for one or both of the 2020 elections, this would not render plaintiffs' requested relief unreasonable. Plaintiffs have demanded that BMDs be used as the default method of voting in "all future elections," not simply the 2020 elections. Compl. p.19.

[13] This is additionally so given that the undue burden determination "must be based on all resources available for use in the program," which includes not just budgeted line items but the overall resources available to the Board, whether from the state or other funding sources. Title II Technical Assistance Manual, Title II Technical Assistance Manual at § II-5.1000, https://www.ada.gov/taman2.htm (last visited Sept. 17, 2019); *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 418 (4th Cir. 2015); *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 944–46 (N.D. Ind. 2009).

defendants and determining a genuine dispute of material fact existed that prevented summary judgment on this issue). Plaintiffs have therefore met their burden to plead a reasonable remedy.

### C. The statute of limitations does not bar plaintiffs' claims.

The Board's denial of an equal voting experience to individuals with disabilities has been "a fixed and continuing practice" from April 2016 through today. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (internal quotation marks omitted). Where unlawful conduct occurs not just once, but "in a series of separate acts," with the "same alleged violation . . . committed at the time of each act, . . . the limitations period begins anew with each violation." *Id.* (internal quotation marks omitted); *cf. Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 411 (D. Md. 2015) ("[I]f one act in a continuous history of discriminatory conduct falls within the [statutory] period, then acts that are plausibly or sufficiently related to that act, which fall outside the [statutory] period, may be considered for purposes of liability.") (internal quotation marks omitted). Ms. Cobb's and Ms. Sager's experiences voting in the April 2016 primary election were the start of a continuing violation of their civil rights that has continued through the most recent election in November 2018. Compl. ¶¶ 39, 41. Indeed, Ms. Cobb and Ms. Sager refer to their experiences voting in the 2016 primary only as part of their broader description of the difficulties they have encountered voting in every election since Maryland changed to paper ballots in 2016. *Id* ¶ 39 (alleging that Ms. Sager "has had varying levels of difficulty voting in every election since the Board transitioned to paper ballots and BMDs in 2016"); *id* ¶ 41 (alleging that Ms. Cobb "has had difficulty voting in every election since 2016" and "has been required to spend between half an hour to an hour trying to vote, even though there has been no line at her polling place"). The Board's argument that plaintiffs' claims arising from the 2016 primary election are barred by the three-year statute of limitations, Defs.' Mem. 18–19, is therefore unavailing.

23

Even if the allegations related to the 2016 primary were not part of a continuing violation, plaintiffs' experiences during the 2016 primary may still be used as evidence of the effects of the Board's policy of maintaining separate and unequal voting systems. "Statutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th Cir. 1994). Furthermore, plaintiffs do not raise separate claims for each election, nor do they seek damages. Their claims and available remedies remain the same regardless of whether they encompass the last four or only the last three elections. Statute of limitations issues should therefore have no effect on the progress of this suit.

## II.   Defendants Do Not Satisfy the Fundamental Alteration Defense.

Plaintiffs' proposal to require the Board to offer the BMD as the default option for in-person voting does not constitute a fundamental alteration as a matter of law. As the Board concedes, "the fundamental alteration analysis is typically not appropriate at the motion-to-dismiss stage." Defs.' Mem. 27 (citing *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004)). "Defendants bear the burden of proving that the requested modification would be a fundamental alteration to the program." *Lamone I*, 813 F.3d at 508 (citing 28 C.F.R. § 35.130(b)(7)).

Defendants cannot satisfy their burden. Plaintiffs do not ask the Board to allow voters to cast their ballots by raising their hands or some other means not already contemplated by the current voting system. Plaintiffs merely request that the Board adopt a procedure already proposed by the Maryland Attorney General and in use by some voters. 98 Md. Op. Att'y Gen. at 153. Indeed, the Board ran an all-machine voting system from 2004 until 2016; it transitioned away from that system to generate a paper trail. Plaintiffs do not ask that the Board revert to its old machines that both mark and cast ballots, only that it present its new, accessible BMDs—

which generate the required paper trail—as the default voting option and provide paper ballots upon request.

This request is in line with others that promote the rights of voters with disabilities and that courts have found do not fundamentally alter defendants' voting programs. *Lamone I*, 813 F.3d at 509–10 (affirming that requiring the Board to send and allow for the marking of absentee ballots electronically would not fundamentally alter paper-based absentee voting program because "[r]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does") (internal quotation marks and citation omitted); *Disabled in Action*, 752 F.3d at 202 (holding that order requiring assessments and monitoring of polling sites to address mobility and vision disability access would not fundamentally alter city voting program).

