# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

NATIONAL FEDERATION        *
OF THE BLIND, INC., *et al.*,

                             *

       Plaintiffs,

                             *

v.                                            Civil Action No. 19-2228-SAG

                             *

LINDA H. LAMONE, *et al.*,

                             *

       Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

Jessica P. Weber (Federal Bar No. 17893)
James T. Fetter (Federal Bar No. 20727)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
jweber@browngold.com
jfetter@browngold.com

Dated: September 20, 2019                *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

    I.   Voting in Maryland ....................................................................................... 2

    II.   Plaintiffs ...................................................................................................... 5

    III.  The Impact of Board Policy on Blind Voters ....................................... 7

    IV.  The Board's Recent Policy Changes .................................................... 8

LEGAL STANDARD ................................................................................................. 10

ARGUMENT .............................................................................................................. 10

    I.   Plaintiffs are likely to succeed on the merits of their ADA and
       Section 504 claims. ................................................................................. 10

        A.   Plaintiffs have established a violation of the ADA and
            Section 504 ................................................................................. 10

        B.   Plaintiffs' proposed relief is a necessary and appropriate
            auxiliary aid or service and is also a reasonable modification ..... 14

        C.   Defendants cannot establish that plaintiffs' requested relief
            would fundamentally alter Maryland elections or create an
            undue financial or administrative burden. ................................... 17

    II.   Plaintiffs are likely to suffer irreparable harm in the absence of
       preliminary relief .................................................................................... 19

    III.  The balance of equities tips decidedly in plaintiffs' favor ................... 20

    IV.  An injunction is in the public interest. ................................................. 20

    V.   Plaintiffs are prepared to post a bond. ................................................ 21

    VI.  CONCLUSION .................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Blake v. Baltimore Cty., Md.*, No. CV L-07-50, 2008 WL 11358014
    (D. Md. July 1, 2008) ..................................................................................... 21

*Burlington N.R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064 (9th Cir. 1991)) .............................. 19

*Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229 (N.D. Cal.
    2013) ......................................................................................................... 14

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir.
    2005) ......................................................................................................... 12

*Disabled in Action v. Bd. of Elections*, 752 F.3d 189 (2d Cir. 2014) ......................................... 14

*Hindel v. Husted*, No. 2:15-CV-3061, 2016 WL 2735935 (S.D. Ohio May 11,
    2016) ......................................................................................................... 14

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) .............................. 21

*Kerrigan v. Phila. Bd. of Election*, No. CIV. A. 07-687, 2008
    WL 3562521 (E.D. Pa. Aug. 14, 2008) ................................................................. 14

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) .................. 10

*Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635 (E.D.N.C. 2010) ................................ 21

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494  (4th Cir. 2016) ........................................... 13

*Nat'l Fed'n of the Blind, Inc. v. Lamone*, No. CIV.A. RDB-14-1631, 2014
    WL 4388342  (D. Md. Sept. 4, 2014) ................................................................... 21

*Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699 (D. Md.
    2002) ......................................................................................................... 19

*Potomac Conf. Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni
    Ass'n, Inc.*, No. CIV.A. DKC 13-1128, 2014 WL 857947 (D. Md. Mar. 4,
    2014) ......................................................................................................... 21

*Prakel v. Indiana*, 100 F. Supp. 3d 661 (S.D. Ind. 2015) ...................................................... 15

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766
    (D. Md. 2008) .............................................................................................. 21

*Reyazuddin v. Montgomery Cty, Md.*, 789 F.3d 407 (4th Cir. 2015) ........................................ 18

*Schade v. Md. St. Bd. of Elections*, 401 Md. 1 (2007) ........................................................... 18

*Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333 (4th Cir. 2012) ......................... 12

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...................................................................... 20

*Westchester Disabled on the Move, Inc. v. Cty. of Westchester*, 346 F. Supp. 2d 473
    (S.D.N.Y. 2004) ................................................................................. 14

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)) .................................... 10

**Statutes**

29 U.S.C. § 794 ........................................................................................... 1, 11, 12

42 U.S.C. § 12101 ............................................................................................... 20

42 U.S.C. § 12102 ............................................................................................... 12

42 U.S.C. § 12132 ............................................................................................... 10

42 U.S.C. § 12188 ............................................................................................... 19

42 U.S.C. §§ 12131–12134 ............................................................................... 1, 10

Md. Code Ann., Elec. Law § 9-102 ........................................................... passim

**Regulations**

28 C.F.R. § 35.130 ................................................................... 11, 13, 15, 17

28 C.F.R. § 35.160 ................................................................... 11, 13, 14, 15

28 C.F.R. § 35.164 ........................................................................................... 17

28 C.F.R. § 41.51 ..................................................................................... 11, 13

COMAR § 33.10.01.10 ....................................................................................... 3

**Other Authorities**

*Analysis of the FY 2020 Maryland Executive Budget, 2019*: *State Board of
    Elections* 1, General Assembly of Maryland,
    http://mgaleg.maryland.gov/Pubs/BudgetFiscal/2020fy-budget-docs-
    operating-D38I01-State-Board-of-Elections.pdf ................................... 19

Election Systems and Software, *ExpressVote: Universal Voting System as a
    Marker*, https://www.essvote.com/wp-content/uploads/2018/12/ExpressVote-
    Marker_One-Sheet.pdf ....................................................................... 18

