**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE NATIONAL FEDERATION OF THE BLIND, INC., *et al.*, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. SAG-19-2228 |
| | * | |
| LINDA H. LAMONE, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs The National Federation of the Blind, Inc. ("NFB"), The National Federation of the Blind of Maryland, Inc. ("NFB-MD"), Joel Zimba ("Zimba"), Ruth Sager ("Sager"), and Marie Cobb ("Cobb") (collectively, "Plaintiffs") initiated this suit against Linda H. Lamone, the Administrator of the Maryland State Board of Elections, and other members of the Maryland Board of Elections (collectively, "the Board") on August 1, 2019.  ECF 1.  Plaintiffs seek a declaratory judgment that the Board's policy regarding the use of paper ballots, supplemented by the use of electronic ballot marking devices ("BMD" or "BMDs"), as the primary method of voting violates their rights under Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973.  *Id.*  Plaintiffs also seek an injunction requiring the Board to implement a policy of having every in-person voter in Maryland use BMDs as the default method of voting.  *Id.*

On September 3, 2019, the Board filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF 17; ECF 18 (the Board's

Memorandum in Support of its Motion to Dismiss) (collectively, "the Motion to Dismiss"). Plaintiffs timely opposed, ECF 20, and the Board timely replied, ECF 24.

On September 20, 2019, Plaintiffs filed a Motion for Preliminary Injunction, seeking an order requiring the Board to offer BMDs as the default voting option to all Maryland voters in time for the 2020 general election. ECF 21; ECF 21-1 (collectively, "the Injunction Motion"). The Board timely opposed. ECF 24. After conducting a conference call with the parties, the Court granted Plaintiffs' Motion for Leave to Take Expedited Discovery on the issues of the cost and feasibility of Plaintiffs' proposed injunctive relief. ECF 34. After the discovery period ended, Plaintiffs filed a Reply on December 23, 2019. ECF 46 (sealed); ECF 55 (redacted). The Board, with the Court's leave, filed a Surreply on January 9, 2020. ECF 52 (sealed); ECF 56 (redacted); *see* ECF 44 (granting the Board leave to file a Surreply).

The Court thereafter held a hearing on the Injunction Motion on January 17, 2020, at which the parties presented only legal argument. ECF 54. However, on February 7, 2020, Plaintiffs filed a Motion for Leave to File Supplemental Evidence, providing eleven additional declarations from voters that details their experiences voting during the February, 2020 special primary election in the Seventh Congressional District. ECF 57.

Given that the Motion to Dismiss raises the same substantive legal issues as the Injunction Motion, the Court finds that no hearing is necessary on the Motion to Dismiss. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, the Motion to Dismiss will be denied, and the Injunction Motion will also be denied. Finally, because Plaintiffs' new evidence does not change the Court's view of Plaintiffs' request for preliminary injunctive relief, Plaintiffs' Motion for Leave to File Supplemental Evidence will be granted, without awaiting an opposition.

## I.     THE BOARD'S MOTION TO DISMISS

### A.     Facts Relevant to the Motion to Dismiss

The following facts are derived from Plaintiffs' Complaint, and all documents integral to the Complaint.[1]  *See United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  All facts are accepted as true, and all reasonable inferences are drawn in Plaintiffs' favor.  *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

The NFB is the oldest, and largest, organization of blind persons in the United States, acting as "a collective and representative voice on behalf of blind Americans and their families." ECF 1, ¶ 7.  The NFB-MD is but one of the NFB's many affiliates.  *Id.* ¶¶ 7, 10.  Both the NFB and the NFB-MD have blind members who "wish to vote in person at their local precinct on the same terms as all other voters."  *Id.* ¶ 7; *see id.* ¶ 10.  Plaintiffs Joel Zimba, Ruth Sager, and Marie Cobb, blind members of both the NFB and NFB-MD, are all residents of, and registered to vote in, the State of Maryland.  *Id.* ¶¶ 11-13.

The Board is an agency created, authorized, and existing under Maryland law.  *Id.* ¶ 14. Its primary responsibilities include managing and supervising Maryland elections, and ensuring compliance with federal and state laws.  *Id.*  The Board's members – Defendants Linda H. Lamone, Michael R. Cogan, Patrick J. Hogan, William G. Voelp, Kelley A. Howells, and

---

[1] The Board's Memorandum in Support of its Motion to Dismiss references various documents not attached as exhibits to Plaintiffs' Complaint.  *See, e.g.*, ECF 18 at 11 (Board policy documents); *id.* at 13 (Board-run webpage); *id.* at 14 (Board meeting minutes); *id.* at 16 (Board reports); *id.* at 17-18 (legislative history documents); ECF 17-2 (NFB submissions to the Maryland Legislature); ECF 17-3 (docket entry in a Maryland state court case).  Even accepting *arguendo* that these materials may be properly considered at the Rule 12(b)(6) stage, for the reasons stated in Part I.C., *infra*, the Motion to Dismiss nonetheless fails.

Malcolm L. Funn – are all appointed by Governor Hogan, with the advice and consent of the Maryland State Senate. *Id.* ¶¶ 14, 16-19. Ms. Lamone is the State Administrator of the Board, making her Maryland's chief election official. *Id.* ¶ 16. The Board receives federal financial assistance in carrying out its duties. *Id.* ¶ 15.

From 2004 to 2016, all Maryland voters utilized electronic voting machines to cast their ballots. *Id.* ¶ 20. In 2007, however, the Maryland Legislature enacted a law requiring the Board to certify voting machines that would leave a paper trail for elections occurring after January 1, 2010. *Id.* ¶ 21 (citing Md. Code Ann., Elec. Law § 9-102 (West 2019)). The law requires that any machine the Board certifies must not force voters with disabilities to vote by a "segregated ballot." *Id.* In 2013, the Maryland Attorney General issued an opinion regarding the term "segregated ballot." *Id.* ¶ 22 (citing 98 Md. Op. Att'y Gen. 152 (Dec. 18, 2013)). The Attorney General opined that the Board had three options for certifying an elections system that would not result in disabled voters voting by a "segregated ballot": (1) require that all voters use accessible voting machines; (2) certify voting machines that print ballots that are identical to paper ballots that are marked by hand; or (3) certify voting machines that print ballots that are not identical to paper ballots that are marked by hand, "so long as [the Board] establishes polling-procedures to ensure that enough non-disabled voters will use the accessible system that the ballots of disabled voters cannot be identified as such." 98 Md. Op. Att'y Gen. at 166.

The Board chose the third option. Beginning in 2016, the Board implemented a policy making handwritten paper ballots the default voting method for Maryland voters. ECF 1, ¶ 3; *see id.* ¶ 23. For blind voters, the Board began leasing ExpressVote Ballot Marking Devices, or "BMDs," from the company Election System and Software ("ES&S"). *Id.* ¶ 23. The BMDs are voting machines that electronically mark, and then physically print, the voter's ballot. *Id.*

Notably, the paper ballots that BMDs produce "differ in shape, size, and content from the hand-marked ballots," making them "readily distinguishable from hand-marked ballots." *Id.* Specifically, the BMD's paper ballot measures 4.5 by 14 inches, and only lists the choices the voter selected. *Id.* ¶ 24. Conversely, the paper ballot that voters fill in by hand measures 8.5 by 11 inches, and contains all contest selections, with corresponding bubbles for voters to fill in. *Id.*

To ensure that "the ballots of disabled voters cannot be identified," 98 Md. Op. Att'y Gen. at 166, the Board implemented a policy in 2016 requiring each precinct to have at least two voters use the BMD, ECF 1, ¶¶ 26-27. In the 2016 and 2018 primary and general elections, however, multiple precincts failed to comply with this policy. *Id.* ¶¶ 28, 30, 32. Between 22 to 40 precincts in each election only had one voter vote via BMD. *Id.* Further, in the 2018 general election, 66 precincts failed to have *any* voter use the BMD. *Id.* ¶ 32. Plaintiff Joel Zimba alleges that in the 2018 primary election, he was the only voter at his Baltimore City precinct to vote via BMD. *Id.* ¶ 37. He alleges that the poll workers at his precinct "recognize [him] when he comes to vote and even know him by name," thereby denying him the right to vote by secret ballot, because his ballot looks different from everyone else's. *Id.*

The other individual named Plaintiffs, Ruth Sager and Marie Cobb, allege additional shortcomings. Ms. Sager alleges that during the 2018 general election, she was not able to use a BMD at her Baltimore County precinct because "the poll workers informed her that the only BMD at the location was broken." *Id.* ¶ 39. Ms. Sager alleges that the poll workers told her to have her husband read and mark a paper ballot for her. *Id.* Uncomfortable with that proposal, Ms. Sager asked the poll worker to read and mark the paper ballot for her. *Id.* The poll worker attempted to do so, but had difficulty pronouncing certain names, and improperly read some numbers on the ballot. *Id.* After Ms. Sager, with the poll worker's help, finished filling out the

ballot, the ballot scanner could not properly process it, requiring a second poll worker to fill out a new paper ballot for Ms. Sager. *Id.* In all, Ms. Sager spent approximately fifty minutes voting, "even though there was no line." *Id.*

Ms. Cobb "has had difficulty voting in every election since 2016." *Id.* ¶ 41. During the 2016 general election, a poll worker at Ms. Cobb's Baltimore County precinct had insufficient knowledge to help Ms. Cobb use the BMD, forcing Ms. Cobb to enlist the assistance of her thirteen-year-old granddaughter. *Id.* Her granddaughter discovered that the BMD was not even plugged in, despite the fact that Ms. Cobb went to vote in the afternoon. *Id.* Ms. Cobb had to call the NFB for guidance on how to set the machine up. *Id.* Ms. Cobb experienced similar difficulties in voting during the 2018 general election. *Id.*

In May, 2019, the Board enacted a number of policy changes to be implemented in future elections. First, it increased the minimum number of BMD voters in each precinct from two to five. *Id.* ¶ 34. Second, the Board gave precincts permission, but did not require them, to deploy a second BMD on election day. ECF 18 at 20.[2] Third, the Board mandated increased election judge training "around how voters are notified about the availability of the BMDs." *Id.* Fourth, the Board voted to change the statement given to all voters about the availability of BMDs, to read: "You have two ways to mark your ballot – either by hand or with the electronic device. Which do you prefer?" *Id.*

While recognizing these policy changes, Plaintiffs allege that the Board's failure to adopt policies "designed to create an integrated voting experience for voters with and without

---

[2] The Board cites to its Meeting Minutes from June 27, 2019 for this proposition. ECF 18 at 20. As previously stated, the Court accepts *arguendo* that these Minutes can be considered at the Rule 12(b)(6) stage. *See supra* n.1. Notably, Plaintiffs' Opposition cites to the Board's Memorandum in recounting the Board's 2019 policy changes. *See* ECF 20 at 12. Thus, the authenticity of the minutes does not seem to be in serious question.

disabilities" has "deteriorated" the voting experiences of blind Maryland voters. *Id.* ¶ 45. They allege that because the Board's past failures are unlikely to be remedied by the Board's recent policy changes, Plaintiffs, and other blind voters in Maryland, will continue to have an unequal voting experience in the 2020 general election, in violation of both Title II of the ADA and section 504 of the Rehabilitation Act. *Id.* ¶¶ 46-73. Plaintiffs seek (1) a permanent injunction requiring the Board to offer BMDs to every in-person voter in "all future elections," (2) a declaratory judgment that the Board has, and continues, to violate Title II of the ADA and section 504 of the Rehabilitation Act, and (3) reasonable attorneys' fees. ECF 1, Prayer for Relief, ¶¶ a-c.