The Board relies on *Montalvo v. Radcliffe*, 167 F.3d 873, 879 (4th Cir. 1999), an appeal of a bench trial decision, for the proposition that program-wide alterations are not required under the ADA. Defs.' Mem. 27. Yet *Montalvo* does not stand for such a broad proposition. The *Montalvo* court held that plaintiffs' proposed modification—a softer karate teaching style—was not required because it would force the defendant, which ran a "hard-style Japanese karate . . . with a heavy emphasis on sparring and actual-fight simulation," to "abandon its essential mission and to offer a fundamentally different program." *Montalvo*, 167 F.3d at 876, 879. Where, as here, a requested modification would not alter the essential mission or purpose of a program, there is no reason why a program-wide alteration would be impermissible. Furthermore, the Board's essential mission is to "ensure compliance with the requirements of Maryland and federal election laws by all persons involved in the election process." *About SBE*, The State Board of Elections, https://www.elections.maryland.gov/about/index.html (last visited Sept. 16, 2019). Plaintiffs' proposed relief is fully consistent with this mission.

25

### III. Plaintiffs' Claims Are Not Moot.

The Board's recent minor changes to its policies do not moot plaintiffs' claims. Defendants claiming mootness bear "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (citation omitted). A case is moot only "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (internal quotation marks and citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (internal quotation marks and citations omitted). Furthermore, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189 (citations omitted); *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (refusing to find case moot where challenged statute was repealed during litigation because legislature could simply reenact law at later date); *N.Y. St. Nat'l Org. for Women v. Terry*, 159 F.3d 86, 91–92 (2d Cir. 1998) (finding that although defendants had not violated the permanent injunction in over seven years, the case was not moot because it was "by no means absolutely clear that defendants' violations of the district court's orders could not reasonably be expected to recur") (internal quotation marks and citation omitted). If voluntary cessation were enough to moot a case, a defendant would be "free to return to his old ways." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). In particular, last minute "maneuvers designed to insulate a decision from review by this Court [through claimed mootness] must be viewed with a critical eye." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (citation omitted).

Given the formidable burden of establishing mootness, the Board's last-minute policy change, coming this past summer only after plaintiffs threatened litigation, does not moot plaintiffs' claims.  Without a permanent injunction, any or all of the Board's recent policy changes could be rescinded at a future Board meeting.  But more importantly, the Board's written policy is only part of the problem.  The practices on the ground—for four consecutive elections—of failing to carry out the policies that were in place demonstrate a systemic problem with the Board's implementation of its policies.  If the Board could not get all precincts to comply with the two-voter minimum in the past three elections, even once it was on notice of violations, establishing a five-voter minimum will not avert the harm.  Thus, it is by no means "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

Finally, the Board's recent policy changes, even if followed, are unlikely to remedy the violations of plaintiffs', and other blind voters', rights under the ADA and Section 504.  The Board now "authorizes," but does not require, local boards to have a second BMD at each precinct.  Defs.' Mem. 29.  Simply allowing, but not requiring, polling sites to have a second BMD would not prevent a situation like Ms. Sager experienced in November 2018 from occurring again, where the only BMD at her precinct was not working and she required assistance to vote.

Nor will these policy changes ensure that the BMDs are readily usable by voters once installed in precincts.  The Board was required to provide BMDs, and therefore poll workers capable of operating them, for the past four elections, but failed to do so.  Compl. ¶¶ 39, 41.  The Board's policy changes do not call for more training in this needed area; instead, they simply call for increased poll worker training "around how voters are notified about the availability of the BMDs."  Defs.' Mem. 29.  Even if voters are properly notified that they can use the BMDs and

the BMDs are presented neutrally as another voting option, if poll workers are not familiar with how to set up and use them and there are not enough BMDs for all voters to use, it is unlikely many voters will opt to use the BMDs rather than paper ballots.  The fewer voters who use the BMDs, the less familiar poll workers will be with the machines, and the cycle of separate and unequal voting will continue.

Finally, whether requiring five voters is enough to ensure a secret ballot is a question of fact on which discovery is needed.  It may be that five users is not sufficient, as a matter of probability, to protect the privacy of the voters who use the BMDs.

The Board's recent policy changes do not make it "absolutely clear" that plaintiffs will have an equal voting experience in 2020 and beyond.  *See Friends of the Earth, Inc.*, 528 U.S. at 190.  Thus, plaintiffs' claims are not moot.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' Motion to Dismiss should be denied.


Dated: September 17, 2019                    Respectfully submitted,


                                             _____*/s/*_____
                                             Jessica P. Weber (Federal Bar No. 17893)
                                             James T. Fetter (Federal Bar No. 20727)
                                             Brown, Goldstein & Levy, LLP
                                             120 E. Baltimore Street, Suite 1700
                                             Baltimore, Maryland 21202
                                             (410) 962-1030 (phone)
                                             (410) 385-0869 (fax)
                                             jweber@browngold.com
                                             jfetter@browngold.com

                                             *Attorneys for Plaintiffs*