Maryland State Board of Elections, *Agreement Number: MD18101001, Program Narrative Submission, March 23, 2018 – March 22, 2023* (submitted July 11, 2018), https://www.eac.gov/havadocuments/MD_Narrative_Budget.pdf .............................. 12

*New Voting System—What you Need to Know*, The State Board of Elections, https://www.elections.maryland.gov/voting_system/index.html ............................................. 4

*Operating Budget Facts*, General Assembly of Maryland, http://mgaleg.maryland.gov/webmga/frmbgtnfiscal.aspx?pid=bnfpage&stab=01&id=sk001_tab01&tab=subject4&ys=2019RS (Maryland's total operating budget for Fiscal Year 2020 exceeds $46 billion) ................................................................. 18

State Bd. of Elections, *July 25, 2019 Meeting*, https://elections.maryland.gov/pdf/minutes/2019_07.pdf ....................................................... 9

State Bd. of Elections, *June 27, 2019 Meeting* at 9, https://elections.maryland.gov/pdf/minutes/2019_06.pdf ....................................................... 9

Title II Technical Assistance Manual, https://www.ada.gov/taman2.htm ................................... 18

## INTRODUCTION

Plaintiffs the National Federation of the Blind, Inc. ("NFB"), the National Federation of the Blind of Maryland ("NFB-MD"), Joel Zimba, Ruth Sager, and Marie Cobb (collectively "plaintiffs") bring this Motion for Preliminary Injunction against Defendants Linda H. Lamone, in her official capacity as State Administrator of the Maryland State Board of Elections ("the Board"), Michael R. Cogan, in his official capacity as Chairman of the Board, Patrick J. Hogan, in his official capacity as Vice Chairman of the Board, and William G. Voelp, Kelley A. Howells, and Malcolm L. Funn, in their official capacities as members of the Board (collectively, "defendants" or "the Board"), to enjoin the Board from denying blind individuals an equal opportunity to vote in person and to communicate their votes in an equally effective manner,  in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

Plaintiffs are likely to prevail on the merits of their claim because without an order requiring the Board to move from maintaining two separate and unequal voting systems to an integrated voting system where accessible ballot marking devices ("BMDs") are the default voting option offered to all voters, Mr. Zimba, Ms. Sager, Ms. Cobb, and many NFB and NFB-MD members will continue to be denied an equal voting experience at their polling places on election day.  Furthermore, the Board is unlikely to succeed in an affirmative defense of undue financial or administrative burden: the Board has significant financial resources available to it and was able to pay for and handle the logistics related to maintaining enough accessible voting machines for all voters to use for more than a decade until 2016.  In addition, the Board has admitted that it could acquire a sufficient number of BMDs in time for the 2020 general election

to make them the default method of marking ballots in Maryland.  Granting the requested relief also would not fundamentally alter Maryland's voting program.

Because plaintiffs' civil rights are at stake in this litigation, plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. The balance of the equities tips decidedly in plaintiffs' favor because if the Board is not preliminarily enjoined, Mr. Zimba, Ms. Sager, Ms. Cobb, and many NFB and NFB-MD members will be denied an equal voting experience—both in terms of not having a guaranteed secret ballot and encountering difficulties attempting to vote not shared by other voters—in the November 3, 2020 general elections. Conversely, the Board will suffer minimal harm by acquiring enough BMDs to offer them to all voters as the default method of marking ballots in the 2020 general election.  Finally, the public interest will be served by enforcing the ADA and Section 504's goal of creating equal opportunities for individuals with disabilities to participate in civic life and exercise their fundamental right to vote.  Accordingly, this Court should issue Plaintiffs a preliminary injunction and require the Board to make BMDs the default method of marking ballots in Maryland by the November 3, 2020 general election.

## **STATEMENT OF FACTS**

### I.  **Voting in Maryland**

From 2004 until 2016, Maryland required all voters to vote using electronic voting machines, which were equipped with accessibility features that gave blind voters nonvisual access to the ballot.  98 Md. Op. Att'y Gen. 152, 154–56 (Dec. 18, 2013); Decl. of Jonathan Lazar ("Lazar Decl.") ¶ 5 (Sept. 20, 2019).  These voting machines directly recorded and tabulated votes and did not produce a voter-verifiable paper record.  98 Md. Op. Att'y Gen. at 154–55.

2

In 2007, Maryland enacted legislation requiring the Board to certify, for elections after January 1, 2010, voting machines that would generate a paper trail.  Md. Code Ann., Elec. Law § 9-102.  This legislation also required the Board to ensure that voters with disabilities could vote at their local precinct on accessible BMDs that generated a paper trail, so that they could vote privately and independently.  *Id.*  BMDs are machines that allow voters to mark their ballots electronically, instead of by hand.  98 Md. Op. Att'y Gen. at 152, 156.  They are equipped with both a touchscreen and a non-visual interface to allow blind voters to mark their ballots without assistance.  Lazar Decl. ¶ 6.  BMDs help prevent common voter mistakes by alerting voters if they have selected too many options for a particular contest (over-voting) or too few (under-voting).  *Id.*; COMAR § 33.10.01.10.  Once voters confirm their selections, the BMDs print a paper ballot they can then feed into the scanner that tabulates votes.  98 Md. Op. Att'y Gen. at 156.  BMDs do not cast or directly record any votes.  Lazar Decl. ¶ 6.