### B. Legal Standards

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (*per curiam*).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co*, 637 F.3d at 440; *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts.

*See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004).

C.    **Analysis**

1.    Plaintiffs' claims are not moot.

The Board argues that Plaintiffs' claims are moot, because the wrongful alleged behavior here occurred during the 2016 and 2018 election cycles. ECF 18 at 35. That behavior cannot "reasonably be expected to recur" in 2020, according to the Board, because its 2019 policy changes "clearly remed[y] the circumstances under the prior policy that formed the basis for [P]laintiffs' claims." *Id.* at 35-36. The Board asserts that its policy changes will lead to (1)

increased BMD usage "that will more than compensate for the handful of precincts in which only one BMD-marked ballot was cast in recent elections," and (2) poll workers with a working knowledge of BMDs, preventing repetition of the challenges Plaintiffs faced in using BMDs in prior elections. *Id.* at 36-37. The Board's arguments miss the mark.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Since the parties lack an interest in the outcome of the case, "the court's subject matter jurisdiction ceases to exist also," requiring dismissal of the case. *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013) ("If any intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." (citation omitted)).

However, one of the "well-recognized" exceptions to the mootness doctrine is the doctrine of voluntary cessation. *E.g.*, *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017). If a defendant voluntarily abandons a challenged practice, the Court generally does not lose its power to determine the policy's legality. *Id.* (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, [and] then pick up where he left off . . . ." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The standard for determining whether a defendant's voluntary conduct has mooted a case is "stringent": the defendant's conduct must make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *see*

*also Already, LLC*, 568 U.S. at 91. The "heavy burden" to demonstrate mootness by voluntary cessation lies with the party asserting mootness. *Friends of the Earth*, 528 U.S. at 189.

The Fourth Circuit has recognized three circumstances in which a change in policy can moot a case, two of which are relevant here. *See Porter*, 852 F.3d at 364-65. First, a change in policy can moot a challenge to the government's former policy if the government "has not asserted its right to enforce [the challenged policy] at any future time." *Id.* (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989)). Second, if the government relinquishes its right to reinstate the challenged policy, then any challenge to that policy may become moot. *See id.* at 364-65; *Pashby v. Delia*, 709 F.3d 307, 316-17 (4th Cir. 2013) (holding that a challenge to a former governmental policy was not moot because the entity remained "free to reassess" the former policy "at any time").

Applying those standards, Plaintiffs' challenge to the Board's voting procedures is not moot, for two reasons. First, the Board has not truly abandoned the voting procedures that Plaintiffs now challenge. While it is true that the Board has made modifications to its policy since the 2018 general election (the last election that occurred under the previous policy), fundamentally, the procedures remain the same. When Maryland voters go to the polls to participate in the 2020 primary and general elections, paper ballots will still be the default method of voting, and BMDs will still be offered to blind and other visually impaired voters. Taking all of the allegations in Plaintiffs' Complaint as true, as this Court must at the Motion to Dismiss stage, it is not evident that the policy changes will completely eradicate the issues Plaintiffs have encountered in the past.

Second, at oral argument on Plaintiffs' Motion for Preliminary Injunction, the Board acknowledged that it could change its policy in the future. While the Board made clear that it

was committed to its newly implemented voting procedures for the 2020 general election, the Board only stated that it was "not likely to rescind" those new policy changes in future elections. Because the Board therefore "retains the authority and capacity to repeat an alleged harm," the Court cannot say that the Board has met its formidable burden to establish that Plaintiffs' claims are moot. *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014); *see also Pashby*, 709 F.3d at 316-17.

## 2. Plaintiffs have plausibly alleged a violation of the ADA and section 504 of the Rehabilitation Act.

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity." 42 U.S.C. § 12132 (2018). The Board qualifies as a "public entity" that the ADA covers. *See id.* § 12131(1)(B) (defining a "public entity" as, *inter alia*, any department of a State government). Further, "[v]oting is a quintessential public activity." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("*NFB I*"). Thus, the Board's provision of elections properly falls within the ADA's ambit.

Similarly, section 504 of the Rehabilitation Act of 1973 prohibits the exclusion of a "qualified individual with a disability" from participating in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2018). The Board, which receives federal funding, makes no argument that conducting elections is not a "program or activity" that the Rehabilitation Act covers. *See id.* § 794(b)(1)(A) (including in the definition of "program or activity" all operations of a State government department, "any part of which is extended Federal financial assistance"). Accordingly, the Board's provision of elections in the State of Maryland constitutes activity governed by section 504 of the Rehabilitation Act.

Claims arising under the ADA and section 504 of the Rehabilitation Act can be analyzed together "because the analysis is 'substantially the same.'" *Seremeth v. Bd. of Cty. Comm'rs of Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995)); *see* 42 U.S.C. § 12133 (incorporating into Title II of the ADA the "remedies, procedures, and rights" applicable to actions under section 504 of the Rehabilitation Act). First, Plaintiffs must allege a *prima facie* claim. That is, Plaintiffs must allege facts sufficient to plausibly demonstrate that (1) they have a disability, (2) they are otherwise qualified to receive a public service's benefits, and (3) they were excluded from participating in, or receiving the benefits of, a public service, or otherwise were discriminated against on the basis of their disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

The Board makes two arguments in favor of dismissal. First, the Board asserts that any claim for relief based on conduct occurring during the 2016 primary elections is time barred under the applicable three-year statute of limitations. ECF 18 at 25-26. Second, the Board argues that Plaintiffs have failed to plausibly allege that the Board's voting procedures deny Plaintiffs a meaningful opportunity to equally participate in the voting process. *Id.* at 26-30. Neither argument is persuasive.

        i.       *Evidence regarding the Board's election practices during the 2016 primary elections is not time-barred.*

The Board first argues that Plaintiffs' claims arising from the April, 2016 primary election are time barred. The Board correctly points out that Maryland's three-year statute of limitations for civil actions governs Plaintiffs' claims. ECF 18 at 25 (citing *Semenova*, 845 F.3d at 567). However, the Fourth Circuit has held that if a statutory violation occurs "in a series of separate acts[,] and if the same alleged violation was committed at the time of each act, then the

13

limitation period begins anew with each violation." *A Society Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (alteration in original) (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991). Plaintiffs' allegations that the Board's implementation of handwritten paper ballots as the default method of voting in every election since 2016 is such a series of separate acts. Each time the Board used this voting process, in November, 2016, April, 2018, and November, 2018, it resulted in the same violation from Plaintiffs' perspective – the deprivation of a meaningful opportunity to cast a secret ballot, in violation of Title II of the ADA and section 504 of the Rehabilitation Act. Thus, Plaintiffs' claims that the Board violated those statutes in April, 2016 by using the paper ballot system are not time barred. *See Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (holding that the continued enforcement of an allegedly unconstitutional statute within the statute of limitations period satisfied the continuing violation exception, allowing for consideration of the statute's enforcement in years outside of the applicable two-year statute of limitations).

> ii. *Plaintiffs have plausibly alleged that the Board's voting procedures deprive them of a meaningful opportunity to equally participate in the voting process.*

As previously indicated, to establish a *prima facie* violation of the ADA and the Rehabilitation Act, Plaintiffs must show that (1) they have a disability, (2) they are otherwise qualified to participate in the elections the Board conducts, and (3) they are excluded from receiving a benefit that the Board offers in conducting those elections, or are otherwise discriminated against, on the basis of their disability. *Constantine*, 411 F.3d at 498.[3] Only the third element is at issue here. *See* ECF 18 at 26-30.

---

[3] Under the Rehabilitation Act, Plaintiffs must also allege that the Board is an entity that receives federal funding. *See* 29 U.S.C. § 794(a). Plaintiffs have made such an allegation. ECF 1, ¶ 15.

Congress enacted the ADA "to remedy widespread discrimination against disabled individuals." *Nat'l Fed'n of the Blind*, 813 F.3d at 505 (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001)). Indeed, Congress specifically found that discrimination against disabled individuals was not limited to instances of intentional discrimination, but existed also in the "failure to make modifications to existing facilities and practices." *Id.* (quoting *PGA Tour, Inc.*, 532 U.S. at 675). As relevant here, the Department of Justice has interpreted Title II to mean that public entities cannot, when offering any public service, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the . . . service that is not equal to that afforded others."[4] 28 C.F.R. § 35.130(b)(1)(ii) (2019). Nor may a public entity "[p]rovide a qualified individual with a disability with a[] . . . service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." *Id.* § 35.130(b)(1)(iii).

Similarly, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794; *accord Alexander v. Choate*, 469 U.S. 287, 301 (1985). Like Title II of the ADA, the Rehabilitation Act has been interpreted to prohibit public entities from denying disabled individuals "the opportunity to participate in or benefit from" an offered aid, benefit, or service, and from affording disabled individuals "an

_____

[4] The DOJ's regulations implementing the ADA are given "controlling weight." *Seremeth*, 673 F.3d at 338 (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)).

opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 45 C.F.R. § 84.4(b)(1)(ii)-(iii) (2019).[5]

In *Choate*, a unanimous Supreme Court held that section 504 of the Rehabilitation Act "requires that an otherwise qualified handicapped individual must be provided with *meaningful access* to the benefit" that the public entity offers. 469 U.S. at 301 (emphasis added). Courts have applied the *Choate* Court's construction of section 504 in ADA Title II cases. *See K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013); *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). The Fourth Circuit also appears to have adopted the "meaningful access" standard in ADA Title II cases. *See NFB I*, 813 F.3d at 504-07 (interchangeably using the phrases "meaningful access" and "not equal to others," and ultimately concluding that the Board's online absentee voting program did "not provide[] plaintiffs with meaningful access to Maryland's absentee voting program").

Further, and of particular relevance here, the regulations implementing Title II require public entities to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity" it offers. 28 C.F.R. § 35.160(b)(1). For such auxiliary aids to be effective, they must be (1) "provided in accessible formats," (2) "in a timely manner," and (3) "in such a way as to protect the privacy and independence of the individual with a disability." *Id.* § 35.160(b)(2). This regulation also applies to claims brought under the Rehabilitation Act.

---

[5] Plaintiffs cite to 28 C.F.R. § 41.51 as the governing regulation. ECF 20 at 15. While the citation is certainly understandable, section 41.51 and its related provisions are intended to apply "to each Federal department and agency that is empowered to extend Federal financial assistance." 28 C.F.R. § 41.2. Instead, 45 C.F.R. § 84.1 *et seq.* are the proper governing provisions, for they apply "to each recipient of Federal financial assistance." 45 C.F.R. § 84.2; *see also NFB I*, 813 F.3d at 506 n.8 (citing 45 C.F.R. § 84.4(b)(1)(ii)-(iii)).

*See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362 (4th Cir. 2008) (noting that the rights available under Title II are those that are available under the Rehabilitation Act (quoting 42 U.S.C. § 12133)); *Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 393 (D. Md. 2011).