The 2007 Maryland legislation also specified that the Board must "provide access to voters with disabilities that is equivalent to access afforded voters without disabilities without creating a segregated ballot for voters with disabilities."  Md. Code Ann., Elec. Law § 9-102(f)(1).  In 2013, the Maryland Attorney General issued an opinion elucidating the meaning of the term "segregated ballot" and interpreting § 9-102(f)(1).  98 Md. Op. Att'y Gen 152.  In this opinion, the Attorney General wrote that, "the General Assembly, by using the term 'segregated ballot,' intended to ensure that the ballots cast by voters with disabilities could not be identified as such during the process of casting, counting, and, if necessary, re-counting the paper ballots cast in an election."  *Id.* at 153.  The Attorney General presented the Board with three options for certifying a voting system that would not create a segregated ballot for voters with disabilities: "[1] require all voters to use a voting system that is accessible to voters with disabilities . . . [; 2]

3

certify an accessible voting system that generates a ballot that is formally identical to those ballots cast by non-disabled voters . . . [; or 3] certify an accessible voting system that generates a non-identical ballot, so long as voting procedures are implemented to ensure that non-disabled voters use the accessible system as well and do so in sufficient numbers to prevent the resulting ballots from being identified as having been cast by voters with disabilities." *Id.*

The Board finally transitioned to a paper-based voting system in 2016, choosing to lease Election Systems and Software's ExpressVote BMD for use as an accessible alternative to hand marking paper ballots. *New Voting System—What you Need to Know*, The State Board of Elections, https://www.elections.maryland.gov/voting_system/index.html (last visited Sept. 19, 2019). In adopting a new voting system, the Board followed none of the Attorney General's proposed options for complying with Maryland law. The ExpressVote BMD generates ballots that differ significantly in size, shape, and content from hand-marked paper ballots. While the paper ballots used for hand marking are 8.5 by 11 inches and contain all contest selections, with corresponding bubbles for voters to fill in with their selections, the ExpressVote paper ballots measure 4.25 by 14 inches and only list the options the voter selected. Lazar Decl. ¶ 7; Ex. A to Defs.' Mem. Supp. Mot. Dismiss, ECF No. 18 (hereinafter "Mot. Dismiss Mem."), at 26, ECF No. 17-2; Ex. C to Decl. of Ronza Othman ("Othman Decl.") (Sept. 20, 2019) at 3 (Jan. 18, 2018 Letter from NFB-MD to Maryland General Assembly). Although the ExpressVote ballots are thus readily distinguishable from the hand-marked paper ballots used in Maryland, the Board required neither that all voters nor sufficient voters without disabilities use the BMDs. Ex. D to Othman Decl. at 1–2 (July 30, 2018 Report from Board to Senator Kasemeyer and Delegate McIntosh).

Instead, since 2016, the Board has presented paper ballots that require hand marking to all voters as the default voting option, steering almost all voters without disabilities to such ballots. Ex. C to Othman Decl. at 1; Ex. D to Othman Decl. at 2. As a matter of policy since 2016, the Board has required that two voters per precinct use BMDs to mark their ballots; as a matter of practice, however, in every election since 2016, the Board has failed to meet even this low benchmark in multiple precincts throughout the state. Ex. A to Mot. Dismiss Mem. at 21–24, ECF No. 17-2. In the 2016 general election, there were 34 precincts in which only one voter used the BMD. *Id.* at 21. In the 2018 primary election, the number of precincts in which only one voter used the BMD rose to 40. *Id.* at 22. In the 2018 general election, there were 22 precincts in which one ballot was marked using a BMD and 66 precincts in which the BMD was not used at all.[1] *Id.* at 23–24.

## II. Plaintiffs

Plaintiffs Joel Zimba, Ruth Sager, and Marie Cobb are blind registered voters in Maryland. Decl. of Joel Zimba ("Zimba Decl.") ¶¶ 4–5 (Sept. 17, 2019); Decl. of Ruth Sager ("Sager Decl.") ¶¶ 4–5 (Sept. 19, 2019); Decl. of Marie Cobb ("Cobb Decl.") ¶¶ 4–5 (Sept. 18, 2019). Because they are blind, they cannot hand mark a paper ballot and must use a BMD to vote. Zimba Decl. ¶¶ 4–5; Sager Decl. ¶¶ 4–5; Cobb Decl. ¶¶ 4–5. Mr. Zimba, Ms. Sager, and Ms. Cobb generally vote in person at their local polling places. Zimba Decl. ¶ 4; Sager Decl. ¶ 4 Cobb Decl. ¶ 4. They have all voted in person in prior elections since 2016 and intend to continue voting in person in future elections. Zimba Decl. ¶¶ 6–7, 9; Sager Decl. ¶¶ 6–8, 11; Cobb Decl. ¶¶ 6, 11.

---

[1] The 2018 general election is the only election for which the Board chose to collect and release data on the number of precincts in which BMDs were not used at all.