In *NFB I*, the plaintiffs, including the NFB, filed suit against the Board under Title II of the ADA and section 504 of the Rehabilitation Act, arguing that the Board's absentee ballot program prevented blind voters from obtaining the benefit of voting by secret ballot. 813 F.3d at 498-500. The Board's policy required that the voter either mark an absentee ballot electronically online, or fill out a paper ballot. *Id.* at 499. The Board had worked to develop a tool to allow blind voters to mark online absentee ballots without assistance, but had not certified the tool for usage. *Id.* at 499-500. There was no other means by which a blind voter could mark an absentee ballot without another person's assistance. *Id.*

On appeal, after the district court held a three-day trial, the Fourth Circuit upheld the district court's order requiring the Board to certify the online ballot marking tool in time for the 2014 general election. *Id.* at 501-02, 510. The Fourth Circuit found that Maryland law provided all voters the benefit of voting "privately and independently without assistance." *Id.* at 506. This was not a "standalone right," the court clarified, but rather a benefit that, under the ADA and Rehabilitation Act, must be afforded to disabled and non-disabled voters alike. *Id.* at 506-07. Because the Board provided no accessible means by which blind voters could independently mark absentee ballots, the Fourth Circuit concluded that the Board failed to provide them with "meaningful access" to Maryland's absentee voting program, in violation of the ADA. *Id.*

Like in *NFB I*, "[t]his case does not turn on whether there is a standalone right to vote privately and independently without assistance." *Id.* at 506. Indeed, Maryland law requires the

Board to certify election procedures that afford access to disabled voters "without creating a segregated ballot." Md. Code. Ann., Elec. Law § 9-102(f)(1). As interpreted by the Maryland Attorney General,[6] this provision is "intended to prevent the certification of a voting system that, for voters with disabilities, creates ballots that . . . can be easily distinguished from the ballots cast by other voters." 98 Md. Op. Att'y Gen at 166. Thus, if the Board guarantees non-disabled voters the ability to cast a ballot that cannot "be easily distinguished from the ballots cast by other voters," then the Board cannot deny that same benefit to disabled voters because of their disability. *Id.* "This is precisely the sort of harm the ADA seeks to prevent." *NFB I*, 813 F.3d at 506; *see also Disabled in Action v. Bd. of Elecs. in City of N.Y.*, 752 F.3d 189, 200 (2d Cir. 2014) (holding that, under the Rehabilitation Act, an allegation that a polling site failed to maintain working BMDs unlawfully precluded disabled individuals "from casting a private ballot on election day").

Plaintiffs Zimba, Sager, and Cobb each allege instances that, if taken as true, plausibly establish that they were deprived individually of the ADA's and Rehabilitation Act's guarantee of an opportunity to vote privately and independently without assistance, like their non-disabled counterparts. Mr. Zimba alleges that, while the BMD at his polling precinct was operational, he was the only one at his precinct to use it. ECF 1, ¶ 37. Because Mr. Zimba is a known and recognized voter at his precinct, his ballot became "readily identifiable to the poll workers," *id.*, given the noticeable differences between a typical paper ballot and a BMD-printed ballot, *see id.*

---

[6] While the Maryland Attorney General's opinion does not bind Maryland courts, generally, an opinion from the Maryland Attorney General is "given great consideration" in interpreting ambiguous statutory language, because the Legislature is presumed to have acquiesced to the Attorney General's interpretation if the Legislature takes no further action after the opinion is issued. *E.g.*, *State v. Crescent Cities Jaycees Found., Inc.*, 330 Md. 460, 470 (1993) (quoting *Read Drug/Chem. Co. v. Claypoole*, 165 Md. 250, 257 (1933)). Whatever weight this Court should give the Attorney General's opinion here is immaterial, however, since the parties agree that section 9-102(f) guarantees that no voter will vote by segregated ballot.

¶¶ 3, 24.  The failure to require just one more voter to use a BMD at Mr. Zimba's polling place, therefore, prevented the auxiliary aid offered to him, the BMD, from giving him an equal opportunity to cast a private ballot.  *See* 28 C.F.R. § 35.160(b)(2).

The fact that Mr. Zimba has not alleged that his ballot was manually reviewed by any poll worker at his precinct, ECF 18 at 27, is immaterial.  The ADA and the Rehabilitation Act guarantee that, just like non-disabled voters, disabled voters will cast a ballot without compromising their ballot's privacy.  *See NFB I*, 813 F.3d at 506-07; *Disabled in Action*, 752 F.3d at 199-200; *Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013) ("Even if blind and visually impaired voters can communicate their votes with the assistance of third parties, they certainly cannot 'enjoy the benefits of' the secret ballot afforded to most other voters.").  Whether the ballot's privacy is jeopardized on the front end by requiring a voter like Ms. Sager to rely on a poll worker to fill out her ballot, *see* ECF 1, ¶ 39, or on the back end when a poll worker is able to determine which individual cast a particular BMD-printed ballot, the voter's benefit of voting privately is extinguished.  If "requiring blind and visually impaired individuals to vote with the assistance of a third party . . . at best provides these individuals with an inferior voting experience," so too does providing blind voters with a voting experience that does not guarantee privacy throughout the entire voting process. *Cal. Council of the Blind*, 985 F. Supp. 2d at 1239.  Taken as true, for the purposes of a Motion to Dismiss, Plaintiffs' allegations adequately state such a claim.

The Board takes issue with the fact that Plaintiffs have not alleged, with regards to the 2018 primary election, that there was a voter within one of the forty precincts in the State failing to meet the two-BMD-voter minimum who was known to poll workers, that there was a recount in that precinct, and that that voter's ballot was reviewed in the recount.  ECF 18 at 28.  This

contention places far too great of a burden on Plaintiffs at the Rule 12(b)(6) stage. Indeed, to adopt the Board's logic would require this Court to draw factual inferences in the Board's favor, which it cannot do. *See, e.g.*, *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. Plaintiffs allege that the "2018 primary election generated several manual recounts," and that in the 2018 primary there were forty precincts statewide with only one BMD-cast ballot. ECF 1, ¶ 30. Drawing all reasonable inferences in Plaintiffs' favor, as the Court must on a Motion to Dismiss, it is reasonable to infer that the Board's policy resulted in systemic problems that were not due to mere "employee negligence." *See Foley v. City of Lafayette*, 359 F.3d 925, 930 (7th Cir. 2004).

Next, Ms. Sager alleges that she had to rely on two different poll workers to properly fill out, and scan, her ballot, because the only BMD at her polling place was broken. ECF 1, ¶ 39. This plausibly alleges a violation of the ADA and the Rehabilitation Act. *See Disabled in Action*, 752 F.3d at 199-200 (holding that a plaintiff could not cast a private ballot because her polling site failed to maintain BMDs in working condition). The Board counters that the Help America Vote Act ("HAVA") requires only one accessible voting device at each polling place, *see* ECF 18 at 29 (citing 52 U.S.C. § 21081(a)(3)), and the ADA's regulations excuse "isolated or temporary interruptions in service" of BMDs on election day, *id.* (quoting 28 C.F.R. § 35.133(b)). Even accepting both premises *arguendo*, "the duration of, frequency of, and reason for the failure of accessible voting machines to operate properly is a question of fact." *Cal. Council of the Blind*, 985 F. Supp. 2d at 1240. Accepting Plaintiffs' allegations as true, and drawing all reasonable inferences in their favor, they have plausibly alleged that the BMDs "were not inoperable due to an 'isolated or temporary interruption . . . due to maintenance or repairs.'" *Id.* (quoting 28 C.F.R. § 35.133(b)).

Finally, Ms. Cobb alleges that she needed her daughter's, and the NFB's, help to set up the BMD at her polling place because, when she arrived hours after the polling place opened, the BMD was not even plugged in. ECF 1, ¶ 41. Such an allegation plausibly alleges that her BMD was not inoperable because of "maintenance or repairs." *Cal. Council of the Blind*, 985 F. Supp. 2d at 1240; *see* 28 C.F.R. § 35.133(b).

Both of the Board's arguments to the contrary are inapposite. First, the Board argues that Ms. Cobb does not explain why the half an hour to an hour she spent setting up the BMD on her own "would have been shorter had a poll worker . . . been able to explain the operation of the BMD to her." ECF 18 at 30 & n.15. This argument misses the mark. The time that she would have spent voting, had she needed a poll worker to explain the BMD's operation to her, is immaterial. She alleges that the Board failed to adequately train its poll workers on how to operate, or even turn on, the BMDs. Accepting those assertions as true, Plaintiffs have plausibly alleged that the BMD at Ms. Cobb's polling place was not inoperable because of mere maintenance or repairs. *Cal. Council of the Blind*, 985 F. Supp. 2d at 1239-40.

Second, the Board once again tries to characterize the alleged failure to turn on the BMD at Ms. Cobb's polling place as an example of isolated negligence. This Court cannot make such a fact-specific finding at the Rule 12(b)(6) stage. Accordingly, Plaintiffs have plausibly alleged that they were excluded from receiving the benefits of voting by a secret ballot in Maryland elections, completing their *prima facie* claim for the purposes of a Motion to Dismiss.

3.     <u>Plaintiffs have plausibly alleged a reasonable modification of the Board's election policy.</u>

Determining that Plaintiffs have plausibly alleged that they were excluded from receiving the benefits of a public entity's program does not end the inquiry. *See NFB I*, 813 F.3d at 507. Indeed, the Fourth Circuit has expressly recognized that not all public services can be offered in

a meaningfully accessible manner to every single citizen, at least not "without a prohibitive cost or unreasonable effort." *Id.* Specifically, Title II of the ADA only requires public entities to implement those "reasonable accommodation[s] . . . necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). Plaintiffs must therefore plausibly allege that their proposed policy modification is reasonable. *See NFB I*, 813 F.3d at 507 (citing *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012)).[7]

A policy modification is reasonable "if it is reasonable on its face or used ordinarily or in the run of cases and will not cause undue hardship." *Id.* at 507 (internal quotation marks omitted) (quoting *Halpern*, 669 F.3d at 464). A proposed modification is unreasonable, however, if it "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). While it is a plaintiff's burden to demonstrate that the proposed modification is reasonable, the burden lies on a defendant-public entity to demonstrate that the modification would constitute a fundamental alteration, or impose an undue hardship on the entity. *See NFB I*, 813 F.3d at 507-08 & n.10; *Halpern*, 669 F.3d at 464; *see also, e.g.*, *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (establishing the same framework in a Title III ADA case).[8]

At the pleading stage, the burden of establishing reasonableness is "not a heavy one." *NFB I*, 813 F.3d at 507 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)).

---

[7] Plaintiffs also argue that 28 C.F.R. § 35.160 does not require them to demonstrate that their proposed accommodation is reasonable, since a public entity must furnish any auxiliary aid that is "appropriate" and "necessary." ECF 20 at 24-25. Given that Plaintiffs have plausibly alleged a reasonable modification, the Court need not rule on the merits of this argument.

[8] Because "Titles II, III, and the Rehabilitation Act should be construed together to the extent possible," Title III cases are instructive. *NFB I*, 813 F.3d at 507 n.9. *Johnson* is particularly apt, as the relevant Title III provisions in that case are nearly identical to the regulations at issue here. *Compare* 42 U.S.C. §§ 12112(b)(5)(A), 12182(b)(2)(A)(ii) (the relevant modification provisions in Title III cases) *with* 28 C.F.R. §§ 35.130(b)(7), 35.164.