Plaintiff the NFB is the oldest and largest national organization of blind persons.  Decl. of

Mark Riccobono ("Riccobono Decl.") (Sept. 19, 2019) ¶ 4.  It has affiliates in all 50 states,

Washington, D.C., and Puerto Rico, and its headquarters in Baltimore, Maryland.  *Id.*  The NFB

and its affiliates are widely recognized by the public, Congress, executive agencies of state and

federal governments, and the courts as a collective and representative voice on behalf of blind

Americans and their families.  *Id.*  The organization promotes the general welfare of the blind by

assisting the blind in their efforts to integrate themselves into society on terms of equality and by

removing barriers that result in the denial of opportunity to blind persons in virtually every sphere

of life, including education, employment, family and community life, transportation, and

recreation.  *Id.*

The ultimate purpose of the NFB is the complete integration of the blind into society on a

basis of equality.  *Id.* ¶ 5.  This objective includes the removal of legal, economic, and social

discrimination.  *Id.*  As part of its mission and to achieve these goals, the NFB has worked

actively to ensure that the blind have an equal opportunity to vote on the same terms as all other

voters by collaborating with developers of voting technology to ensure accessibility for the blind.

*Id.*  In particular, the NFB has devoted extensive resources—resources that have been diverted

from other important projects—to helping develop accessible voting options and advocating to

election officials, including the Maryland State Board of Elections, to provide equal voting

opportunities for blind individuals.  *Id.*  The NFB has many blind members who are registered to

vote in Maryland and wish to vote in person at their local precinct on the same terms as all other

voters. *Id.* ¶ 6.

The NFB-MD is the Maryland state affiliate of the NFB.  Othman Decl. ¶ 3.  The NFB-

MD is a 501(c)(3) non-profit corporation made up of approximately 2,000 blind Marylanders and

their families and friends.  *Id.*  The NFB-MD shares the NFB's mission and purpose, with a

focus on issues and organizing at the Maryland state level.  *Id.* ¶ 4.  The NFB-MD works in

furtherance of its members' right to participate fully and equally in all aspects of their lives in

Maryland, including in voting.  *Id.*  The organization has devoted substantial resources—

resources diverted from other important work— to advocacy in the Maryland legislature and

before the Maryland State Board of Elections to protect the right of blind Marylanders to vote on

equal terms during Maryland's recent transition from electronic to paper-based voting.  *Id.* ¶¶ 4,

6–9, 11–12.  The NFB-MD has sent representatives to multiple Board meetings and has

expended significant resources advocating for a legislative fix to the Board's ongoing violations

of the rights of blind Maryland voters. *Id.* ¶ 4, 11.  The NFB-MD has many blind members who

are registered to vote in Maryland and wish to vote in person at their local precinct on the same

terms as all other voters.  *Id.* ¶ 5.

## III.     The Impact of Board Policy on Blind Voters

Segregated voting in Maryland has harmed blind voters, including Plaintiffs Joel Zimba,

Ruth Sager, and Marie Cobb.  Mr. Zimba was the only voter to use a BMD in his precinct in the

2018 primary election.  Zimba Decl. ¶ 6.  The poll workers at Mr. Zimba's precinct recognized

him when he came to vote and knew him by name.  *Id.* ¶ 7.  Thus, unlike Maryland voters

without disabilities, Mr. Zimba had no reasonable expectation that his ballot was secret.  *Id.*

While all Marylanders without disabilities will go to vote in 2020 confident that their voting

selections will remain anonymous, Mr. Zimba is concerned that he will again be deprived of a

secret ballot.  *Id.* ¶ 8.

In every election since 2016, Plaintiff Marie Cobb has experienced avoidable delays

when voting, ranging from a half hour to an hour, caused by untrained poll workers and

improperly set up BMDs.  Cobb Decl. ¶ 6.  Poll workers at Ms. Cobb's precinct have told her

that they never received training on how to set up or use the BMD.  *Id.* ¶¶ 7–8.  In both the 2016

and 2018 general elections, when Ms. Cobb voted on election day, she had to set up the BMD

herself, without the assistance of poll workers.  *Id.*  In the 2016 general election, she even had to

enlist the help of her 13-year-old granddaughter, who discovered that, although Ms. Cobb's

precinct had been open for hours, the only BMD was not plugged in and the cord was still

wrapped and affixed to the back of the machine.  *Id.* ¶ 7.  Ms. Cobb's granddaughter had to plug

in the machine, at which point Ms. Cobb contacted an NFB employee by phone for instructions

on how to use it.  *Id.*

The Board denied Plaintiff Ruth Sager the right to vote privately and independently

altogether. When Ms. Sager voted during the November 2018 general election, the poll workers

at her precinct informed her that the only BMD was broken and that she should have her

husband, who was sighted, fill out her ballot for her.  Sager Decl. ¶ 7.  Ms. Sager was not

comfortable with this option, so the poll workers assisted her with voting instead.  *Id.*  The first

poll worker who assisted Ms. Sager was unable to read her ballot properly or correctly record her

choices, requiring Ms. Sager to request assistance from another poll worker.  *Id.* ¶¶ 7–8.  Ms.

Sager thus had to divulge her voting selections to two poll workers to exercise her right to vote in

the November 2018 election.  *Id.*  Because she has found that poll workers often do not know

how to properly set up or operate the BMDs, she has also experienced varying levels of difficulty

trying to vote in other elections since 2016.  *Id.* ¶ 6.