Indeed, it "is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (quoting *Henrietta D.*, 331 F.3d at 280). Typically, the reasonableness of a proposed policy modification is a fact-specific inquiry. *Halpern*, 669 F.3d at 464; *accord Keith v. County of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86 (9th Cir. 1996); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995); *see also Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542-43 (7th Cir. 1995) (noting that just because an accommodation's cost exceeds its benefit does not necessarily mean that it is an unreasonable one). In some cases, however, a proposed accommodation may be so unreasonable on its face that a court may dismiss the request as a matter of law. *See, e.g.*, *Staron*, 51 F.3d at 356.

While Plaintiffs' proposed accommodation seeks to enact a significant change to the method by which Maryland voters cast their ballots on election day, and comes at a significant cost, requiring the Board to implement a policy of having all in-person voters use BMDs is plausibly reasonable. In 2019, the Maryland Legislature estimated that it would cost the State $6 million, and local governments $6 million collectively, every year that the Board implemented an all-BMD voting system. Dep't of Legislative Servs., Md. Gen. Assembly, Fiscal & Policy Note: H.B. 565 at 1-2 (Feb. 17, 2019), http://mgaleg.maryland.gov/2019RS/fnotes/bil_0005/hb0565.pdf. Even if this cost is accurate, it is plausible that the benefit of requiring the Board to implement an all-BMD voting system, guaranteeing ballot secrecy for all voters, would outweigh this cost. Specifically, an all-BMD voting system would eliminate the potential for human error that Plaintiffs allege has been realized in each election since 2016. That potential for human error continues to exist under the Board's new policy, which calls for more training, increasing the number of BMD voters per precinct, and altering the statement poll workers use to offer the

BMD as a "neutral alternative." *See* ECF 18 at 32-33. Even the new system, then, depends on people, not machines. Based on the alleged pattern of counties statewide not complying with the two-BMD-voters-per-precinct policy in previous elections, Plaintiffs have plausibly alleged that there will still be counties in 2020 that do not comply with a five-BMD-voters-per-precinct policy. The impact of the Board's new policies cannot be construed in the Board's favor at the Rule 12(b)(6) stage, where all inferences must be drawn in Plaintiffs' favor.

The Board also notes that it would need about 18,000 BMDs to implement Plaintiffs' request, but currently only has about 3,500. ECF 18 at 32. According to the Board, "[p]rocuring that many BMDs from [its] manufacturer would require a lead time of 12-14 months, which would put the 2020 primary . . . and probably the 2020 general elections . . . out of reach for implementation."[9] *Id.* Whatever the Board's lead time is for procuring BMDs, it does not render Plaintiffs' proposed accommodation inherently unreasonable, because it does not preclude Plaintiffs from obtaining an order requiring the Board to adopt BMDs by some other year, if they can ultimately succeed in proving that such relief is reasonable. ECF 1, Prayer for Relief, ¶ a (requesting an order "requiring the Board in all future elections to offer BMDs . . . as the default method of voting," in addition to any relief the Court deems just); *see Staron*, 51 F.3d at 358 ("We do not think that it is necessary at [the Rule 12(b)(6) stage] to bind plaintiffs to the one specific modification they prefer. If plaintiffs should fail in their quest for an outright ban on smoking [in McDonald's restaurants], they may still be able to demonstrate after discovery that modifications short of an outright ban . . . are both 'reasonable' and 'necessary' . . . .").

---

[9] The Board later supplemented its Motion, stating that it could actually procure 16,000 BMDs and 7,000 BMD activation-card printers from the manufacturer by February 28, 2020, provided that the Board placed its order by October 4, 2019. ECF 19 at 2. The Court has not been provided more updated ordering information.

Plaintiffs have therefore plausibly alleged a reasonable accommodation, satisfying their burden to state a claim for relief under Title II of the ADA and section 504 of the Rehabilitation Act.

### 4. Defendants' affirmative defenses are not proper for consideration at the motion to dismiss stage.

The Board's Motion to Dismiss can be read to contain two affirmative defenses. First, throughout their argument on the reasonableness of Plaintiffs' proposed relief, the Board refers to the notion that Plaintiffs' proposed accommodation would impose an "undue hardship" on the Board. ECF 18 at 31, 33. Second, the Board argues that granting Plaintiffs their proposed accommodation would fundamentally alter Maryland's voting system. ECF 18 at 33-35. The Board carries the burden of proof to establish each defense. *See NFB I*, 813 F.3d at 508 (citing 28 C.F.R. § 35.130(b)(7)); 28 C.F.R. § 35.164 (stating that the public entity "has the burden of proving that" a proposed accommodation would "result in undue financial and administrative burdens").

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250).

The Board's affirmative defenses do not present one of those "relatively rare circumstances." *Goodman*, 494 F.3d at 464. First, the Board's undue burden defense presents "a multi-faceted, fact-intensive inquiry, requiring consideration of: (1) financial cost, (2) additional administrative burden, (3) complexity of implementation, and (4) any negative impact which the accommodation may have." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 737 (D. Md. 1996) (citing 29 C.F.R. § 1630.2(p)). The defense's ultimate focus is on the impact the accommodation "would have, if implemented, on the specific [defendant] in question at a particular time." *Id.* (internal quotations omitted) (quoting 29 C.F.R. § 1630.15(d)). The facts presented in Plaintiffs' Complaint, coupled with the limited facts adduced in the government documents that the Board points to, are insufficient to allow the Court to properly balance the benefits and burdens that Plaintiffs' proposed accommodation will have.

The Board's fundamental alteration defense is equally unsuitable for disposition at the motion to dismiss stage. To prevail on a fundamental alteration defense, the Board must provide evidence that "focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation." *Johnson*, 116 F.3d at 1059-60; *see also Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 153 (2d Cir. 2013) ("It is a factual issue whether a plaintiff's proposed modifications amount to . . . 'fundamental alterations' . . . ." (alterations & citations omitted)); *Crowder*, 81 F.3d at 1485 (finding that whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constituted a fundamental alteration was a "question of fact").

Here, to determine whether a transition to an all-BMD voting system would be a fundamental alteration, "a much more developed record will be required." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004). Given that Plaintiffs allege that the

Board utilized electronic voting machines from 2004 until 2016, the evidence may show that a transition to an all-BMD voting process would not result in a significant change to Maryland's voting procedures. The opposite could also be true. Again, the facts currently before the Court are insufficient for the Court to make a determination as a matter of law.

In sum, Board's two affirmative defenses are not proper for adjudication at the Rule 12(b)(6) stage. Because, as demonstrated above, Plaintiffs have plausibly alleged a violation of Title II of the ADA and section 504 of the Rehabilitation Act, the Board's Motion to Dismiss is denied. The Court turns now to Plaintiffs' Motion for Preliminary Injunction.

## II. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### A. Facts Applicable to the Injunction Motion

The following facts are derived from the parties' written submissions, as the parties made no evidentiary presentation at the January 17, 2020 hearing. The facts set forth in Plaintiffs' Complaint regarding the identity of the parties, the previous voting method in Maryland prior to 2016, the adoption of Maryland Code Annotated, Election Law § 9-102(f) in 2007, and the Board's adoption of the challenged policy are all uncontested and supported by evidence. *See* ECF 21-1 at 7-9, 10-12 (Plaintiffs' recitation of facts); ECF 24 at 5-7 (the Board's recitation of facts). Moreover, the experiences that Plaintiffs Zimba, Cobb, and Sager alleged in their Complaint are identically attested to in declarations accompanying the Injunction Motion. *Compare* ECF 1, ¶¶ 37-42 *with* ECF 21-3 (Cobb Decl.); ECF 21-4 (Zimba Decl.); ECF 21-5 (Sager Decl.). Accordingly, the Court incorporates the factual summary on those matters set forth in Part I.A, *supra*, and begins its factual recitation for the Injunction Motion with the April, 2016 primary election.

1. <u>The History of the Board's BMD Policy and Statewide Compliance with that Policy</u>

The April, 2016 primary election was the first election for which the Board implemented its policy of administering paper ballots as the default voting method, with BMDs utilized for disabled voters. ECF 24-3, ¶ 10 (Charlson Decl.). The Board required local county boards to ensure that "a minimum of 2 voters a day at each early voting center", and two voters at each center on election day, use the BMD. ECF 24-3 at 15 (Board Meeting Minutes, Mar. 4, 2016). While the Board's policy allowed for non-disabled individuals to use BMDs to vote, the Board did not require poll workers to advise non-disabled individuals that a BMD was available to them. *Id.*

The shortfalls of the Board's 2016 primary election policy showed in the compliance data. There were 67 early voting centers and 1,789 election day polling places operating for the 2016 primary election. ECF 24-3, ¶ 3. Of those 1,856 combined polling stations,[10] 82 locations had only one BMD-marked ballot, and 335 locations had zero BMD-marked ballots. ECF 24-8, ¶ 3 (Satterfield Decl.); *see id.* at 13-70 (polling data for each location in the April, 2016 primary election). In other words, approximately 22.47% of polling places in the April, 2016 primary failed to comply with the Board's two-voter requirement.

In a measure to remedy these shortfalls, in September, 2016, the Board amended its policy to require election judges to say to each voter, "If needed, there is an accessible way to read or mark your ballot," and to affix this language at each voting check-in station. ECF 24-3 at 19 (Board Meeting Minutes, Sept. 8, 2016). The policy in place for the November, 2016 general election also required poll workers to offer to explain the BMD's accessibility features to any

---

[10] There are 1,991 voting precincts in the State of Maryland, but oftentimes the Board will consolidate some precincts together into a single polling place. ECF 24-3, ¶ 2.

voter who requested to use it, and provided that, generally, only one BMD would be deployed at each polling place.[11]  ECF 24-3 at 32 (Board Meeting Minutes, May 19, 2019).

The November, 2016 general election saw an improvement in statewide compliance with the two-voter requirement.  In that election, there were 69 early voting centers and 1,790 election day polling places.  ECF 24-3, ¶ 3.  Of those 1,859 combined polling stations, 54 polling stations had only one BMD-marked ballot, and 97 locations had zero BMD-marked ballots.  ECF 24-8, ¶ 3; *see id.* at 72-110 (polling data for each location in the November, 2016 general election). Thus, the percentage of non-compliant polling places dropped significantly from 22.47% in April, 2016, to approximately 8.12% in November, 2016.

 The Board kept the November, 2016 general election BMD policy in place for both the April, 2018 primary election and the November, 2018 general election.  ECF 24-3, ¶ 14; *id.* at 44 (Board Meeting Minutes, Oct. 26, 2017).  The Board saw mixed results in each election.  In the April, 2018 primary election, there were 78 early voting centers and 1,796 election day polling places.  ECF 24-3, ¶ 3.  Of those 1,874 combined polling places, 40 polling stations had only one BMD-marked ballot, and 119 locations had zero BMD-marked ballots.  ECF 24-8, ¶ 3; *see id.* at 112-148 (polling data for each location in the April, 2018 primary election).  Thus, the percentage of non-compliant polling places increased marginally from 8.12% in November, 2016, to 8.49% in April, 2018.  In the November, 2018 general election, there were 79 early voting centers and 1,798 election day polling places.  ECF 24-3, ¶ 2.  Of those 1,877 combined polling places, 23 polling places had only one BMD-marked ballot, and 56 polling places had zero BMD-marked ballots.  ECF 24-8, ¶ 3; *see id.* at 150-186 (polling data for each location in

---

[11] It is unclear from the Meeting Minutes whether these latter two provisions were new additions to the November, 2016 policy, or whether they were also in place during the April, 2016 primary elections.

the November, 2018 general election).  The percentage of non-compliant polling places thus dropped significantly again, from 8.49% in April, 2018, to only 4.21% in November, 2018.