## IV.    The Board's Recent Policy Changes

After years of writing letters, testifying at Board meetings, and pushing corrective

legislation (opposed by the Board) in a vain attempt to get the Board to take the persistent issue

of unequal and non-anonymous voting experiences for blind voters seriously, plaintiffs sent the

Board a final demand letter in May 2019.  Othman Decl. ¶ 12; Ex. F to Othman Decl. (May 7,

2019 letter from J. Weber to Board and A. Trento).  Faced with the prospect of a lawsuit, the

Board, in June 2019, increased the number of voters per precinct required to use BMDs from two

to five, gave permission to local boards of elections to place up to two BMDs at polling sites on

election day (but did not require it), and directed staff to increase training of election judges on

notifying voters about the availability of BMDs.  *See* State Bd. of Elections, *June 27, 2019*

*Meeting* at 9, https://elections.maryland.gov/pdf/minutes/2019_06.pdf.  In July 2019, the Board

changed the statement that poll workers are supposed to deliver to all voters when they check in

to vote to neutrally present hand-marking or the BMD as two options for voting.  State Bd. of

Elections, *July 25, 2019 Meeting* at 11, https://elections.maryland.gov/pdf/minutes/2019_07.pdf.

Plaintiffs, however, are concerned about the Board's ability to ensure that five voters at

each precinct use a BMD on election day, when over the course of four consecutive elections, it

has never succeeded in ensuring that at least two voters use the machine at all precincts.  Ex. A

to Mot. Dismiss Mem. at 21–24, ECF No. 17-2; Zimba Decl. ¶ 8; Sager Decl. ¶ 10; Cobb Decl. ¶

10; Othman Decl. ¶ 13.  Furthermore, the Board's changes—particularly capping the number of

BMDs that can be offered at each polling site to two (and not even requiring that more than one

machine be deployed)—ensure that voters seeking to use the BMDs will encounter delays,

discouraging their use.  Because they will have little experience with the BMDs, poll workers

will be less familiar with their set-up and operation, causing further difficulty and delay and

perpetuating their underutilization.  The Board can expect that the BMDs will continue to be

underused or not used at all, as occurred in 66 precincts in the November 2018 election.  Ex. A to

Mot. Dismiss Mem. at 23–24, ECF No. 17-2.  Plaintiffs therefore proceeded with filing the

present lawsuit to ensure that they or their members can vote in future elections without sacrificing their civil right to an equal voting experience, including a secret ballot.  Since filing this lawsuit, plaintiffs have learned that the Board can acquire a sufficient number of BMDs and related equipment from its vendor so that the BMD could be offered as the default method of voting in the 2020 elections.  *See* Supp. to Mem. in Supp. of Defs.' Mot. to Dismiss 1–2, ECF No. 19.

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they can demonstrate that: "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

**I.     Plaintiffs are likely to succeed on the merits of their ADA and Section 504 claims.**

A.     Plaintiffs have established a violation of the ADA and Section 504.

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Public entities include "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(B).  In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified

10

individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others.  28 C.F.R. § 35.130(b)(1)(ii)–(iii).  Public entities are also required to provide "appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).  The aids and services must be provided to "protect the privacy and independence of the individual with a disability." § 35.160(b)(2).

Similarly, under Section 504 of the Rehabilitation Act of 1973, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  Moreover, a recipient of federal financial assistance may not, in providing aids, benefits, or services, "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may such programs and activities provide qualified handicapped persons with "an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 41.51(b)(1)(ii)–(iii). Therefore, the Board is obligated to provide Mr. Zimba, Ms. Sager, Ms. Cobb, and members of the NFB and NFB-MD with an opportunity to vote that is equal to that afforded to voters without disabilities.

To prove a violation of either the ADA or Section 504,[2] Mr. Zimba, Ms. Sager, Ms. Cobb, and NFB and NFB-MD members must establish that: (1) they have disabilities; (2) they are "otherwise qualified to receive the benefits of a public service, program, or activity"; and (3) they were "excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [their] disabilit[ies]." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). In addition, to prove a violation of Section 504, plaintiffs must show that the Board receives federal funds. *See* 29 U.S.C. § 794(a).

The Board regularly receives federal financial assistance and, in 2018, received more than $7 million in federal grant money to "enhance election technology and make election security improvements." *See* Maryland State Board of Elections, *Agreement Number: MD18101001, Program Narrative Submission, March 23, 2018 – March 22, 2023* (submitted July 11, 2018), https://www.eac.gov/havadocuments/MD_Narrative_Budget.pdf.  As for proving a violation of the ADA and Section 504, the first and second prongs of this test are easily met. Because they are blind, Mr. Zimba, Ms. Sager, Ms. Cobb, and blind NFB and NFB-MD members each have a physical impairment "that substantially limits one or more major life activities" such as seeing.  42 U.S.C. § 12102(1)(A); Zimba Decl. ¶ 5; Sager Decl. ¶ 5, Cobb Decl. ¶ 5; Riccobono Decl. ¶ 6; Othman Decl. ¶ 5.  Each, therefore, has a "disability" under the ADA.  Furthermore, because Mr. Zimba, Ms. Sager, Ms. Cobb, and many NFB and NFB-MD members are registered to vote in Maryland, they are eligible and thus "qualified" to receive the

---

[2] Because the standards established by Title II and Section 504 are substantially similar, the Fourth Circuit analyzes the two statutes together. *See Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336, n.1 (4th Cir. 2012).

benefits of voting in the November 3, 2020 general elections.  *See* Zimba Decl. ¶ 4; Sager Decl.

¶ 4, Cobb Decl. ¶ 4; Riccobono Decl. ¶ 6; Othman Decl. ¶ 5.