Notably, in each election, Harford County accounted for a disproportionate number of non-compliant polling places.  ECF 24-8 at 188.  In the April, 2016 primary election, over one-third of its polling places (27/66) were non-compliant.  *Id.*  In November, 2016, over one-half of polling places there (39/66) were non-compliant.  *Id.*  Over 85% of polling places (56/65) were non-compliant in the April, 2018 primary election.  *Id.*  Finally, in the November, 2018 general election, a little over two-thirds of polling places (47/65) were non-compliant.  *Id.*  In other words, in the November, 2018 general election, Harford County alone accounted for 47 of the 79 non-compliant polling places across the entire state.  *Id.*  The Board has since learned that the former Director and Deputy Director of the Harford County Board of Elections affirmatively discouraged election staff from complying with the BMD policy.  ECF 24-6, ¶ 7.  Those two individuals are no longer with the Harford County Board.  *Id.* ¶ 1.

## 2.    The Board's Modifications to its 2020 Election BMD Policy

Beginning in May, 2019, with the input of local county boards of elections, the Board undertook an effort to revise its BMD policy, in order to address continued concerns about its ability to maintain ballot secrecy for all Maryland voters.  ECF 24-5, ¶ 5 (Perrone Decl.); *id.* at 16-50 (results of a June 27, 2019 survey sent to each county's board of elections).  The Board considered this feedback and, at its June and July, 2019 meetings, implemented a number of changes to its BMD policy for the 2020 primary and general elections ("the 2020 policy").  ECF 24-5, ¶¶ 4-9.  Those changes include:

- Increasing the minimum number of voters that must use a BMD in each polling place from two to five, and directing that "election judges must try to meet this minimum by 1 pm," ECF 24-3 at 58 (Board Meeting Minutes, June 27, 2019);

- Allowing local boards to deploy up to four BMDs at early voting centers, and up to two BMDs at election day polling centers, without prior Board approval, *id.*;

- Amending the statement presenting the BMD voting option to read as follows: "You have two ways to mark your ballot – either by hand or with the electronic device. Which do you prefer?" *Id.* at 74 (Board Meeting Minutes, July 25, 2019);

- Increasing the amount of training given to election judges on the BMD, *id.* at 58; and

- Requiring each local board to designate at least two "BMD experts" at each polling place, who will receive additional training on operating BMDs, ECF 24-5, ¶ 12(c).

In reviewing local county boards' responses to the Board's June, 2019 survey, the Board's Director of the Election Management and Reform Division, Erin Perrone, found that "additional training would be helpful in increasing precinct-level compliance with the BMD Policy." *Id.* ¶¶ 1, 8. Accordingly, Director Perrone amended the training for the 2020 election cycle to include:

- A session at the Board's statutorily required biennial conference in October, 2019 on training election judges on BMDs, *id.* ¶ 12(a); *see also* Md. Code Ann., Elec. Law § 2-104;

- An additional requirement that local boards provide hands-on training on setting up BMDs, beginning "from the very first step of getting the BMD out of the car in which BMDs are transported to polling places," all the way through the voting process, ECF 24-5, ¶ 12(b);

- Increased training requirements for each polling place's designated "BMD Experts," *id.* ¶ 12(c);

- Increased training requirements for chief election judges on how to use the BMDs, *id.* ¶ 12(d); and

- A requirement that step-by-step instruction manuals on how to set up, and operate, BMDs be distributed to each election judge at a training class, and, ultimately, to each polling place on election day, *id.* ¶ 12(e).

The Board's new training program began in October, 2019. *Id.* ¶ 13. At this point in the election cycle, election judge training began last month in January, 2020. *Id.* ¶ 13(e).

### 3. The Costs Associated with Switching to an All-BMD Voting Process

As indicated at the outset, the parties engaged in a brief, expedited discovery period on matters "regarding the cost and feasibility" of Plaintiffs' proposed accommodation. ECF 34 at 1. The most substantial cost the Board would incur if the Court ordered that it transition to an all-BMD voting regime would be the cost of leasing additional BMDs. ECF 24-8, ¶ 22 (listing a BMD acquisition cost of $9,692,000 per year). This cost, however, would be split evenly between the Board and local boards of elections. *Id.* at 194 (Fiscal and Policy Note to H.B. 565).

The parties contest, at length, myriad other costs that the Board may, or may not, incur if it transitioned to an all-BMD voting regime. *See* ECF 55 at 17-29 (Plaintiffs' Reply); ECF 56 at 6-17 (the Board's Surreply). At a minimum, the parties agree that, in addition to a yearly cost of $4,846,000 to lease BMDs, the Board will have to incur two costs. First, the Board would incur a one-time cost of $968,792 to help local boards purchase at least 1,616 carts to transport BMDs from the local boards' storage sites to their polling places. ECF 55-7 at 54:10-55:6 (Ross Dep.) (noting that the Board splits the cost of carts with local boards 50-50, and that the carts cost

$1,199 each); ECF 55-12, ¶¶ 2-7 (Duckworth Decl.); ECF 55-14. Second, the Board would incur a one-time cost of at least $125,215.63, associated with quality testing the newly-acquired BMDs, with the other half paid by local county boards. ECF 24-8, ¶¶ 19-20; ECF 55-9 at 155:9-156:7, 158:7-159:14, 160:20-162:19 (Satterfield Dep.); ECF 55 at 19 n.4. Thus, the Board will incur at least an additional $5.94 million in costs in the first year of implementing an all-BMD voting regime, and $4.846 million every year thereafter (comprising solely of the cost to lease BMDs each year). By comparison, the Board's total budget is approximately $27.8 million per year. ECF 24 at 35.

However, the Board is not the only entity incurring additional costs if the Court granted Plaintiffs' requested injunctive relief. All twenty-four Maryland counties[12] would be required to contribute the other $4,846,000 per year necessary to lease the additional BMD units. ECF 24-8 at 194. Next, counties would also have to incur the one-time cost of $968,792 to split the purchase price of the necessary transportation carts with the Board. ECF 55-7 at 54:10-55:6; ECF 55-12, ¶¶ 2-7; ECF 55-14. Third, counties would incur the same one-time cost of $125,215.63 for testing the new BMDs. ECF 24-8, ¶¶ 19-20; ECF 55-9 at 155:9-156:7, 158:7-159:14, 160:20-162:19; ECF 55 at 19 n.4. Fourth, local counties will incur significant costs each year to transport all of the necessary BMDs to their respective polling places. ECF 24-7, ¶ 5 (noting that the number of carts to be transported would likely double). Thus, in addition to the monies expended by the Board, local boards of elections will collectively incur at least $5.94 million in additional costs in the first year (not accounting for transportation costs), and

---

[12] Technically, there are twenty-three counties plus Baltimore City, which for election purposes operates as a county would. For ease of reference, however, the Court will simply refer to the "twenty-four counties."

approximately $4.846 million in costs each year thereafter (again, exclusive of transportation costs).[13]

    4. <u>The February, 2020 Special Primary Election in the Seventh Congressional District</u>

On October 28, 2019, Governor Larry Hogan issued a Proclamation scheduling a special primary election in the 7th Congressional District to fill the seat of the late United States Congressman Elijah Cummings.[14] Governor Larry J. Hogan, Proclamation: Special Election – Vacancy in the Seventh Congressional District (Oct. 28, 2019), https://elections.maryland.gov/elections/2020/Governors%20Proclamation-7th%20Cong%20Dist%20Special%20Election.pdf?fbclid=IwAR3dRE29KKiKnELMCP9xeAqO4C-7dFfWAwwijfaJ4xRewY9NVXaA-WIKN. That election took place on Tuesday, February 4, 2020. *Id.* Plaintiffs have since provided supplemental affidavits describing several voters' experiences during that election. *See* ECF 57.

First, Plaintiffs provide the declarations of five individuals who are sighted, but were not given a statement offering the BMD to them as an option to cast their votes on Election Day. ECF 57-5, ¶ 6 (Braun Decl.); ECF 57-6, ¶ 5 (Dibner Decl.); ECF 57-9, ¶ 4 (Neubauer Decl.); ECF 57-10, ¶ 5 (Rigney Decl.); ECF 57-11, ¶ 5 (Yingling Decl.). Of those five individuals, four of them did not indicate that they made any attempt, or had any need, to use the BMD. ECF 57-

---

[13] The parties dispute the value of other costs, such as the cost of storing additional BMD equipment and the cost of acquiring additional tables to sit the BMDs on in each polling place. ECF 55 at 18, 21-22; ECF 56 at 10-12, 14. The Court need not resolve these factual disputes because, as discussed *infra*, even assuming that Plaintiffs' estimate of $0 applies, *see* ECF 55 at 23, the low-end estimates of the costs the Board and local counties will incur constitute unreasonable ones and, in the alternative, constitute an undue burden.

[14] Courts may take judicial notice of facts that are not "subject to reasonable dispute" because their accuracy can be determined readily from inherently reliable sources. Fed. R. Evid. 201(b)(2). This includes proclamations issued by the head of the executive branch of government. *See, e.g.*, *Untied States v. Holmes*, 414 F. Supp. 831, 839 (D. Md. 1976) (taking judicial notice of a Presidential Proclamation).

6, ¶ 5; ECF 57-9, ¶ 4; ECF 57-10, ¶ 5; ECF 57-11, ¶ 5. One sighted individual, Lizabeth Braun, did express her interest in using a BMD. ECF 57-5, ¶¶ 5, 7. However, when she went to use the BMD, she was informed by the poll worker that the previous voter had caused a paper jam. *Id.* After waiting approximately twenty minutes for the BMD to be repaired by the on-site technician, Ms. Braun decided to vote by paper ballot. *Id.* ¶¶ 7-8.

Anne Blackfield, who is "legally blind with limited usable vision," also voted in the special primary in Baltimore, Maryland. ECF 57-3, ¶¶ 3-4. (Blackfield Decl.). When she votes, she uses the BMD's "enlargement capability to allow [her] to read [her] ballot in large print." *Id.* ¶ 4. When Ms. Blackfield arrived at her polling place, workers initially asked if her partner (who is sighted) would be helping her vote. *Id.* ¶ 6. After she said no, Ms. Blackfield was offered a BMD. *Id.* While she was able to use a text enlargement feature in the 2016 general election, she was told this time that the BMD provided no such feature. *Id.* ¶¶ 5, 9-10. No poll worker otherwise called for assistance in enlarging the machine's text. *Id.* ¶ 11. She avers that since she did not bring headphones to plug into the machine, she accepted the poll worker's offer to read the ballot to her. *Id.* ¶¶ 9, 11-12. The poll worker, however, "audibly confirmed" Ms. Blackfield's selections "in a loud voice that would have been loud enough for others standing by to hear." *Id.* ¶ 12.