Plaintiffs satisfy the third element of this test as well.  When Mr. Zimba, Ms. Sager, and

Ms. Cobb, along with other NFB and NFB-MD members, go to vote on election day in

Maryland, they cannot be confident that their readily distinguishable ballots will remain

anonymous.  *See* Zimba Decl. ¶¶ 6–8.  Voters without disabilities have no reason to doubt the

secrecy of their ballots.  Plaintiffs encounter significant delays at the polls when the BMDs are

not adequately set up and/or poll workers cannot give sufficient instruction on how to operate the

machines.  *See* Cobb Decl. ¶¶ 6–8; Sager Decl. ¶¶ 6–8.  Voters without disabilities experience no

such frustrations.  And when the one BMD at a plaintiff's polling place is inoperative, she cannot

vote privately and independently at all.  *See* Sager Decl. ¶¶ 7–8.  Maryland's move to a

predominately hand-marked paper ballot system of voting has created a separate and unequal

voting system for plaintiffs and NFB and NFB-MD members that deprives them an equal voting

experience. This violates Title II and Section 504's promise of equal opportunity and equally

effective communication.  *See* 28 C.F.R. § 41.51(b)(1)(ii)–(iii); 28 C.F.R. § 35.130(b)(1)(ii)–

(iii); 28 C.F.R. § 35.160(b)(1).

The Board has not complied with federal law simply because Mr. Zimba, Ms. Sager, and

Ms. Cobb were all able to cast their ballots in the past four elections, albeit without the guarantee

of ballot secrecy and with delay or other difficulties.  Courts have made clear that individuals

with disabilities must be able to vote in an equal manner, not merely some manner.  Thus, where

states offer sighted voters the opportunity to vote privately and independently by absentee ballot,

it is not sufficient to offer blind voters only the options of voting in person or by absentee ballot

with assistance.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016)

(hereinafter "*Lamone I*"); *Hindel v. Husted*, No. 2:15-CV-3061, 2016 WL 2735935, at *8 (S.D.

Ohio May 11, 2016), *rev'd on other grounds by,* 875 F.3d 344 (6th Cir. 2017).  And when many

local polling sites are off limits to voters with disabilities, it is not enough for public entities to

provide alternate means of voting on election day for these voters that impose additional

inconveniences.  *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 199 (2d Cir. 2014);

*Kerrigan v. Phila. Bd. of Election*, No. CIV. A. 07-687, 2008 WL 3562521 at *18 (E.D. Pa. Aug.

14, 2008); *Westchester Disabled on the Move, Inc. v. Cty. of Westchester*, 346 F. Supp. 2d 473,

478 (S.D.N.Y. 2004).  If voters without disabilities can vote privately and independently at their

polls, it does not satisfy Title II and Section 504 to afford blind voters the right to vote only with

third-party assistance.  *Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229, 1238

(N.D. Cal. 2013).  To assume that public entities need only offer "the opportunity to vote at some

time and in some way—would render meaningless the mandate that public entities may not

afford persons with disabilities services that are not equal to that afforded others."  *Disabled in

Action*, 752 F.3d at 199.

> B.     Plaintiffs' proposed relief is a necessary and appropriate auxiliary aid or service
>        <u>and is also a reasonable modification.</u>

The persistent nature of the Board's violations of plaintiffs' civil rights—over the course

of four consecutive elections and at multiple polling sites—makes clear that only systemic relief

will ensure an equal voting experience in future elections: making ballot marking devices, rather

than pens, the default method for voting in Maryland.  Plaintiffs' requested relief, expanded use

of BMDs to ensure plaintiffs can communicate their votes in an equally effective manner,

constitutes an auxiliary aid or service.  *See* 28 C.F.R. § 35.160(b)(1).  Thus, the Board must

implement it upon a showing that it is "appropriate" and "necessary," in that it will "afford

individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a

14

service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1) (stating that a public

entity "shall" provide the auxiliary aid or service); *Prakel v. Indiana*, 100 F. Supp. 3d 661, 683

(S.D. Ind. 2015) (distinguishing mandatory nature of auxiliary aid requirement in effective

communications regulation, 28 C.F.R. § 35.160(b)(1), from requirement under 28 C.F.R. §

35.130(b)(7)(i) that modifications be reasonable).

Plaintiffs' proposed auxiliary aid or service is both appropriate and necessary to ensure

that blind voters can communicate their voting selections in an equally effective manner.  The

recent, minor policy changes that the Board adopted this past summer are not sufficient to

prevent the ongoing violation of plaintiffs' rights.  The Board's written policy is only part of the

problem.  The practices on the ground—for four consecutive elections—of failing to carry out

the policies that were in place demonstrate a systemic problem with the Board's implementation

of its policies.  If the Board could not get all precincts to comply with the requirement that at

least two voters per precinct use the BMDs in the past three elections, even once it was on notice

of violations, establishing a five-voter minimum will not avert the harm.

Even if successfully implemented, the Board's recent policy changes are unlikely to

remedy the violations of plaintiffs', and other blind voters', rights under the ADA and Section

504.  The Board now "authorizes," but does not require, local boards to have a second BMD at

each precinct.  Mot. Dismiss Mem. 29.  Simply allowing, but not requiring, polling sites to have

a second BMD would not prevent a situation like Ms. Sager experienced in November 2018 from

occurring again, where the only BMD at her precinct was not working and she required

assistance to vote.