Two of the named Plaintiffs in this action, Ms. Cobb and Mr. Zimba, also voted in the special primary. ECF 57-1 (Cobb Decl.); ECF 57-2 (Zimba Decl.). Ms. Cobb experienced difficulties adjusting the audio output on the BMD, so she asked poll workers for assistance. ECF 57-1, ¶ 6. At first, the poll workers could not fix the issue, and one admitted that "she did not know very much about the BMD." *Id.* Ultimately, Ms. Cobb and the workers resolved the issue "through trial and error," though the issue delayed Ms. Cobb's ability to vote. *Id.*

Similarly, Mr. Zimba, at a different polling place, could not get the BMD to put out audio. ECF 57-2, ¶¶ 4, 6. Poll workers called technical support for him, and they resolved the issue, but it took about half an hour. *Id.* ¶ 6.

Aloma Bouma, who is blind, served as an election judge at her polling place in Baltimore, Maryland. ECF 57-4, ¶¶ 3-4. At approximately 11:00 a.m., she informed her fellow workers that she would be voting on the BMD. *Id.* ¶ 5. When she went to use it, however, the on-site technical support individual informed her that the BMD "had not been working" and that "he had called the problem in to the Board of Elections earlier that morning." *Id.* It was "her impression," based on this conversation, that the BMD had not been working since the polling place opened. *Id.* ¶ 7. Ms. Bouma then heard him place a follow up call, and about thirty minutes later, someone came and fixed the BMD. *Id.* ¶¶ 5-6. Ms. Bouma voted on the machine without issue. *Id.* ¶ 6.

Finally, William and Bernadette Jacobs voted in the special primary at their Baltimore County polling place. ECF 57-7, ¶ 4 (B. Jacobs Decl.); ECF 57-8, ¶ 4 (W. Jacobs Decl.). Mrs. Jacobs is blind, but Mr. Jacobs is sighted. ECF 57-7, ¶¶ 5-6. Initially, poll workers handed Mr. Jacobs a ballot to fill out for Mrs. Jacobs, but poll workers later gave Mrs. Jacobs a ballot for the BMD. *Id.* ¶ 7. Mrs. Jacobs then began experiencing issues with her BMD. *Id.* ¶¶ 8-10. The poll worker attempted to fix the BMD by restarting it, but that did not resolve the issue, so the worker had Mrs. Jacobs let Mr. Jacobs fill out a paper ballot for her. *Id.* ¶¶ 10-11. According to Mrs. Jacobs, "[t]he poll workers never tried to call for outside assistance, nor did they tell me anything about a timeline for getting the BMD fixed or replaced." *Id.* ¶ 12.

**B.     Legal Standards**

A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2642838, at \*6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating that preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of far-reaching power [that is] to be granted only sparingly and in limited circumstances") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-46 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 20), *vacated on other grounds and remanded*, 130 S. Ct. 2371 (2010), *reaff'd in part and remanded*, 607 F.3d 355 (4th Cir. 2010). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). Ultimately, the decision to issue a preliminary injunction is committed to the trial court's discretion. *Id.* at 319.

## C.    Analysis

### 1.    Plaintiffs are not likely to succeed in establishing a violation of the ADA and the Rehabilitation Act.

At the outset, the Court notes that the Board reasserts its mootness argument in opposing Plaintiffs' Motion. ECF 24 at 28-29. Despite the additional factual evidence provided from the parties' limited discovery, for the same reasons set forth in Part I.C.1, *supra*, the Board's mootness arguments fail.

The Court's analysis of the merits of Plaintiffs' Motion for Preliminary Injunction identically tracks that of the Board's Motion to Dismiss. First, Plaintiffs must demonstrate a likelihood to succeed in establishing a *prima facie* violation of Title II of the ADA and section 504 of the Rehabilitation Act. *Constantine*, 411 F.3d at 498. Plaintiffs must then demonstrate a likelihood to succeed in establishing that their proposed accommodation is reasonable. *See NFB I*, 813 F.3d at 507. Even accepting that Plaintiffs have shown a likelihood to succeed in establishing a *prima facie* case, under the more stringent standard of review after the motion to dismiss stage, and on the current record, Plaintiffs fail to meet their burden to show that their proposed relief is reasonable.

> *i.    Plaintiffs have provided evidence that some blind voters have had to sacrifice their ballot's privacy while voting.*

As previously indicated, to establish a *prima facie* violation, Plaintiffs must show that (1) they have a disability, (2) they are otherwise qualified to participate in the elections the Board conducts, and (3) they are excluded from receiving a benefit that the Board offers in conducting those elections, or are otherwise discriminated against on the basis of their disability. *Constantine*, 411 F.3d at 498. Once again, only the third element is at issue.

Plaintiffs have provided evidence that at least four individuals have voted in Maryland elections without receiving the benefit of voting by secret ballot. ECF 21-4, ¶¶ 6-7 (Mr. Zimba,

during the April, 2018 primary election); ECF 21-5, ¶¶ 7-8 (Ms. Sager, during the November, 2018 general election); ECF 57-3, ¶¶ 9-12 (Ms. Blackfield, during the special primary); ECF 57-7, ¶¶ 6-12 (Mrs. Jacobs, during the special primary). While this evidence, in its totality, is much less than the evidence of systemic violations in other cases, the Court is willing to accept, without concluding, that it is sufficient for Plaintiffs to complete their *prima facie* case. *Compare with NFB I*, 813 F.3d at 506-07 (finding that blind voters were wholly excluded from obtaining the benefit of secret voting because Maryland's absentee voting program made it impossible to mark their ballots without assistance); *Disabled in Action*, 752 F.3d at 192-93, 199-200 (finding that blind voters were excluded from obtaining the benefit of secret voting because in four straight years, "80% or more of the polling sites surveyed" in New York City "contained at least one physical barrier to access" by disabled individuals, and in the 2011 election, the board of elections never repaired the only electronic voting machine at a polling place at which 90% of voters were blind); *cf. Hindel v. Husted*, No. 2:15-cv-3061, 2016 WL 2735935, at *6 (S.D. Ohio May 11, 2016) (finding that, for the purposes of the defendants' motion for judgment on the pleadings, that the plaintiffs were not afforded meaningful access absentee voting because there was no way for blind voters to mail in an absentee ballot without third-party assistance); *Kerrigan v. Phila. Bd. of Election*, No. Civ. A. 07-687, 2008 WL 3562521, at *14, 18 (E.D. Pa. Aug. 14, 2008) (finding, upon the defendant's motion for summary judgment, that the plaintiffs created a genuine issue of material fact as to whether voters with mobile disabilities were denied meaningful access to polling places, because evidence showed that 26% of the city's polling divisions were inaccessible).[15]

---

[15] Contrary to Plaintiffs' assertions, ECF 21-1 at 19, the cases *California Council of the Blind*, 985 F. Supp. 2d at 1238, and *Westchester Disabled on the Move, Inc. v. County of Westchester*,

> ii. *Plaintiffs are not likely to succeed in demonstrating that their proposed policy modification is reasonable.*

However, Plaintiffs are unlikely to succeed in showing that their proposed relief is reasonable. Plaintiffs assert two arguments regarding the reasonableness aspect of their case. *See* ECF 21-1 at 19-22; ECF 55 at 10-13. First, they argue that no reasonableness analysis is required under the effective communications regulation, 28 C.F.R. § 35.160(b)(1). Second, even construed as a policy modification, Plaintiffs argue that their proposed relief is reasonable. Both positions are unpersuasive.

Plaintiffs are correct that the effective communications regulation, 28 C.F.R. § 35.160(b)(1), requires public entities to furnish any auxiliary aid that is "appropriate" and "necessary" to "afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." Nevertheless, Plaintiffs cite no authority, nor could this Court find any, to support the notion that requiring a State Board of Elections to offer a particular voting device to *every* voter in an election is considered to be furnishing an "auxiliary aid." If the Board's voting policy was to offer only paper ballots to in-person voters, and Plaintiffs sought an order requiring the Board to amend its policy to provide at least one BMD in each polling place, then perhaps Plaintiffs' effective communications argument would have merit. Here, however, Plaintiffs attempt to transform the auxiliary aid – the BMD – into the sole instrument used by every Maryland resident for voting. The regulation's text contemplates provision of the auxiliary aid to individuals with disabilities, not to every individual, whether they have a disability or not. *See* 28 C.F.R. § 35.160(b)(1).

---

346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004), bear little relevance to Plaintiffs' preliminary injunction request, since both courts rendered their decisions only at the Rule 12(b)(6) stage.

Accordingly, Plaintiffs' requested relief is more properly considered as a policy modification that need only be taken if reasonable. *See NFB I*, 813 F.3d at 507.

Under that standard, Plaintiffs are unlikely to demonstrate that their proposed policy modification is reasonable. Again, "[f]ederal law mandates that federal grantees and public accommodations make reasonable, but not substantial or fundamental, modifications to accommodate persons with disabilities." *Halpern*, 669 F.3d at 465 (internal quotations omitted) (citing *Choate*, 469 U.S. at 300). In *NFB I*, the Fourth Circuit determined that the NFB's proposed online absentee ballot marking tool was reasonable. 813 F.3d at 507-08. The court positively cited the district court's conclusion that the tool was "reasonably secure and reasonably accessible to disabled voters." *Id.* at 508. The court continued that "although not determinative by itself, the fact that a version of the tool was voluntarily implemented in the 2012 elections – without any apparent incident – speaks to the reasonableness of using the tool." *Id.* (internal citations and quotations omitted). Finally, the court reasoned that since the tool was already developed, there was no "substantial cost or implementation burden" that the Maryland State Board of Elections would incur in implementing the tool in the next election cycle. *Id.*

Plaintiffs' current request stands in stark contrast to that made in *NFB I*. First, unlike in *NFB I*, the Board does not currently have the tools necessary to implement Plaintiffs' requested relief. Even accepting the (now questionable) proposition that the Board could procure the BMDs before November, 2020, Plaintiffs' requested relief would force the Board to incur, at bare minimum, nearly $6 million in implementation costs (21.58% of its current budget) in the first year, and a little less than $5 million in costs (18% of its current budget) each year thereafter in perpetuity. This includes costs to acquire the 18,000 necessary BMDs, to run quality control testing on each, and to purchase all new transportation carts. These figures could very well

increase, given that it is unclear whether the Board will receive a discount from its BMD vendor for additional staging apparatus and ballot printers. *See* ECF 56-2 at 153:10-18 (Ryan Dep., representative of ES&S) (noting that it is a "possibility" that a contract for additional BMDs would include printers at no extra charge, but would depend on whether doing so was "a good business decision"); *id.* at 186:5-188:5 (noting that discounts would vary based on the particular order, but indicating, "it's safe to say that substantial discounts would be applied to a Maryland deal for 18,000 [BMDs]").

Local boards of election would incur similar expenses each year. While all twenty-four counties would pay only their relative share of the $6 million initial implementation costs and $5 million in annual costs, these figures do not account for what will likely be significant costs that each board will incur in transporting all of the new BMDs to polling places on election day. *See* ECF 24-7, ¶ 5.[16] Each county's share of the costs will certainly vary, given that some counties have more polling places than others, and each has a different budgetary means. But even for a county like Howard County, whose board of elections has an annual budget of about $4 million, requiring it to transition to an all-BMD voting process in each of its 90 to 100 polling places carries a strong likelihood of imposing a "substantial cost or implementation burden," *NFB I*, 813 F.3d at 508; *see* ECF 24-8 at 188; Howard Cty., Md. Cty. Executive, Fiscal Year 2020 Approved Operating Budget 20 (2019), https://www.howardcountymd.gov/LinkClick.aspx?fileticket=4c-Hls1c5e4%3d&tabid=1111&portalid=0. The fact that local boards and voters already use some BMDs, ECF 21-1 at 21-22, does not diminish the cost and implementation burdens accompanying an order requiring them to change to an all-BMD voting regime.