Nor will these policy changes ensure that the BMDs are readily usable by voters.  The

Board was required to provide BMDs, and therefore poll workers capable of operating them, for

the past four elections, but failed to do so.  *See* Sager Decl. ¶ 6; Cobb Decl. ¶¶ 6–8.  The Board's

policy changes do not call for more training in this needed area; instead, they simply call for

increased poll worker training "around how voters are notified about the availability of the

BMDs."  Mot. Dismiss Mem. 29.  Even if voters are properly notified that they can use the

BMDs and the BMDs are presented neutrally as another voting option, if poll workers are not

familiar with how to set up and use them and there are not enough BMDs for all voters to use, it

is unlikely many voters will opt to use the BMDs rather than paper ballots.  The fewer voters

who use the BMDs, the less familiar poll workers will be with the machines, and the cycle of

separate and unequal voting will continue.  Accordingly, to ensure that plaintiffs are not once

again denied an equal voting experience in the November 2020 election, the Court should require

the Board make BMDs the default voting option for all Maryland voters, with paper ballots

available upon request or in cases where there are long lines of people waiting to vote.

Plaintiffs' requested relief is also a modification of Board policy that is reasonable.  First,

the Board has already admitted that it could obtain enough BMDs and related equipment from its

vendor in time for the November 2020 election.  *See* Supp. Mem. Supp. Defs.' Mot. Dismiss 1–

2.[3]  Second, because BMDs are already in use in Maryland; it is difficult to imagine that the

Board would implement a method of voting that it finds unreasonable.  Third, the Board's

counsel, the Office of the Maryland Attorney General, has opined that requiring all voters to use

BMDs to vote would be a potential solution to preventing segregated ballots in the state.  98 Md.

Op. Att'y Gen. at 153.  It is unlikely the Attorney General would propose an unreasonable

change to the voting program.  Fourth, asking all voters to mark their ballots with a machine is

---

[3] Although the Board refers to an October 4, 2019 contract deadline for obtaining the necessary number of BMDs by December 31, 2019, and more BMD activation-card printers by February 28, 2020, the contract deadline would presumably be later to obtain the necessary equipment in time for the November, rather than the April, 2020 election.

not new to Maryland; the state required all in-person voters, with the exception of those casting

provisional ballots, to use machines to vote from 2004 until 2016.  98 Md. Op. Att'y Gen. at

154–56; Lazar Decl. ¶ 5.  Fifth, several other jurisdictions in the United States, including the

entire state of West Virginia and all jurisdictions within Michigan and Arkansas that use the

ExpressVote BMD, already require or encourage all voters to use BMDs to mark their ballots.

*See* Lazar Decl. ¶ 10.  Finally, because BMDs produce a voter-verifiable paper ballot, the

expanded use of BMDs is fully consistent with the Maryland legislature's goal of creating a

paper trail for all voters.  *See* Md. Code Ann., Elec. Law § 9-102(d)(1)(vi).

   C.   Defendants cannot establish that plaintiffs' requested relief would fundamentally
        alter Maryland elections or create an undue financial or administrative burden.

      The Board may only refuse to provide blind voters with an equal voting experience if it

can prove that doing so would either fundamentally alter the nature of Maryland elections or, in

the case of providing an auxiliary aid or service, that it would pose an undue financial or

administrative burden.  *See* 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 35.164.  The Board will not

be able to establish that using BMDs as the default voting method would fundamentally alter the

nature of the in-person voting program—all ballots would still be marked either by hand or by

BMD and tabulated using optical scanners, as they now are.  There would still be a paper trail for

all votes cast in Maryland.

      In addition, because Maryland can obtain the necessary number of additional BMDs to

make them the default voting option in time for the November 2020 election from the BMD

vendor, Supp. Mem. Supp. Defs.' Mot. Dismiss 1–2, implementing plaintiffs' requested relief

would not pose an undue administrative burden.  To the contrary, because BMDs remove the

ambiguity in voters' selections that can plague hand-marked ballots (*e.g.*, problems determining

if a voter intended to fill in the bubble for a particular candidate or situations where the voter

places an "X" in the bubble, rather than filling it in completely) and also prevent voters from selecting too many options for a contest (over-voting) and having their selections for that contest thrown out, their expanded use reduces the overall administrative burden on the Board.  Lazar Decl. ¶ 6; Election Systems and Software, *ExpressVote: Universal Voting System as a Marker* at 2,  https://www.essvote.com/wp-content/uploads/2018/12/ExpressVote-Marker_One-Sheet.pdf; *Schade v. Md. St. Bd. of Elections*, 401 Md. 1, 8–9 (2007) (discussing disadvantages of hand-marked paper ballots, including "questionable marks resulting in the need to guess at voter intent during a recount").

Furthermore, given the extensive financial resources available to the Board and to the State of Maryland, both in the form of already allocated funds and additional funding available upon request, whether from the federal government, the state legislature, or the Maryland Board of Public Works, the Board will not be able to show that making BMDs the default voting option for all voters will pose an undue financial burden.  *See* Title II Technical Assistance Manual, Title II Technical Assistance Manual at § II-5.1000, https://www.ada.gov/taman2.htm (explaining that the undue financial burden analysis "must be based on all resources available for use in the program"); *Reyazuddin v. Montgomery Cty, Md.*, 789 F.3d 407, 418 (4th Cir. 2015) (holding that court must consider overall available resources of the department and county, not merely the amount budgeted for the accommodation); *Operating Budget Facts*, General Assembly of Maryland, http://mgaleg.maryland.gov/webmga/frmbgtnfiscal.aspx?pid=bnfpage&stab=01&id=sk001_tab01&tab=subject4&ys=2019RS (last visited Sept. 20, 2019) (Maryland's total operating budget for Fiscal Year 2020 exceeds $46 billion); *Analysis of the FY 2020 Maryland Executive Budget, 2019*: *State Board of Elections* 1, General Assembly of Maryland,

http://mgaleg.maryland.gov/Pubs/BudgetFiscal/2020fy-budget-docs-operating-D38I01-State-Board-of-Elections.pdf (Board's total operating budget for Fiscal Year 2020 exceeds $27 million).  This is especially so given that from 2004 to 2016, the Board required all voters to use machines to vote and was thus presumably able to pay for enough machines, including their storage, transportation, and maintenance.