---

[16] The parties fully address this issue in the sealed briefings. *See* ECF 46 at 23-24; ECF 52 at 13-14. It is unnecessary to resolve the parties' factual disputes because, even accepting Plaintiffs' lower calculations, the cost to local county boards of election would be significant.

While the fact that a proposed modification's costs outweigh its benefits does not automatically render the proposed modification unreasonable, *e.g.*, *Vande Zande*, 44 F.3d at 542-43, on the present record, the benefits of Plaintiffs' requested modification are so substantially outweighed by its costs, such that Plaintiffs' requested relief is facially unreasonable, *see NFB I*, 813 F.3d at 507-08; *Halpern*, 669 F.3d at 464 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002)).

First, Plaintiffs' evidence regarding the number of zero- and one-BMD-marked-ballot polling places does not convince the Court that the BMD policy in place for the 2020 election cycle will *ipso facto* result in disabled voters being deprived of meaningful access to voting by secret ballot. Notably, each of the policies in place during the 2016 and 2018 elections contain marked substantive differences, when compared with the policy in place for 2020. *Compare* ECF 24-3 at 19, 44 (2016 and 2018 policies) *with id.* at 58-59, 75 (2020 policy); ECF 24-5, ¶¶ 12(a)-(e) (2020 election judge training requirements). Whatever probative value the past BMD policy compliance data has, that value is undercut by the new requirements under the 2020 policy, particularly by the new, neutral statement read to each voter to present the BMD as an option. The removal of the Harford County election officials fostering an environment of non-compliance in 2016 and 2018 further bolsters the notion that the general non-compliance data carries less probative weight, given that Harford County accounted for a disproportionately large number of noncompliant polling places in those elections.

Second, there lies a more fundamental flaw in Plaintiffs' reliance on the past BMD policy compliance data. The fact that some polling places have conducted elections without *any* voter using a BMD does not demonstrate that disabled voters are being systematically denied access to the benefit of casting a secret ballot. Rather, if anything, the logical conclusion to draw

from this data is that no visually impaired voter attempted to vote at those precincts. Plaintiffs have produced no evidence to show that, in those polling places where no BMD-marked ballots were cast, a blind voter attempted to cast a ballot with a BMD, but was otherwise denied that opportunity.

The one instance of compromised ballot secrecy through non-compliance with the two-voter minimum that Plaintiffs have demonstrated, *see* ECF 21-4, ¶¶ 6-7 (Zimba Decl.), presents a very nuanced, specific factual scenario, such that the Court cannot say that requiring a switch to all BMDs will have much benefit at all. For the harm Mr. Zimba suffered to reoccur, one of Maryland's 1,800+ polling places will have to have only one BMD-marked ballot in November, 2020, there will have to be a manual recount, *and* the poll workers will have to personally know the voter who used the BMD. *See id.* Plaintiffs have not demonstrated how requiring every polling place across the State to use only BMDs is the only reasonable way to remedy this potential harm, instead of implementing a much less costly measure, such as restricting election judges from performing recounts for polling places they were assigned to monitor.

Third, Plaintiffs' lawsuit comes on the tail of an election in which only 23 out of 1,877 polling places across the State (1.2%) had only one BMD-marked ballot, ECF 24-8, ¶ 3, and in the midst of an unforeseen special primary election that, again, was implemented in a three-month timespan. Of the 23 polling places in the 2018 general election that failed to comply with the two-voter requirement, 7 were located in Harford County, ECF 24-8 at 169-71, a county in which election officials fostered an environment of non-compliance, ECF 24-6, ¶¶ 7-9. Besides Mr. Zimba, ECF 21-4, ¶¶ 6-7, Plaintiffs have not offered any evidence that the other 22 non-compliant polling places' single BMD-marked ballot was cast by a blind voter. Nor have Plaintiffs provided any case law to suggest that the Court can draw such an inference in deciding

a Motion for Preliminary Injunction. Further, evidence of sighted voters not being given the neutral statement offering the BMD as an option to mark their ballot, without more, does little to convince the Court that, in the 2020 general election, precincts statewide will fail to comply with the five-BMD-voters-per-precinct policy. ECF 57-5, ¶ 6 (Braun Decl.); ECF 57-6, ¶ 5 (Dibner Decl.); ECF 57-9, ¶ 4 (Neubauer Decl.); ECF 57-10, ¶ 5 (Rigney Decl.); ECF 57-11, ¶ 5 (Yingling Decl.). Nor does the evidence compel the conclusion that, as to the special primary, those voters' precincts failed to comply with the minimum voter requirement. On the present record, there simply is not enough evidence to make the conclusions that Plaintiffs seek to make. By extension, Plaintiffs' argument that their proposed relief will eliminate ballot secrecy issues that stem from the Board's storage of BMD-cast ballots online, *see* ECF 55 at 8-9, fares no better.

Plaintiffs next argue that requiring all voters to use BMDs would be most beneficial in eliminating uneducated election judges. This contention, too, lacks merit. Even under an all-BMD regime, election judges will only be effective in offering BMDs if they are properly trained to use them. Simply requiring everyone to use BMDs does not automatically mean that every election judge will know how to walk a voter through the voting process step-by-step. The best way to do that is through increased hands-on training. That is exactly what the Board's 2020 policy requires. *See* ECF 24-5, ¶¶ 12(a)-(e). The Board has even gone a step further in requiring two "BMD experts" at each polling place. *Id.* Ms. Cobb avers that in every election since 2016, she has encountered poll workers who "do not know how to set up or operate the accessible voting machines," causing her to have to either ask others for help, or to figure it out herself. ECF 21-3, ¶ 6. Ms. Sager describes similar difficulties. ECF 21-5, ¶ 6. Further, upon arriving to her polling place for the November, 2018 general election, Ms. Cobb avers that the BMD at

her polling place was not even plugged in. ECF 21-3, ¶ 7. These issues are directly attributable, however, to the insufficient training given to election judges in the 2016 and 2018 elections. Plaintiffs point to nothing to support their notion that "[t]he fewer voters who use the BMDs, the less familiar poll workers will be with the machines." ECF 21-1 at 21. If anything, the evidence now demonstrates that the Board has heard Plaintiffs' concerns about ill-trained election judges, and has tailored a new training policy to address those concerns.

The fact that some poll workers in the February, 2020 special primary were unable to fix the seemingly prevalent technical and mechanical issues with BMDs at some polling places does not undercut this notion. While one worker admitted to Ms. Cobb that she did not "know much" about the machine, ECF 57-1, ¶ 6, all election judges cannot reasonably be expected to know how to troubleshoot every BMD issue without needing to consult another poll worker, or a technical support individual. In fact, poll workers were able to help Ms. Cobb figure out the issue she was experiencing and, though she experienced some delay, she was able to cast a private ballot. *See id.* The Court recognizes that two voters, Ms. Blackfield and Mrs. Jacobs, could not cast private ballots, in part, because poll workers did not call for technical assistance or otherwise know how to resolve the pertinent issue. These instances alone, however, are insufficient for the Court, on the present record, to conclude that transitioning to an all-BMD voting system will have any significant benefit. If the problem is training, then the relief should be tailored towards addressing the insufficient training.

Plaintiffs finally assert that requiring all voters to use BMDs will have the benefit of removing the possibility of a blind voter coming to a polling place and encountering a broken, or otherwise not functioning, BMD, since the Board will not require local boards to deploy a second BMD at polling places. ECF 21-1 at 20. As an initial matter, it is worth noting that the

2020 policy's new provision, permitting local boards to deploy a second BMD without Board authorization, is something that local boards overwhelmingly supported. *See* ECF 24-5 at 24-26 (June, 2019 survey responses by local county boards, with at least 14 of 24 counties expressing the need for at least two BMDs at their polling places).

Regardless, the evidence to support Plaintiffs' claimed benefit is unconvincing. Ms. Sager avers that when she arrived at her polling place for the November, 2018 general election, the only BMD there was broken. ECF 21-5, ¶ 7. The Election Director for the Baltimore County Board of Elections, Katie Brown, confirms this, and provided a BMD issue log from that election indicating that Ms. Sager's polling place had a paper jam issue with the BMD that day. ECF 24-2, ¶¶ 2-3; *id.* at 6 (Ex. A). The log indicates that each issue the polling place had that day was resolved, allowing for eight total people to cast a BMD-marked ballot. *Id.* ¶ 3; *id.* at 6 (Ex. A). At most, this demonstrates an "isolated or temporary interruption[] in service . . . due to maintenance or repairs" that does not amount to a violation of the ADA. 28 C.F.R. § 35.133(b).

Further, while Mrs. Jacobs's experience in the recent February, 2020 special primary resulted in her having to sacrifice her private ballot, this was the result of poll workers being unfamiliar with the machine's text enlargement capability, not a maintenance issue. *See* ECF 57-7, ¶¶ 7-12. Mr. Zimba, Ms. Cobb, and Ms. Bouma, who each claim the BMD at their polling place was not functioning in some manner, were each able to cast their ballot independently after a twenty-to-thirty minute wait for repairs to occur. ECF 57-1, ¶ 6 (Ms. Cobb); ECF 57-2, ¶¶ 4, 6 (Mr. Zimba); ECF 57-4, ¶¶ 5-7 (Ms. Bouma). While certainly a meaningful inconvenience, the Court cannot conclude, on the present record, that the waits those voters experienced were anything other than "isolated or temporary interruptions in service . . . due to maintenance or repairs." 28 C.F.R. § 35.133(b). The only evidence to the contrary is Ms. Bouma's

"impression" that the BMD at her polling place was inoperable since the poll opened. ECF 57-4, ¶ 7. But even if that "impression" proves true, there is no evidence that any blind voter prior to, or including, Ms. Bouma had to sacrifice ballot privacy because the BMD had not been repaired. Ms. Braun also experienced a delay in voting, because the BMD she requested to use was out of service upon her arrival. ECF 57-5, ¶¶ 5, 7. The fact that Ms. Braun refused to wait more than twenty minutes for the BMD to be fixed does not mean that her polling place – which had an on-site technician there to address the issue – took an impermissible amount of time to repair the BMD. *See id.* ¶¶ 7-8. Taken together, these cases do not convince the Court that compelling the Board to run an all-BMD election will have much benefit at all, especially considering the rate at which Plaintiffs seem to imply BMDs encounter maintenance and repair issues.

Even accepting Plaintiffs' arguments regarding the efficacy of an all-BMD regime in remedying issues of blind voters encountering nonfunctioning BMDs on election day at face value, Plaintiffs have not presented any evidence showing why, "ordinarily or in the run of cases," the response to this solution would be to overhaul the entire system and require every voter to use BMDs. *See U.S. Airways*, 535 U.S. at 401-02. Plaintiffs have provided nothing to show why this solution would be more effective than, for example, requiring the Board to amend its policy to require every polling place to deploy two BMDs on election day.