**II.      Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.**

Irreparable harm may be presumed when a defendant has violated a civil rights statute such as the ADA or Section 504.  *See Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001)).  This is particularly so when that statute explicitly provides for injunctive relief, as the ADA does.  *Id.* (citing *Burlington N.R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991)); 42 U.S.C. § 12188(a)(2).  The ADA authorizes injunctive relief, including mandatory preliminary injunctive relief, to remedy acts of discrimination against persons with disabilities.  *See* 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.").

If the Court does not grant a preliminary injunction and the Board is not required to obtain enough BMDs to ensure that they are the default voting option for the 2020 general election, Mr. Zimba, Ms. Sager, Ms. Cobb, and other blind NFB and NFB-MD members will face delays at the polls, will be required to enlist the help of third parties either to set up BMDs or to vote at all, will encounter broken BMDs and untrained poll workers, and will have to hope that enough voters use the BMD at their precinct to protect the secrecy of their ballots.  No

amount of monetary relief can compensate for not having an equal opportunity to exercise the fundamental right to vote.

**III.     The balance of equities tips decidedly in plaintiffs' favor.**

The balance of equities tilts heavily in favor of plaintiffs in this case. Without a systemic solution to the problems that have plagued the last four Maryland elections (no guarantee of ballot secrecy, delay in using the BMDs or the inability to use them at all, and needing to rely on third parties for assistance setting up and using the BMDs), Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members will not be able to vote on equal terms with other voters. Accordingly, they will suffer the effects of discrimination and exclusion from one of the most important acts a citizen in a democracy can undertake.

In contrast, the Board will suffer minimal harm if a preliminary injunction is granted. The Board can obtain enough BMDs from its vendor of choice and, for more than a decade, managed a voting system where all voters used voting machines to cast their votes.  Furthermore, increased usage of BMDs will ease the administration of elections, reducing the number of ambiguous ballots and thus simplifying the recount process.  Accordingly, the balance of equities tips heavily in favor of granting plaintiffs a preliminary injunction.

**IV.     An injunction is in the public interest.**

Congress has made clear in enacting the ADA and Section 504 that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(b)(1)).  In the context of preliminary injunctions, courts have found that "the public interest lies with upholding the law and having the mandates of the ADA and Rehabilitation Act enforced." *Marlo M.* ex rel. *Parris v. Cansler*, 679 F. Supp. 2d 635, 638

(E.D.N.C. 2010); *Blake v. Baltimore Cty., Md.*, No. CV L-07-50, 2008 WL 11358014, at *7 (D. Md. July 1, 2008) (finding that public interest factor weighed in favor of employee seeking to uphold protections under ADA).

Furthermore, in ensuring that all citizens have an equal opportunity to vote, a preliminary injunction in this case would promote the fundamental right to vote. *See, e.g.*, *Nat'l Fed'n of the Blind, Inc. v. Lamone*, No. CIV.A. RDB-14-1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014), *aff'd* 813 F.3d 494 (4th Cir. 2016) ("Granting injunctive relief in this case promotes the right to vote, is consistent with the anti-discrimination mandate of the ADA and Section 504, and thus serves the public interest."); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 796 (D. Md. 2008) *aff'd*, 368 F. App'x 370 (4th Cir. 2010) (finding that an injunction serves the public interest where it would "further[] the exercise and protection of [a] constitutional right").

## V.     Plaintiffs are prepared to post a bond.

The Fourth Circuit has interpreted Federal Rule of Civil Procedure 65(c) to mean that "[a]lthough the district court has discretion to set the bond amount 'in such sum as the court deems proper,' it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). "[I]n circumstances where the risk of harm is remote, a nominal bond may suffice." *Potomac Conf. Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, No. CIV.A. DKC 13-1128, 2014 WL 857947, at *22 (D. Md. Mar. 4, 2014). Plaintiffs are prepared to post a bond that is reasonable given the remote risk of harm to the Board pending final resolution on the merits, in the amount deemed proper by the Court.

## VI.     CONCLUSION

The balance of the four factors for issuing a preliminary injunction weighs heavily in plaintiffs' favor.  For the foregoing reasons, plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction and order the Board to make the BMD the default voting method in time for the November 2020 general election.


Dated: September 20, 2019                    Respectfully submitted,


                                             _____*/s/*_____
                                             Jessica P. Weber (Federal Bar No. 17893)
                                             James T. Fetter (Federal Bar No. 20727)
                                             Brown, Goldstein & Levy, LLP
                                             120 E. Baltimore Street, Suite 1700
                                             Baltimore, Maryland 21202
                                             (410) 962-1030 (phone)
                                             (410) 385-0869 (fax)
                                             jweber@browngold.com
                                             jfetter@browngold.com

                                             *Attorneys for Plaintiffs*