Plaintiffs further argue that their proposed relief is reasonable because other states have implemented all-BMD voting regimes, and because the Maryland Attorney General has opined that an all-BMD voting regime is one way to fully comply with Maryland law. ECF 21-1 at 21-22. While these are correct factual statements, they are not legally significant. The ultimate question presented is whether, under the current facts and circumstances, it is reasonable to compel the Board to implement an all-BMD voting regime, and abandon its current voting

regime. That the Attorney General recognizes that an all-BMD voting regime results in compliance with Maryland law, and that other jurisdictions have implemented such a system, does not make an order requiring the Board to transition to such a voting system reasonable.

As a final note, in *NFB I*, the Fourth Circuit cited positively to the fact that the online absentee balloting tool the NFB sought was "reasonably secure." 813 F.3d at 508. While the parties have not produced any evidence regarding the security of BMDs, the Court is aware of the growing national concerns regarding the security of this country's elections. The Maryland Legislature would be much better equipped to consider the costs and benefits, including the election security, of transitioning to an all-electronic BMD voting system than the federal judiciary, especially in a case like this, in which limited evidence has been provided on the issue.

In sum, the significant costs of Plaintiffs' proposed policy modification, weighed against the minimal benefits that it would garner, demonstrate that, on the present record, Plaintiffs' requested relief is not reasonable on its face. The cases that Plaintiffs cite are therefore inapposite, for in those cases the costs each public entity was to incur were counterbalanced by a demonstrable benefit to a sizeable group of disabled voters. *See NFB I*, 813 F.3d at 506-07; *Disabled in Action*, 752 F.3d at 194, 200-02 (deeming as reasonable an order requiring New York City to make polling places accessible to disabled persons, assign workers to aid disabled individuals on election day, and relocate services to accessible voting locations to remedy the problem of 80% of polling places containing a barrier to accessibility by disabled voters); *cf. Kerrigan*, 2008 WL 3562521, at *11, 18, 23 (holding that, since nearly 25% of polling places were inaccessible to voters with mobile disabilities, plaintiffs had created a genuine issue of material fact as to whether their proposed relief of requiring the city to conduct a full-scale

review of each polling place at a cost of $2 million was reasonable to defeat a motion for summary judgment).[17]

Plaintiffs have lodged a lawsuit against a voting process full of new, untested measures specifically designed to address the difficulties each Plaintiff has faced in the past two election cycles. The Court does not want to diminish the difficulties blind voters like Mr. Zimba, Ms. Cobb, Ms. Sager, and others have encountered in obtaining the benefit of voting by secret ballot, as afforded by the State of Maryland, Title II of the ADA, and section 504 of the Rehabilitation Act. But Plaintiffs largely rely on violations of previous iterations of policies that have been superseded to support their claims, and use those in an attempt to justify perhaps the most costly way of addressing them. As described above, this evidence alone is insufficient for Plaintiffs to meet their burden. Accordingly, the Court finds that Plaintiffs have failed to meet their burden to demonstrate that their proposed policy modification is reasonable. On this ground alone, Plaintiffs' Motion for Preliminary Injunction may be denied. *See Pashby*, 709 F.3d at 320–21.

> 2. Defendants are likely to succeed in establishing that Plaintiffs' proposed relief would impose an undue burden.

Even if Plaintiffs had demonstrated a likelihood of success on the merits, and had met their burden to show that their proposed modification is reasonable, the Board has met its burden to show that Plaintiffs' proposed relief would impose an undue burden. An undue burden defense presents "a multi-faceted, fact-intensive inquiry, requiring consideration of: (1) financial cost, (2) additional administrative burden, (3) complexity of implementation, and (4) any negative impact which the accommodation may have." *Bryant*, 923 F. Supp. at 737 (citing 29

---

[17] Plaintiffs again cite *California Council of the Blind*, 985 F. Supp. 2d at 1240, to support their position that they will succeed on the merits of their position that their proposed relief is reasonable. ECF 55 at 12. Given that the case was decided at the Rule 12(b)(6) stage, it carries little persuasive weight as to the appropriateness of injunctive relief.

C.F.R. § 1630.2(p)). In addition to the cost concerns detailed in Part II.C.1.ii, *supra*,[18] Defendants have demonstrated that transitioning to an all-BMD voting system would carry additional administrative burdens and other negative impacts that, in the aggregate, constitute an undue burden.

First, there are a number of administrative burdens, in addition to cost, that would be imposed upon the Board and local county boards under Plaintiffs' proposed modification. First, polling places will have to reevaluate their schematic layouts in order to accommodate the new BMD equipment. ECF 24-4, ¶¶ 5-6 (Mickley Decl.); ECF 55-2 at 38:3-42:9 (Mickley Dep.). The main difference, according to Mickley, is that when voters are done voting on a BMD, they will need to take their printed ballot to a ballot scanner to complete the voting process. *Id.* at 39:9-10. With the electronic machines Maryland voters used prior to 2016, however, "when [voters] were finished with that process, they were done voting and they left the installation." *Id.* at 38:17-19. Further, despite the fact that ballot scanners are still necessary under an all-paper balloting voting system, Mickley reiterated that he will still have to reevaluate the schematics of each polling place in his county. *Id.* at 42:3-9. Mickley explained that, under Plaintiffs' proposed regime, he will still have to install "several" booths for paper ballot voting, given that voters could opt-out of using the BMD, or might be steered to more efficient paper ballots if the polling place "got too crowded or busy." *Id.* at 39:1-13; ECF 24-4, ¶ 5. This effort would take "a tremendous commitment of resources." ECF 24-4, ¶ 6.

---

[18] On the cost issue, Plaintiffs argue at length that there is no undue burden on the Board because it can obtain more money from the State. ECF 55 at 26-28. There are two issues with this argument. First, even considering the past instances in which the Board successfully obtained more money, *id.*, that success is not guaranteed for future years. Second, Plaintiffs have not suggested that similar mechanisms are available for local boards. The burden on local boards cannot be ignored.

Local boards would also need to consult electricians to determine whether their polling locations can power all of the necessary BMDs, under Plaintiffs' proposed system. Acting Director Satterfield avers that a survey he performed of three counties found that in each county, anywhere from 66% to 95% of polling precincts would not be able to accommodate the increased power draw required by Plaintiffs' proposed relief. ECF 24-8, ¶ 16. ES&S has testified that BMDs have a relatively "low [power] draw," and Mr. Satterfield recognizes that the problem might be alleviated through daisy-chaining BMDs together. ECF 55-4 at 73:14-22; ECF 24-8, ¶ 17. However, ES&S also testified that, typically, no more than seven BMDs can be powered by one 15-amp circuit. ECF 56-2 at 67:9-68:19. Thus, if a county "needed 14 [BMDs] in a given polling location, you'd have one strand of seven [BMDs] plugged into one outlet or one circuit, and then the other seven would need to be plugged into another outlet or circuit." *Id.* at 68:11-15. If the two outlets were on the same circuit, "that would be too much." *Id.* at 68:16-19. Local boards would need to determine whether their polling locations can handle this increased power load, given that they need additional electricity to power ballot scanners.

Local boards would also have to find a way to store their new BMD inventory. ECF 24-7, ¶¶ 3-4 (Ross Decl.). Local boards are primarily responsible for storing their own election equipment, including ballot scanners, in their respective jurisdictions. *Id.* ¶ 3. Whether the particular board decides to utilize already available county-owned storage space, or contract with a private provider, the counties will still incur additional costs. *Id.* ¶¶ 3-4.

Plaintiffs' proposed relief would also result in two negative impacts on the public at large. First, the Board has provided evidence to show that an all-BMD voting system may result in longer lines on election day, particularly in a more heavily attended general election. ECF 56-2 at 178:23-179:12, 183:2-25. With a paper ballot, if a voter wishes to vote only for President

and nothing else, then the voter may mark that selection, and then turn in the partial ballot. ECF 24-4, ¶ 14. Indeed, in Mr. Mickley's experience, "many voters only intend to vote in the presidential election." *Id.* With a BMD, however, the voter must cycle through the entire ballot before being able to print. *See* ECF 56-2 at 178:23-179:12. In the words of ES&S's representative, if the voter is just going to vote for president on a paper ballot and leave, "obviously it's going to be faster." *Id.* at 179:7-12. Additionally, while the parties have provided no evidence on this point, the lines voters face at the polls on election day could lengthen if the BMDs the Board deploys have the same frequency of temporary maintenance and repair issues that Plaintiffs appear to intimate from voters' experiences during the February, 2020 special primary election. *See* ECF 57-1, ¶ 6; ECF 57-2, ¶¶ 4, 6; ECF 57-4, ¶¶ 5-7; ECF 57-5, ¶¶ 5-8.

Second, the current BMD software only lists seven candidates per screen. ECF 24-3, ¶ 11. Thus, in races with more than seven candidates, voters have to affirmatively navigate between screens to see the names of candidates with surnames later in the alphabet. *Id.* Navigating between the various screens could be confusing to voters, "because the screens provided buttons indicating 'previous,' 'next,' and 'more,' without indicating which button moved voters to the next screen of candidates for the same contest, and which button moved voters to the next contest altogether." *Id.* While a later version of the BMD software requires voters to scroll through each page of the candidates in a given contest before moving to the next contest, *id.* ¶ 11 n.2, such a set-up could still present issues with respect to presenting candidates

in a "fair and nondiscriminatory manner," as required by Maryland law, *see* Md. Code Ann., Elec. Law § 9-203(2).[19]

Though other jurisdictions have voluntarily switched to an all-BMD voting regime, *see* ECF 55 at 28-29, this alone does not lead to the conclusion that the ADA and Rehabilitation Act *require* the Board to do so here. Considering the quantified and unquantified costs of Plaintiffs' proposed relief for both the Board and all twenty-four counties, the administrative burdens placed on the Board and the local boards from implementing Plaintiffs' proposed relief, and the negative impacts that may stem from it, the Court concludes that the Board is likely to succeed in demonstrating that Plaintiffs' proposed relief would impose an undue burden. Accordingly, on this ground as well, Plaintiffs' Motion for a Preliminary Injunction may be denied.[20]

## III.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF 17, is DENIED. Plaintiffs' Motion Preliminary Injunction, ECF 21, is also DENIED. Plaintiffs' Motion for Leave to File Supplemental Evidence, ECF 57, is GRANTED. An implementing Order follows.


Dated:  February 10, 2020                                                           /s/

                                                                          Stephanie A. Gallagher
                                                                          United States District Judge

---

[19] The Court does not intend to suggest any future cause of action, but only notes one of the "negative impact[s] which [Plaintiffs'] accommodation *may* have." *Bryant*, 923 F. Supp. at 737 (emphasis added). Indeed, use of the prior BMDs resulted in a lawsuit brought by affected candidates. *See* Petition for Judicial Review & TRO, *Trone v. Md. State Bd. of Elections*, No. C-02-CF-16-000741 (Md. Cir. Ct. Mar. 4, 2016) (attached to the Motion to Dismiss as ECF 17-3).

[20] At this juncture, the Court declines to address the Board's additional argument that Plaintiffs' proposed relief would fundamentally alter Maryland's voting system. Further, because Plaintiffs have failed to demonstrate a likelihood of success as to the reasonableness of their proposal, and because the Board has demonstrated a likelihood of success on their undue burden defense, the Court need not address the other three necessary conditions for awarding injunctive relief. *See Pashby*, 709 F.3d at 320–21.